1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  RONALD D. FLYNN, State Bar #184186
   Chief Deputy City Attorney
3  JON GIVNER, State Bar #208000
   ANDREW SHEN, State Bar #232499
4  JOSHUA S. WHITE, State Bar #237223
   Deputy City Attorneys
5  1 Dr. Carlton B. Goodlett Place
   City Hall, Room 234
6  San Francisco, California 94102-4682
   Telephone:    (415) 554-4661
7  Facsimile:    (415) 554-4699
   E-Mail:       joshua.white@sfgov.org
8

9  Attorneys for Defendant
   JOHN ARNTZ, in his official capacity as
10 Director of the San Francisco Department of
   Elections

11

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15

16 VOTING RIGHTS DEFENSE PROJECT,        Case No. 16-cv-02739 WHA
   AMERICAN INDEPENDENCE PARTY,
   CLARA DAIMS, and SUZANNE             **OPPOSITION OF SAN FRANCISCO
17 BUSHNELL,                             DIRECTOR OF ELECTIONS JOHN ARNTZ
                                         TO PLAINTIFFS' MOTION FOR
18        Plaintiffs,                    PRELIMINARY INJUNCTION**

19        vs.                            Hearing Date:   June 1, 2016
                                         Time:           11:00 a.m.
20 ALEX PADILLA, in his official capacity as   Judge:    Hon. William H. Alsup
   Secretary of State and an indispensable party,  Place: Ctrm. 8, 19th Floor
21 TIM DEPUIS, in his official capacity as chief
   of the Alameda County Registrar of Voters,
22 JOHN ARNTZ, in his official capacity as
   Director of the San Francisco Board of
23 Elections, and DOES I–X,

24        Defendants.

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

FACTUAL BACKGROUND ....................................................................................... 2

    I.    SAN FRANCISCO'S DEPARTMENT OF ELECTIONS .................................. 2

    II.    THE PRESIDENTIAL PRIMARY ELECTION ON JUNE 7, 2016. .................... 3

    III.    THE DEPARTMENT HAS MADE EXTENSIVE EFFORTS TO INFORM NPP VOTERS THAT THEY MAY VOTE IN A PRESIDENTIAL PRIMARY ... 3

    IV.    THE DEPARTMENT HAS ALSO MADE EXTENSIVE EFFORTS TO INFORM VOTERS WHO HAVE EXPRESSED A PARTY PREFERENCE THAT THEY MAY CHANGE THAT PREFERENCE. ......................................... 8

    V.    PROCEDURES FOR VOTING BY MAIL IN SAN FRANCISCO. .................... 10

        A.    The Use of April 18 on the Department's Mailers Informing NPP Voters Who Have Already Applied to Vote by Mail that They May Request a Crossover Ballot ...................................................................................... 10

        B.    The June 1 Deadline for Receiving Requests for Replacement Vote-by-Mail Ballots By Voters Who Have Already Applied to Vote by Mail. ..... 12

    VI.    THE DECLARATIONS SUBMITTED BY PLAINTIFFS DO NOT SUPPORT THEIR CASE ............................................................................................. 13

PROCEDURAL HISTORY ........................................................................................ 14

ARGUMENT ........................................................................................................... 16

    I.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS. ........................................................................................... 16

        A.    The Department Did Not Violate the Voting Rights Act. ......................... 16

        B.    The Department Did Not Violate the Constitution. .................................. 19

        C.    Plaintiffs' Request for a Writ of Mandamus for Alleged Violations of State Law Fails ....................................................................................... 20

            1.    The Statute Under Which Plaintiffs Seek Mandamus Relief—28 U.S.C. § 1361—Does Not Authorize An Injunction Against a Local Official for Violations of State Law. ................................... 20

            2.    Even If This Court Had Jurisdiction Under 28 U.S.C. § 1361, the Department Did Not Violate the California Elections Code. ........ 21

    II.    PLAINTIFFS HAVE NOT SUFFERED AND WILL NOT SUFFER ANY INJURY, MUCH LESS AN IRREPARABLE ONE ........................................... 23

    III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST STRONGLY FAVOR DENYING PLAINTIFFS' MOTION. .................................................. 24

CONCLUSION ........................................................................................................ 25

1

## TABLE OF AUTHORITIES

**Cases**

*Arizona Libertarian Party v. Reagan*
  798 F.3d 723 (9th Cir. 2015) ........................................................................19

*Ayers-Schaffner v. DiStefano*
  37 F.3d 726 (1st Cir. 1994) ..........................................................................20

*Barber v. Beard*
  2015 WL 506254 (S.D. Cal., Feb. 5, 2015) ................................................21

*Burdick v. Takushi*
  504 U.S. 428 (1992) ......................................................................................19

*Burns v. Fortson*
  410 U.S. 686 (1973) ......................................................................................19

*Caribbean Marine Servs. Co., Inc. v. Baldridge*
  844 F.2d 668 (9th Cir. 1988) ........................................................................23

*Ciacci v. Hawaii Government*
  2012 WL 6697569 (D. Hawaii, Dec. 24, 2012) ...........................................21

*Citibank v. Citytrust*
  756 F.2d 273 (2d Cir. 1985) .........................................................................23

*Crawford v. Marion County Election Board*
  553 U.S. 181 (2008) ......................................................................................19

*Dudum v. Arntz*
  640 F.3d 1098 (9th Cir. 2011) ......................................................................19

*Fed. Trade Comm'n v. Affordable Media, LLC*
  179 F.3d 1228 (9th Cir. 1999) ......................................................................24

*Fed. Trade Comm'n v. World Wide Factors, Ltd.*
  882 F.2d 344 (9th Cir. 1989) ........................................................................24

*Florida State Conference of N.A.A.C.P. v. Browning*
  522 F.3d 1153 (11th Cir. 2008) ....................................................................18

*Friedman v. Snipes*
  345 F.Supp.2d 1356 (S.D. Fla. 2004) ...........................................................16

*Gonzalez v. State of Arizona*
  2006 WL 3627297 (D. Ariz., Sept. 11, 2006) ..............................................17

*Lemons v. Bradbury*
  538 F.3d 1098 (9th Cir. 2008) ......................................................................19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Libertarian Party of Washington v. Munro*
   31 F.3d 759 (9th Cir. 1994) ............................................................................19

*Luke v. Abbott*
   954 F.Supp. 202 (C.D. Cal., March 5, 1997) ...............................................15

*Lydo Enterprises, Inc. v. City of Las Vegas*
   745 F.2d 1211 (9th Cir. 1984) .....................................................................23

*Marston v. Lewis*
   410 U.S. 679 (1973).......................................................................................19

*Newton v. Poindexter*
   578 F.Supp. 277 (E.D. Cal., Jan. 18, 1984) ................................................21

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*
   762 F.2d 1374 (9th Cir. 1985) .....................................................................23

*Purcell v. Gonzalez*
   549 U.S. 1 (2006)...........................................................................................24

*Reynolds v. Sims*
   377 U.S. 533 (1964).......................................................................................24

*Rosario v. Rockefeller*
   410 U.S. 752 (1973).......................................................................................19

*Schwier v. Cox*
   340 F.3d 1284 (11th Cir. 2003) ...................................................................16

*Southwest Voter Registration Educ. Project v. Shelley*
   344 F.3d 914 (9th Cir. 2003) .......................................................................25

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008)...............................................................................2, 16, 23

**Statutes**

28 U.S.C. § 1361 .....................................................................................2, 20, 21

52 U.S.C. § 10101(a)(2)(A) ....................................................................1, 16, 17

52 U.S.C. § 10101(a)(2)(B) ....................................................................1, 16, 18

Cal. Elections Code
   § 3000, *et seq.* ................................................................................................3

Cal. Elections Code
   § 3001 ..............................................................................................................3

Cal. Elections Code
   § 3006 ...........................................................................................................14, 18, 22

Cal. Elections Code
   § 3006(c) ...........................................................................14, 17, 20, 21, 22, 25

Cal. Elections Code
   § 3007 ...........................................................................................................22

Cal. Elections Code
   § 3007.5 ...........................................................................................................17

Cal. Elections Code
   § 3007.7(e) ...........................................................................................................17, 21

Cal. Elections Code
   § 3020 ...........................................................................................................13

**Rules**
Civil Local Rule 6-3(a) ...........................................................................................................15

**San Francisco Ordinances, Charters & Codes**
City and County of San Francisco, Charter (1996)
   Article XIII, Section 13.104 ...........................................................................................................15

**Internet References**
http://sfelections.org/tools/vbmapp/ index.php.........................................................................................21

Without any evidence or legal support, Plaintiffs charge that San Francisco's Department of Elections ("Department") has violated the Constitution, the Voting Rights Act, and California law by failing to adequately inform voters who have not expressed a party preference ("NPP" voters) that they can vote in the Democratic, Libertarian, or American Independent presidential primaries on the June 7, 2016 election, and by failing to adequately inform voters who have expressed a party preference that they can change that preference.  This is hogwash.  The Department has engaged in a massive public outreach effort over the last four months to educate voters about these precise issues and provide them with the means to select the presidential primary in which they'd like to vote.  Among many other efforts, the Department has sent a mailer to all NPP voters who have applied to vote by mail informing them that they can vote in one of the presidential primaries by submitting an attached, postage paid form.  Similarly, all NPP voters who go to the Department's website to look up their registration status or apply to vote by mail will see that, to vote in a presidential primary, they must fill out a form that they can access by clicking on a link.  The Department has also sent a Voter Information Pamphlet ("VIP") to every registered San Francisco voter explaining how NPP voters can vote in a presidential primary, and on the back of every VIP sent to an NPP voter is a form that the voter can submit to the Department indicating the primary in which he or she would like to vote.  In addition, the Department trains poll workers to inform NPP voters at the polling place on Election Day that they may vote in a presidential primary, and every polling place has a sign that contains this information.  The Department's efforts to inform voters who have selected a party preference how to change that preference have been just as extensive.

Ignoring the Department's outreach campaign entirely, Plaintiffs assert a variety of baseless legal claims.  *First,* Plaintiffs assert that the Department has violated two provisions of the Voting Rights Act, 52 U.S.C. § 10101(a)(2)(A) and 10101(a)(2)(B).  But the first provision on which Plaintiffs rely applies only to voter registration practices, and is inapplicable to this case.  And the second provision restricts registrars from omitting material information from voter materials, when the Department did just the opposite here.  *Second*, Plaintiffs argue that the Department has violated the First Amendment and the Fourteenth Amendment's Equal Protection Clause by supposedly failing to provide sufficient information to NPP voters about their right to vote in a presidential primary.  This

claim fails because, far from burdening the voting rights of San Franciscans, the Department has gone to great lengths to help San Franciscans fulfill those rights.  *Third*, Plaintiffs argue that the Department has violated a provision of the California Elections Code that requires the Department to inform NPP voters that they may vote in a presidential primary.  As a legal matter, Plaintiffs' claim fails because the statute under which they are seeking relief—28 U.S.C. § 1361—applies exclusively to violations of law by federal officials, not state or local officials.  And as a factual matter, Plaintiffs' claims fail because the Department went above and beyond its statutory duty to educate all voters about voting in the presidential primary and their right to change their party preference.

In addition to not establishing a likelihood of success on the merits, Plaintiffs have also fallen short on every other element of the test for a preliminary injunction.  *See Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008).  There has been no irreparable injury—indeed, there has been no injury whatsoever—as the Department has provided Plaintiffs, like all San Francisco voters, with all required information regarding which presidential primaries they can vote in and how to change their party preference.  Any alleged injury to Plaintiffs or any San Francisco voters is so speculative that even Plaintiffs are unable to articulate a concrete harm.  In addition, the balance of hardships and the public interest weigh strongly against a preliminary injunction here.  The remedies Plaintiffs seek are impossible, unnecessary, and/or unwarranted, and would sow confusion on the eve of Election Day.  For these reasons, the Court should deny the motion for preliminary injunction.

## FACTUAL BACKGROUND

### I.   SAN FRANCISCO'S DEPARTMENT OF ELECTIONS.

The Department conducts all federal, state and local elections in San Francisco.  Declaration of John Arntz ("Arntz Dec.) ¶ 2.  Serving nearly 467,000 registered voters, the Department must ensure that the City meets all applicable legal deadlines, that it has adequate staff and equipment to provide election services, that the recording and tabulation of votes is accurate and secure, and that voting equipment and polling places are usable and accessible to voters.  *See id.*  For the presidential primary election on June 7, 2016, the Department has hired approximately 250 temporary employees, including more than 30 dedicated to voter services and outreach.  *See id.*  On Election Day, the Department will manage 576 polling places staffed by 2,500 volunteer poll workers.  *See id.*

1   Federal, state and local law closely regulate and prescribe nearly every aspect of the

2   Department's operations to ensure that San Francisco's elections are fair and functional.  *See id.* ¶ 3.

3   In compliance with these laws, the Department must adhere to a strict schedule to complete essential

4   tasks for each election, including: ordering ballot supplies; preparing and printing ballots; mailing

5   overseas and other vote-by-mail (formerly known as absentee) ballots; printing and distributing

6   information to the voters; training employees and poll workers; testing the accuracy of every voting

7   machine that will be used in the election; counting and tabulating votes; and conducting a mandatory

8   post-election hand count to verify election results.  *See id.* ¶ 3.

9   **II.      THE PRESIDENTIAL PRIMARY ELECTION ON JUNE 7, 2016.**

10   When registering to vote in California, a person has the option of selecting a political party

11   preference.  *See id.* ¶ 4.  Voters who register to vote without stating a party preference are known as

12   "No Party Preference" or NPP voters.  *See id.*  Each political party has the option of allowing NPP

13   voters to vote in its presidential primary.  *See id.*  For California's presidential primary election on

14   June 7, 2016, three political parties have chosen to allow NPP voters to vote on their presidential

15   primary ballot:  the Democratic Party, the American Independent Party, and the Libertarian Party.  *See*

16   *id.* ¶ 3.

17   State law establishes the procedures for voting by mail.  *See* Cal. Elections Code § 3000, *et*

18   *seq.*  To obtain a vote-by-mail ballot, a person must apply by filling out an application and transmitting

19   it to the Department by the seventh day prior to the election.  Cal. Elections Code § 3001.  For the

20   June 7 election, that deadline is May 31.  *See id.* ¶ 5.

21   **III.     THE DEPARTMENT HAS MADE EXTENSIVE EFFORTS TO INFORM NPP
           VOTERS THAT THEY MAY VOTE IN A PRESIDENTIAL PRIMARY.**

22   The Department has made extensive efforts to inform NPP voters—both those who have

23   applied to vote by mail and those who will be voting in-person at a polling place—that they may vote

24   in one of the three presidential primaries.  *See id.* ¶ 6.

25   *First*, the Department has sent mailers to all NPP voters who have already applied to vote by

26   mail informing them that they may request a "crossover ballot," i.e., a ballot that allows them to vote

27   in a presidential primary in the June election.  *See id.* ¶ 7, Ex. A.  The mailers state:

28

You did not indicate a preference for a qualified political party when you registered to vote.  Each political party can allow voters with no party preference to vote in its presidential primary election.  For the June 7 Presidential Primary Election, the following political parties will allow voters with no party preference to vote in their primary election for President of the United States:

American Independent Party        Democratic Party        Libertarian Party

To request a ballot that includes the presidential primary contest of one of these parties, mark the name of the party on the attached postage paid postcard, and sign and return the postcard no later than April 18. If you do not request the ballot of one of these parties, your ballot will not include a contest for President.

Vote-by-mail ballots will be mailed in early May (April for military and overseas voters). For more information about the June 7 election, visit sfelections.org or call the Department of Elections at (415) 554-4375. Alternatively, you may call the Secretary of State at (800) 345-8683 or visit sos.ca.gov.

*See id.*, Ex. A.  In addition, each mailer includes an application that allows NPP voters to request a vote-by-mail ballot for one of the three political parties.  *Id.*

*Second*, the Department includes a detailed "Voting Instructions" guide with every vote-by-mail ballot sent to San Francisco voters.  *See id.* ¶ 8, Ex. B.  That guide states, in relevant part:

If you chose no party preference when you registered to vote, your ballot will not include a presidential primary contest. You may request a ballot that includes the presidential primary contest of one of the three parties that chose to allow voters with no party preference to participate: American Independent, Democratic, or Libertarian. Call (415) 554-4375 or visit sfelections.org/ vbmstatus. If you have already requested a ballot with the presidential primary contest, the enclosed ballot reflects your request.

*See id.* ¶ 8, Ex. B.  An NPP voter may then request a replacement ballot that includes a presidential primary ballot.  *See id.* ¶ 8.  The guide includes a link to the Department's website where the voter can request a replacement ballot.  *See id.* ¶ 8, Ex. B.  A copy of the replacement ballot form is attached as Exhibit C to Director Arntz's declaration.

*Third*, in early May 2016, the Department provided a Voter Information Pamphlet ("VIP") to every registered San Francisco voter.[1]  *See id.* ¶ 9.  Though the substance of the VIP is the same for all voters, the back cover varies depending on whether or not the voter has expressed a party preference. *See id.* ¶ 9. All back covers contain a vote-by-mail application.  *See id.* ¶ 9.  However, for NPP voters, the application includes the option to select a party preference:

---

[1] In addition, the Department mails VIPS to people who register to vote after the VIPs have been mailed.  Arntz Dec., ¶ 9.  The VIP is also available online in multiple languages.  *See id.*

> According to our records, you did not indicate a preference for a qualified political party when you registered to vote.  For this election, the following political parties will allow voters with no party preference to vote in their primary election for President of the United States: American Independent, Democratic, Libertarian.
>
> Note: If you do not request the ballot of one of these parties, your ballot will not include a contest for President.
>
> I have declined to disclose a preference for a qualified political party.  However, for this primary election only, I request a vote-by-mail ballot of the _____ party (choose one):
>
> ___American Independent     ___Democratic      ___Libertarian
>
> For more information, call 1-800-345-VOTE, or visit sos.ca.gov.

*See id.* ¶ 9, Ex. D.[2]  A voter who submits this application will receive a crossover ballot for the presidential primary indicated on the application.  *See id.* ¶ 9.

*Fourth*, the Department's website offers voters an online tool to look up their voter registration status.  *See id.* ¶ 10, Ex. F, G.  An NPP voter who looks up his status will be informed that he is an NPP voter.  *See id.* ¶ 10, Ex. F, G.  If the voter has not applied to vote by mail (i.e., will be voting in person at a polling place), the website states:

> Our records indicate that you declined to disclose a preference for a qualified political party when you registered to vote.  For this primary election only, you may request a ballot that includes the presidential primary contest of one of these parties: American Independent, Democratic, Libertarian.
>
> When you vote on Election Day, please ask a poll worker for the ballot you prefer.

*See id.* ¶ 10, Ex. F.  If the NPP voter has applied to vote by mail, the voter is provided the same statement, but is also informed that to vote in one of the presidential primaries, he must request a crossover ballot for one of the three political parties that have opened their presidential primaries to NPP voters.  *See id.* ¶ 10, Ex. G.

*Fifth*, an NPP voter who signs up on the Department's website to vote by mail will be provided with similar information.  The first step in the online application process is to enter the voter's house number, zip code, and date of birth.  *See id.* ¶ 11, Ex. H.  From this information, the Department can determine if the person is an NPP voter.  *See id.* ¶ 11.  If so, the voter is informed that he has the

---

[2] Exhibit E to Director Arntz's declaration is the back page of a VIP that a non-NPP voter would receive.

option of voting in one of the presidential primaries, and that to do so, he must fill out an application. *See id.* ¶ 11, Ex. I.  The page contains a link to that application.  *See id.*[3]

*Sixth*, the Department has trained all poll workers to inform NPP voters that they have the option of voting for one of the three designated parties.  *See id.* ¶ 12, Ex. K.  In addition, every polling place in San Francisco has a sign informing NPP voters that they may vote in one of these primaries. *See id.* ¶ 12, Ex. L.

*Seventh*, the VIP, which, as noted above, is sent to every registered San Francisco voter and is available on the Department's website, provides answers to questions such as "What does party preference mean?"; "How can I find out my party preference?"; "How can I change my party preference?" and "I did not disclose a party preference when I registered to vote.  What ballot will I receive?"  *See id.* ¶ 9, Ex. D at 12-13.  The answer provided to the latter question is:

> All voters, regardless of party preference, can vote in contests for voter-nominated offices, nonpartisan offices, and ballot measures. For the June 7 election, three parties will allow voters with no party preference to participate in their presidential primary elections: the American Independent Party, the Democratic Party, and the Libertarian Party. You can request to vote in one of these party primaries, or you will receive a ballot with no presidential contest.
>
> If you vote by mail: you may request a party ballot by indicating your choice on the Vote-by-Mail Application on the back cover of this pamphlet. The Department of Elections must receive this application no later than  5 p.m. on May 31.
>
> If you vote in person: you may request the ballot of your choice from a poll worker when you sign the roster.

*See id.*  The VIP also provides an easy-to-understand flow chart explaining that NPP voters may vote in any of the three designated presidential primaries, whereas voters registered for a political party may only vote in the party's presidential primary.  *See id.* ¶ 9, Ex. D at 13.[4]  In addition, a letter from

---

[3] Plaintiffs allege that the portion of the Department's website that allows voters to sign up to receive a vote-by-mail ballot "failed to provide the mandatory notice to all voters of their right to state no party preference, and further, that a no party preference voter shall be provided with a Democratic, American Independent Party or a Libertarian Party Presidential primary ballot." (Docket No. 29 at 15; *see also* Dec. of James Roguski, ¶ 8.)  This is wrong.  As noted above, after a voter enters his house number, zip code, and date of birth, the website will indicate whether or not he has expressed a party preference. Arntz Dec., ¶ 11, Ex. I.  If he is an NPP voter, the website informs him that he may request a ballot to vote in one of three presidential primaries, and includes a link to request such a ballot.  *See id.* ¶ 11, Ex. I.

[4] Plaintiffs allege that the VIP did not properly inform "voters that were members of political parties" of their "right to state no party preference."  (Docket No. 29 at 15.)  This is false, as the VIP

Director Arntz at the front of the VIP explains that "the party preference that voters selected when registering to vote determines which candidates will appear on their ballots for these contests," but that three parties have allowed NPP voters to vote in their primaries.[5]  *See id.*, Ex. D at 4.

*Eighth*, on April 5, 2016, the Department sent a mailer to every household in San Francisco— over 362,000 in all—reminding them to vote and stating: "To learn what's on the ballot and why your political party preference makes a difference in the Presidential Primary, go to sfelections.org/ June2016."  *See id.* ¶ 14, Ex. M.  That link, among other things, informs NPP voters that they can vote in the presidential primary for any of the three designated parties.  *See id.* ¶ 14, Ex. N.[6]

*Ninth*, the Department has issued five press releases advising that, "Voters who did not select a party preference when registering to vote, will receive a ballot that does not include a presidential contest unless they request a ballot of one of the parties allowing voters with no party preference to participate in their presidential primaries."  *See id.* ¶ 15, Ex. O.  Those press releases explain how NPP voters can select a presidential primary ballot.

*Tenth*, the Department maintains an active social medial presence, regularly issuing tweets and Facebook updates informing NPP voters that they can vote in one of the primaries.  *See id.* ¶ 16, Ex. P. For example, on April 8, the Department issued a Tweet and Facebook post to its more than 1,500 combined followers stating: "June 7 no party preference voting for president?" and attached a flowchart informing NPP voters the presidential primaries in which they are entitled to vote.  *See id.* Similarly, on May 10, 2016, the Department posted: "Registered 'no party'?  Check your vote-by-mail ballot.  You can request Al, Dem, or Lib party ballot."  *See id.*  And on May 2, 2016, the Department

---

informs all voters that they may change their party preference and explains how to do so.  Arntz Dec. ¶ 21, Ex D.

[5] Plaintiffs urge the Court to disregard the VIP because, "A substantial portion of the population struggles with functional illiteracy and cannot be expected to drink from a firehose of information."  (Docket No. 29 at 23-24.)  But the VIP is written for people at an eighth grade reading level and is remarkably easy to understand.  Arntz Dec. ¶ 9.  In any event, even if one disregards the VIP, many of the Department's other outreach efforts focus exclusively on the NPP issue and are a far cry from a "firehose of information."

[6] Many of the documents, websites, and ballots referenced above are available in English, Spanish, Chinese, and Filipino.  Arntz Dec., ¶ 19.  The Department provides voters with multiple opportunities to select their preferred language, and once the voter has expressed a preference, all materials sent to that voter will be in English and that language.  *See id.*

posted: "Party Matters in a Presidential Primary!  Confirm your political party preference."  *See id.*

That post provided links to the Department's website further explaining this issue and providing tools

for vote-by-mail voters to request a presidential primary ballot.  *See id.*

*Eleventh*, the Department maintains a voter outreach desk that is staffed by people who are

knowledgeable about how to change party preference and how to request crossover ballots, among

other issues.  *See id.* ¶ 17.  Any person with questions can call the help desk number, which the

Department publishes in numerous locations, or come into the Department and speak with voter

outreach personnel.  *See id.* ¶ 17, Ex. A-C, E-I, K-R, T.

*Finally,* the Department has conducted an extensive outreach campaign to educate voters about

a host of issues, including the implications of being an NPP voter and how to obtain a crossover ballot.

*See id.* ¶ 18.  In all, the Department has provided informational materials to over 700 civic partners

through a variety of means.  *See id.*  For example, Department representatives distribute materials and

provide presentations at events, fairs, and festivals across the City.  *See id.* ¶ 18, Ex. Q, R.  The

Department pays to post informational materials on the interior of 1,000 Muni vehicles, the exterior of

100 Muni vehicles, and inside 22 Muni and BART stations.  *See id.* ¶ 19, Ex. S.  The Department also

delivers and mails the materials to community-based organizations, such as Chinese for Affirmative

Action, LGBT Community Center, and the Mission Economic Development Agency, as well as to

schools, City departments, and libraries.  *See id.* ¶ 19, Ex. Q.  Finally, the Department has placed ads

in local newspapers such as San Francisco Examiner, SF Weekly, Bay Area Reporter, 14 San

Francisco neighborhood newspapers, the Asian Journal, Philippine News, Vietnam Daily News, Sing

Tao, World Journal, La Opinion de la Bahia, El Tecolote, Nichi Bei Weekly, and the Korean Times.

*See id.* ¶ 18, Ex. T.

## IV.    THE DEPARTMENT HAS ALSO MADE EXTENSIVE EFFORTS TO INFORM VOTERS WHO HAVE EXPRESSED A PARTY PREFERENCE THAT THEY MAY CHANGE THAT PREFERENCE.

Although Plaintiffs' claims focus primarily on the information provided to NPP voters,

Plaintiffs also accuse the Department of failing to notify voters with a party preference that they have

the ability to switch parties.  (See, *e.g.*, Docket No. 29 at 15.)  To the contrary, the Department's

efforts to inform voters who have expressed a political preference that they may re-register for a different political party have also been extensive.  *See id.* ¶ 20.

*First*, the VIP, which contains a discussion of "Voting in the June 2016 Presidential Primary Election" states:

> **How can I change my party preference?**
>
> If you want to change your political party preference, you must reregister to vote. The registration deadline for the June 7 election is May 23.
>
> Reregister at registertovote.ca.gov, or call the Department of Elections at (415) 554-4375 to request that a voter registration card be mailed to you. You may also fill out a voter registration card in person at the Department of Elections in City Hall.

*See id.* ¶ 21, Ex. D at 12-13.

*Second*, every envelope containing a vote-by-mail ballot sent to San Francisco voters includes a "Voting Instructions" guide that states: "If you chose a party preference when you registered to vote, the enclosed ballot includes, among other contests, all contests specific to that party. If you want to change your political party preference, you must reregister to vote by May 23."  *See id.* ¶ 22, Ex. B. This guide is also available on the Department's website, on a portion of the site devoted to "Voting in the June 7, 2016, Election."  *See id.*

*Third*, every voter who uses the Department's voter registration tool to determine if he is registered to vote, the political party for which he is registered, and his polling place, is informed that he may change his party preference:

> If you want to change your party preference, name, or home address in time for this election, you must reregister by May 23 at registertovote.ca.gov. Alternatively, you may call (415) 554-4375 for a registration form to be mailed to you.
>
> To make changes to your voter registration, or to register to vote, please go to the Secretary of State website for a registration form or more information. You can also obtain a voter registration card from the Department of Motor Vehicles (DMV), public libraries, or post offices.

*See id.* ¶ 23, Ex. F-G.

*Fourth,* as noted above, the Department sent a mailer to every household in San Francisco— over 362,000.  *See id.* ¶ 24, Ex. M.  That mailer, among other things, informed voters they could

change their party preference: "Voting June 7: To register to vote—or update your registration to change your political party, home address, or name—go to registertovote.ca.gov by May 23."  *See id.*

*Fifth*, the Department's outreach materials, which, as noted above, have been provided to over 700 civic partners and distributed at events throughout San Francisco leading up to Election Day, inform voters that they may change their party preference and how to do so.  *See id.* ¶ 25, Ex. M-O, R-T.

*Finally*, the Department has provided information about how voters can change party preference via its social media posts, its help desk, and its press releases, all of which are described above.

## V.   PROCEDURES FOR VOTING BY MAIL IN SAN FRANCISCO.

### A.   The Use of April 18 on the Department's Mailers Informing NPP Voters Who Have Already Applied to Vote by Mail that They May Request a Crossover Ballot.

As noted above, the Department sent mailers to all NPP voters *who have already applied to vote by mail* informing them that they may request a crossover ballot.  *See id.* ¶ 31, Ex. A.  Those forms state, among other things: "To request a ballot that includes the presidential primary contest of one of these parties, mark the name of the party on the attached postage-paid postcard, and sign and return the postcard *no later than April 18*. If you do not request the ballot of one of these parties, your ballot will not include a contest for President."  *See id.*  (emphasis added).

The Department's goal is for voters to receive their vote-by-mail ballots three to four weeks before Election Day.  *See id.* ¶ 32.  The use of the April 18 date on the mailers is not legally mandated but it is based on the operational requirements of the Department and the third-party vendor with which the Department contracts to print and assemble vote-by-mail ballots.  *See id.*  255,000 of San Francisco's 467,000 registered voters have applied to vote by mail.  *See id.*  Given that substantial number, the vendor, which also contracts with numerous other counties in California and other states, requested two weeks to print and assemble the ballots, then have them driven from Washington to a United States Post Office facility in Richmond, where they were placed in the mail.  *See id.*  Shortly after April 18, the Department sent the vendor an "extract" containing the information regarding which San Francisco voters had applied to receive vote-by-mail ballots and the ballots those voters should

receive.  *See id*.  The batch of ballots generated from that extract was placed in the mail in San Francisco on May 4 and 5, 2016, *See id.*, such that voters likely received them three to four weeks before Election Day.

After sending the initial extract to the vendor, the Department sends supplemental extracts on a regular basis.  *See id.* ¶ 33.  Once an NPP voter who has applied to vote by mail submits a request for a crossover ballot, the minimum amount of time that the vendor can process that request is approximately 72 hours, plus mailing time.  *See id.*  Larger extracts can take the vendor up to two weeks to process.  *See id.*   The vendor mails vote-by-mail ballots generated from supplemental extracts from Washington, not San Francisco; as such, mailing times are longer.  *See id.*

The Department promptly transmits to the vendor all requests for crossover ballots from NPP voters, including requests received after April 18.  *See id.* ¶ 34.  Thus, NPP voters who have applied to vote by mail and who have submitted their request for a crossover ballot will receive one, even if they submitted that request after April 18 (so long as the Department receives the request with enough time to provide the voter with a replacement ballot by Election Day). [7]  *See id.*

Plaintiffs take issue with this statement on the Department's mailers: "To request a ballot that includes the presidential primary contest of one of these parties, mark the name of the party on the attached postage-paid postcard, and sign and return the postcard *no later than April 18*. If you do not request the ballot of one of these parties, your ballot will not include a contest for President." However, this statement is accurate:  NPP voters who did not submit the form by April 18 received ballots that did not include a contest for President.  *See id.* ¶ 35.  This is because, immediately after April 18, the Department sent the extract to the vendor, which printed and assembled the ballots and drove them to Richmond, where they were mailed on May 4 and 5.  *See id.*  Such voters, however, were also informed—through the numerous ways explained above, including the Voting Instructions guide included in every vote-by-mail ballot envelope—that they could still vote in a presidential

---

[7] The declaration of Tanya Mena (Docket No. 14-1) supports this aspect of Director Arntz's testimony.  As explained in greater detail in Section VI, the reason Ms. Mena received her Democratic primary ballot is because she returned her mailer to the Department after April 18, not because she re-registered to vote as a Democrat.  *See* Arntz Dec. ¶¶ 39-40.  Indeed, she is still registered as an NPP voter.  *See id.* ¶ 40.

primary by requesting a replacement ballot.  *See id.*  A link to that ballot replacement request form is included on the Voting Instructions guide.  *See id.*, Ex. B.

Plaintiffs have argued that the Department's mailers should not have used April 18, but instead, a much later date given that NPP voters who have applied to vote by mail can technically request a crossover ballot much closer to Election Day.  However, a later date would be infeasible from an operational standpoint.  *See id.* ¶ 36.  If, for example, the Department used May 31 as the deadline, voters who submitted their request on that date would not receive their vote-by-mail ballot in time to cast it.  *See id.*  A large extract would take the vendor two weeks to process, plus the time it would take to mail the ballots from Washington, which can be 10 days or more.  *See id.*

**B.      The June 1 Deadline for Receiving Requests for Replacement Vote-by-Mail Ballots By Voters Who Have Already Applied to Vote by Mail.**

Plaintiffs have also taken issue with the fact that the Department's ballot replacement request form states that the Department must receive the request by June 1.  In Plaintiffs' view, June 1 is inaccurate, because the deadline to apply to vote-by-mail is May 31.  (*See* Docket No. 12, ¶ 11; Docket No. 27, ¶ 5.)  Plaintiffs, however, misunderstand the purpose of the ballot replacement request form.

That form, which is entitled "Replacement Ballot Request for Voters with No Party Preference" states, among other things: "To request a replacement ballot of one of these parties, complete the form below and return it to the Department as soon as possible to ensure it reaches us by Wednesday, June 1.  A replacement ballot will be sent to you if the information on this form is complete and accurate."  *See id.*, ¶ 37, Ex. C.  Critically, this form is *not* an application to vote by mail.  Rather, its purpose is to allow a person who has *already* applied to vote by mail to obtain a replacement vote-by-mail ballot.  *See id.*  For this reason, the form does not state that the deadline to apply to vote by mail is June 1; but rather, it says that a person who has already applied to vote by mail may obtain a replacement ballot (that includes a crossover ballot) by submitting the form to the Department by June 1.  *See id.*

The Department must receive replacement requests by June 1 in order to ensure that voters receive their replacement ballots in time to actually cast their votes.  *See id.* ¶ 38.  Before using this

June 1 date, the Department was informed by the United States Post Office that items mailed using first class postage may require three to five days to be delivered to a voter in San Francisco. *See id*. After ballot replacement requests are received, the Department must process them, compile a replacement ballot, then mail it to the voter. *See id*. Requests received after June 1 run the risk of not reaching the voter until after Election Day, after which point the vote could not be counted. *See* Cal. Elections Code § 3020.

## VI. THE DECLARATIONS SUBMITTED BY PLAINTIFFS DO NOT SUPPORT THEIR CASE.

Plaintiffs include several declarations in support of their motion, few of which pertain to San Francisco.[8] Those that do are unhelpful to Plaintiffs' case.

Tanya Mena alleges that she "changed her registration to Democratic so I was certain I could vote for a Democratic candidate in the Presidential primary." (Docket No. 14-1, ¶ 1; *see also* ¶ 3.) This is not accurate. Ms. Mena registered to vote in San Francisco in 2014 as an NPP voter, and she has not re-registered. Arntz Dec., ¶¶ 39-40. Because Ms. Mena has applied to vote-by-mail, the Department sent a mailer, which she returned to the Department, requesting a ballot for the Democratic presidential primary. *See id*. Upon receipt of Ms. Mena's request, the Department mailed to Ms. Mena, on May 13, 2016, a ballot for the Democratic presidential primary. *See id*. In other words, the reason she received her ballot is not because she re-registered, but because she submitted the mailer. *See id*. This is consistent with Director Arntz's testimony that NPP voters who have applied to vote by mail who submit their request for a crossover ballot will receive one, even if they submitted that request after April 18. *See id*.

Plaintiffs also submit the Declaration of Claire Daims, who is an NPP voter. (Docket No. 14-2.) Ms. Daims indicates that she is worried that there will not be sufficient Democratic ballots. (Docket No. 14-2, ¶ 3.) This concern is unfounded (and lacks any basis in personal knowledge), as the Department has ordered ballots for all parties far in excess of what will realistically be needed. Arntz Dec., ¶ 41. Ms. Daims states that she has seen a "circular" stating "to request a ballot that includes the

---

[8] The declarations of Jeff Lewis (Docket No. 19), Gary Rener (Docket Nos. 13-3; 20-21), Ashley Beck (Docket Nos. 22-23), Jennifer J. Abreu (Docket Nos. 24-25), and Gabrielle Dolphin (Docket No. 14-3), do not mention the Department.

presidential primary contest of one of these parties, mark the name of the party on the attached

postage-paid postcard. . . ." (Docket No. 14-2, ¶ 4.)  Ms. Daims has not applied to vote by mail, and as

such, these mailers would not have been sent to her.  Arntz Dec., ¶ 41.  If Ms. Daims votes in person,

poll workers have been trained to inform her that she can vote in one of the three presidential

primaries.  *See id.*

The other declarations that pertain to San Francisco—those of Mr. Seidenberg and Mr.

Roguski—offer inadmissible and inaccurate legal opinions.  (Docket Nos. 12, 26.)  Mr. Seidenberg

claims that the Department violated California Elections Code § 3006 because the first page of the

online vote-by-mail application does not include certain language from that Code.  But Mr.

Seidenberg, like Plaintiffs, ignores the fact that the application presents the required information as

soon as the voter enters information identifying himself as an NPP voter.  Arntz Dec., ¶ 11, Ex. I.

### PROCEDURAL HISTORY

Plaintiffs' conduct throughout this litigation and in the time leading up to it belies their claim

that emergency relief is appropriate.  Plaintiffs' counsel first contacted the Department of Elections via

email on Friday, May 13, 2016, stating:

> Please take notice that on Monday, 5/16/16, I am filing in federal court to seek a
> TRO for injunctive/declaratory relief re: Election Code 3006 violations. The
> vote by mail applications provided to SF residents has incorrect information,
> including but not limited to not providing the info on how to provide Democrat,
> AIP and Libertarian ballots to "no party preference" voters. I will call on
> Monday about when and where in federal court the TRO will be heard.

Declaration of Joshua White ("White Dec."), Ex. A.  In response, the Department's attorney, Joshua

White, spoke by phone with Plaintiffs' counsel, explained to him that the Department complies with

its obligations under Elections Code § 3006, and further explained where the information required by

that section can be found on the Department's website and mailers.  *Id.* ¶ 2.  In addition, on Monday,

May 16, 2016, the Department's attorney emailed Plaintiffs' counsel, informing him:

> I'm going to do my best to respond to each of the concerns you raise. I'm
> hopeful and confident that we can avoid going to court.  As you will see below,
> the Department's website and mailers comply with all applicable provisions of
> the California and Municipal Elections.

*Id.*, Ex. B.  Regarding the claim that the Department does not provide NPP voters with the statement

and application required by Elections Code § 3006(c), the Department's attorney attached a screenshot

of what an NPP voter applying to vote by mail online would see, which includes the statement required by Elections Code § 3006(c).  *Id.*, Ex. B.

Plaintiffs' counsel did not reply to the email, *id.* ¶ 3, and filed his lawsuit on Friday, May 20, 2016.  On Monday, May 23, 2016, the Department's attorney called Plaintiffs' counsel and inquired as to whether he would be seeking pre-election relief, and if so, on what timeline.  *Id.* ¶ 3.  Plaintiffs' counsel responded that his hope was to seek ex parte relief and to provide his motion to the Department by the following day (i.e., Tuesday, May 24).  There was no further communication from Plaintiffs' counsel until Thursday, May 26 at 4:24 p.m., when Plaintiffs' counsel informed the Department's attorney by email: "We will be filing our ex parte request - seeking to shorten time for hearing on a preliminary injunction - and seeking to make this request to Judge Alsup himself at 3 pm."  *Id.*, Ex. C.  Before sending that email, Plaintiffs' counsel had made no effort to confer about a schedule.  *Id.* ¶ 5.  Upon receiving this email, the Department's attorney asked Plaintiffs' counsel to provide a proposed schedule as well as the statutory or other basis for Plaintiffs' motion to shorten time.  *Id.*, Ex. D.  Despite this request and in violation of Civil Local Rule 6-3(a), Plaintiffs' counsel never proposed a schedule and never provided the basis for his authority.  *Id.* ¶ 5.

On Friday, May 27, the Court ordered Plaintiffs to serve "[t]he summons, complaint, motion, and all supporting declarations, as well as this order on defendants by **TOMORROW, MAY 28 at 4:00 P.M.**"  (emphasis in original).  Plaintiffs have failed to do any of these things—none of the moving papers or supporting declarations have been provided to the Department,[9] Arntz Dec. ¶ 42, and although Plaintiffs e-filed their memorandum of points and authorities before 4:00 p.m. on May 28, the last line of that document stated that "plaintiffs will *fix the word processing errors* and ask permission to file a modified brief at 5 pm, in one hour."  (Docket No. 28 at 19) (emphasis added).  To the Department's knowledge, Plaintiffs never received permission, but nonetheless, more than an hour

---

[9] Indeed, Defendant Arntz has not even been properly served in this action.  A suit against an official in his official capacity is tantamount to a suit against the entity for which he is employed.  *Luke v. Abbott*, 954 F.Supp. 202, 203 (C.D. Cal., March 5, 1997) ("Official capacity suits are generally another way of pleading an action against an entity of which the officer is an agent.").  Here, as the Department is not an independent legal entity, the actual defendant is the City and County of San Francisco, which can only be served by delivering a summons and complaint to the Mayor's Office or the Board of Supervisors.  *See* City and County of San Francisco, Charter (1996), Article XIII, Section 13.104 (creating the Department of Elections).  Plaintiffs have failed to do either.

later, filed a brief that contained *six additional pages*, including, for the first time, a discussion of the legal authorities that Plaintiffs believe entitle them to relief.  (Docket No. 29.)

In short, Plaintiffs informed the Department that they planned to file a motion on May 16 but then failed to file or to communicate with counsel for the Department over the next ten days, finally filed their motion on the 11th day, and filed a memorandum of points and authorities (after the Court's deadline) on the 12th day.  Plaintiffs' counsel alleges that they spent that time investigating potential violations of law, but their May 28 filing demonstrates no such thing.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs fall short on every element of the *Winter* test.

## I.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Department Did Not Violate the Voting Rights Act.

Plaintiffs argue that the Department violated two provisions of the Voting Rights Act—52 U.S.C. § 10101(a)(2)(A) and 52 U.S.C. § 10101(a)(2)(B).  Neither of those provisions applies here.

Subsection (A) states:

> No person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote....

That provision "was designed to eliminate practices that could encumber an individual's ability to register to vote."  *Friedman v. Snipes*, 345 F.Supp.2d 1356, 1371 (S.D. Fla. 2004) (citing *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).  In *Friedman*, which Plaintiffs cite as "the best guidance in this situation," *see* Docket No. 29 at 20, the court rejected the plaintiff's Voting Rights Act claim because "[t]he error and omission alleged here did not pertain to determining eligibility to vote."  345 F.Supp.2d at 1372.  Like *Friedman*, this case has nothing to do with voter registration.  Rather,

Plaintiffs claim that the Department provided insufficient information to people who have already registered to vote.  Section 10101(a)(2)(A) does not apply.

Even if subsection (A) applies to people who have already registered, Plaintiffs' claim still fails.  Plaintiffs' primary argument is that the Department was obligated to provide all voters, including those who have disclosed a party preference, with the language required by Elections Code § 3006(c), which states that vote-by-mail applications

> shall inform the voter that if he or she has declined to disclose a preference for a political party, the voter may request a vote by mail ballot for a particular political party for the partisan primary election, if that political party has adopted a party rule, duly noticed to the Secretary of State, authorizing that vote. The application shall contain a toll-free telephone number, established by the Secretary of State, that the voter may call to access information regarding which political parties have adopted such a rule. The application shall contain a checkoff box with a conspicuously printed statement that reads substantially similar to the following: "*I have declined to disclose a preference for a qualified political party.* However, for this primary election only, I request a vote by mail ballot for the _____ Party."  The name of the political party shall be personally affixed by the voter.[10]

(emphasis added).  But it makes no sense to provide that statement to party preference voters for the precise reason that they have chosen to "disclose a preference for a qualified political party."

Subsection (A) does not require that every single voter be provided with identical information at the identical moment.  In *Gonzalez v. State of Arizona*, 2006 WL 3627297, at *8 (D. Ariz., Sept. 11, 2006), an Arizona law required different types of identification depending on whether an individual is registering to vote or verifying identity on election day.  *Id.* at *1.  The Court upheld the law, noting: "It is not a violation of subsection (A) for a state to apply different standards to two inherently different procedures."  *Id.* at *8.  Similarly, it would make no sense to require the Department to inform voters who have disclosed a party preference that they have not disclosed a party preference. In any event, as a factual matter, the Department has provided abundant information to all San Franciscans, both registered and unregistered, about how to vote in the presidential primary and how

---

[10] Elections Code § 3007.7(e) clarifies that Elections Code § 3006(c) applies to online vote-by-mail applications: "Except as provided in Section 3007.5 and this section, all other sections of this code pertaining to vote by mail voter applications, submissions, deadlines, and canvassing shall apply to electronic vote by mail ballot applications and applicants."

to change party preference.  *See* Arntz Dec. ¶¶ 2-27, Ex. A-T.  Plaintiffs' claim under Subsection (A) fails.

Plaintiffs' claim under Subsection (B)—sometimes referred to as the Voting Rights Act's "materiality provision"—is equally meritless.  That provision states:

> No person acting under color of law may deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

Subsection (B), in other words, "prohibits denying the right to vote based on errors or omissions that are not material in determining voter eligibility." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).  Originally enacted as part of the Civil Rights Act of 1964, Subsection (B) was part of the federal government's effort to enforce voting rights and "counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African–Americans." *Id.*

In Plaintiffs' view, the Department has denied the right of party preference voters to vote by omitting the statement required by Elections Code § 3006 from both on the online vote-by-mail application and the back cover of the VIP; and by failing to inform voters that they can hand deliver their vote-by-mail applications to the Department.  But there is no evidence or even any realistic possibility that the Department has denied anyone the right to vote.  To the contrary, the Department has gone to great lengths to inform all party preference voters they can re-register, *see* Arntz Dec., ¶¶ 20-30, and that they can drop off their vote-by-mail applications at the Department. *See id.* ¶ 29.  It is true that the vote-by-mail application on the back cover of the VIP provided to party preference voters does not state: "I have declined to disclose a preference for a qualified political party."  The reason is that, by definition, party preference voters *have* "disclose[d] a preference for a qualified political party."  For the same reason, the Department does not post that statement on the first page of the online vote-by-mail application—not all people who are applying to vote online have "declined to disclose a preference for a qualified political party."  Quite rightly, the Department has opted to avoid confusing voters.

**B.     The Department Did Not Violate the Constitution.**

Plaintiffs claim that the Department violated the First Amendment and the Fourteenth Amendment's Equal Protection Clause.  To assess the constitutionality of election laws, courts apply a "flexible standard" that weighs the burdens of such regulation against the government's interests in enacting those laws. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Focusing on "the extent to which a challenged regulation burdens First and Fourteenth Amendments rights," the Court has applied the following test:

> . . . when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.  But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Id.* at 434 (quotations and citations omitted).  If the burden is severe, the regulation is subject to strict scrutiny; if the challenged regulation is reasonable and nondiscriminatory, it may be justified by important regulatory interests.  The Supreme Court and the Ninth Circuit have consistently applied this balancing approach in considering First Amendment, Due Process, and Equal Protection challenges to election laws.  *See Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011); *Lemons v. Bradbury*, 538 F.3d 1098, 1103 (9th Cir. 2008).  Courts have occasionally described the test for reasonable, nondiscriminatory regulations as a "rational basis" test, *Libertarian Party of Washington v. Munro*, 31 F.3d 759, 761 (9th Cir. 1994), under which a plaintiff must demonstrate that the challenged regulation is "not rationally related to a legitimate state interest." *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 733-34 (9th Cir. 2015).

Applying this standard, the courts have upheld a myriad of election regulations as reasonable and non-discriminatory, even where there is a significant possibility that they would burden voters. *See, e.g., Crawford v. Marion County Election Board*, 553 U.S. 181, 185, 202-03 (2008) (plurality opinion) (voter identification); *Rosario v. Rockefeller*, 410 U.S. 752, 760-62 (1973) (advance enrollment requirement for party primary elections); *Burns v. Fortson*, 410 U.S. 686, 686-87 (1973) (requirement that voters register at least 50 days prior to election); *Marston v. Lewis*, 410 U.S. 679, 680-81 (1973) (requirement that voters reside in jurisdiction for 50 days prior to registration); *see also*

*Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729 n.8 (1st Cir. 1994) ("It is, of course, well established that states may restrict the voting privilege through residency and other requirements.").

In the present case, Plaintiffs cannot meet their burden. Indeed, it is difficult to even evaluate Plaintiffs' constitutional claim since it is unclear what that claim actually entails. To the extent Plaintiffs are claiming that it was unconstitutional for the Department not to provide the statement in Elections Code § 3006(c) to both NPP and non-NPP voters, this argument fails. That statement is designed specifically to provide information to NPP voters, and it would be unduly confusing for voters who have disclosed a preference for a qualified political party to receive a statement stating: "I have declined to disclose a preference for a qualified political party." Rather than sow confusion, the Department has, as described above, made extensive efforts to educate voters about the upcoming presidential primary election and the implications of being an NPP voter or being a party-affiliated voter. Far from burdening the voting rights of San Franciscans, the Department has gone to great lengths to help San Franciscans realize those rights.

To the extent that Plaintiffs' constitutional claim relies on the use of the April 18 deadline, that claim is meritless as there is no evidence that the use of this deadline burdened voting rights of even one person, and even if it did, that burden was minimal and justified by the Department's operational needs. To the extent that Plaintiffs' constitutional claim relies on the supposedly erroneous use of the June 1 deadline on the replacement ballot request form, that claim fails because it imposes no burden on voters; and it is justified by the operational needs of the Department.

**C.     Plaintiffs' Request for a Writ of Mandamus for Alleged Violations of State Law Fails.**

**1.     The Statute Under Which Plaintiffs Seek Mandamus Relief—28 U.S.C. § 1361—Does Not Authorize An Injunction Against a Local Official for Violations of State Law.**

Plaintiffs seek a writ of mandamus under 28 U.S.C. § 1361. However, that statute does not authorize federal courts to enjoin the conduct of state or local officials. the statute states: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel *an officer or employee of the United States* or any agency thereof to perform a duty owed to the plaintiff." (emphasis added). Because Director Arntz is not an officer or employee of the United States,

Plaintiffs cannot seek a writ of mandamus under 28 U.S.C. § 1361. *See Barber v. Beard*, 2015 WL 506254, at *6 (S.D. Cal., Feb. 5, 2015) ("But under the plain language of [28 U.S.C. § 1361], federal district courts do not have mandamus jurisdiction over state officials."); *Ciacci v. Hawaii Government*, 2012 WL 6697569, at *2 (D. Hawaii, Dec. 24, 2012) ("28 U.S.C. § 1361 provides district courts with jurisdiction in the nature of mandamus to compel officers or employees of the United States—not state agencies or actors like those named as Defendants in this action—to perform a duty owed to a plaintiff."); *Newton v. Poindexter*, 578 F.Supp. 277, 279 (E.D. Cal., Jan. 18, 1984) (holding that federal courts cannot compel action by state officials under 28 U.S.C. § 1361). Thus, all of Plaintiffs' claims premised on alleged violations of state law fail.

### 2. Even If This Court Had Jurisdiction Under 28 U.S.C. § 1361, the Department Did Not Violate the California Elections Code.

Plaintiffs allege that the Department violated provisions of the California Elections Code. Each alleged violation is discussed in turn below.

*First*, according to Plaintiffs, the Department's online vote-by-mail application feature violates Elections Code Sections 3006(c) and 3007.7(e). In Plaintiffs' view, the tool does not "provide the mandatory notice to all voters of their right to state no party preference; and, further, that a no party preference voter shall be provided with a Democratic, American Independent Party or a Libertarian Party Presidential primary ballot." (Docket No. 29 at 15.) In support of this argument, Plaintiffs cite a link to the first page of the Department's voter registration tool—http://sfelections.org/tools/vbmapp/index.php.

Plaintiffs' argument ignores the fact that the Department's online vote-by-mail application feature is two-step process, and though the cover page does not include the language from Section 3006(c), the second page does. As described above, once a voter inputs his house number, zip code, and date of birth, the Department determines if that person is an NPP voter. Arntz Dec. ¶ 11, Ex. H, I. If so, the next page provides the voter with the information required by Section 3006(c) and includes a link to a vote-by-mail application that includes the language required by Section 3006(c). *See id.* ¶ 11, Ex. I-J. It would make no sense for the first page of the online vote-by-mail application feature to include the information required by Section 3006(c) since the *all* voters see the first page. Voters who

have registered for a political party would be confused if they went to register to vote by mail and saw the statement, "I have declined to disclose a preference for a qualified political party" on the first page of the application.

*Second*, Plaintiffs assert that the Department violated Elections Code § 3006 "by preparing the Voter Information Pamphlet and Sample Ballot in a non-uniform manner." (Docket No. 29 at 15.) Plaintiffs rely on the fact that the back cover of the VIP sent to NPP voters includes the Section 3006(c) language but the back cover of the VIP sent to party preference voters does not. But again, it is nonsensical to construe Section 3006(c) to mean that voters who have disclosed a preference for a qualified political party must receive a statement saying: "I have declined to disclose a preference for a qualified political party." To be sure, other parts of the VIP as well as the Department's outreach efforts, inform voters who have selected a political party that how to change their party preference and the implications of doing so for June 7 election.[11]

*Third*, Plaintiffs argue that the Department has not properly notified people registering to vote by mail that they may personally deliver their application to the Department in City Hall. (Docket No. 29 at 16.) But as noted above, when an NPP voter fills out an application to vote by mail on the Department's website, the website states: "You may mail, <u>deliver</u> or fax the form to the address or fax number listed on the application." Arntz Dec., ¶ 29, Ex I (emphasis added). In addition, the application itself states, "<u>Deliver</u>, mail, or fax the completed application to the address or fax number listed below." *See id.*, Ex. J. (emphasis added). Though the Department's mailers that included vote-by-mail applications did not explicitly inform voters that they may hand deliver their applications to the Department, the applications included the Department's address and paid for the postage. And in

---

[11] Plaintiffs also fault the Department for deviating from the California Secretary of State's uniform vote by mail application. (Docket No. 29 at 15.) This argument fails for two reasons. First, the Department's vote by mail application conforms in all material respects to the Secretary of State's application. *See* Arntz Dec., Ex. J, U. And even if it did not, Elections Code § 3007 does not require the Department to follow the same format: "The Secretary of State shall prepare and distribute to appropriate elections officials a uniform application format for a vote by mail voter's ballot that conforms to this chapter. This format shall be followed by all individuals, organizations, and groups who distribute applications for a vote by mail voter's ballot. *The uniform format need not be utilized by elections officials in preparing a vote by mail voter's ballot application to be included with the sample ballot.*" (emphasis added).

any event, the Department's website and the VIP inform voters that they may hand deliver applications to the Department, and anyone who called the Department's help desk would receive the same information.

## II. PLAINTIFFS HAVE NOT SUFFERED AND WILL NOT SUFFER ANY INJURY, MUCH LESS AN IRREPARABLE ONE.

A preliminary injunction may only be granted when the moving party has demonstrated a real likelihood of irreparable injury or harm. *Winter,* 555 U.S. at 21. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original; internal citations omitted). A preliminary injunction cannot issue based only on the possibility of some remote future injury because "injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22.

Because interim injunctions "are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," a plaintiff's delay "tends to indicate at least a reduced need for such drastic, speedy action." *Citibank v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "By sleeping on its rights a plaintiff demonstrates the lack of need" for preliminary relief. *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) (cites and quotes omitted). A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co*., 762 F.2d 1374, 1377 (9th Cir. 1985).

Plaintiffs have failed to demonstrate that they or any San Francisco voter will suffer an injury, much less an irreparable one. As described above, the Department has gone to great lengths to educate NPP voters that they can vote in one of the presidential primaries and non-NPP voters that they re-register. All NPP voters who vote at a polling place will be informed (both by poll workers and by a sign) that they can vote in one of the primaries. All NPP voters who applied to vote by mail have been informed on multiple occasions that they can vote in one of the primaries. Similarly, the Department's outreach efforts have informed all San Francisco residents that they can register and/or re-register to

vote.  Finally, the fact that Plaintiffs' waited 15 days to seek relief—from May 13 when their lawyer first contacted the Department until May 28 when they filed the instant motion—undercuts the credibility of their claims about the existence and magnitude of injury that would befall the San Francisco electorate without emergency relief.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST STRONGLY FAVOR DENYING PLAINTIFFS' MOTION.

In "balanc[ing] the hardships of the public interest against a private interest, the public interest should receive greater weight."  *Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *Fed. Trade Comm'n v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989)).  In the elections context, the Court should act with particular caution because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).  For these reasons, the Supreme Court has counseled caution in the type of relief to be granted in cases affecting elections:

> In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.  With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

These principles strongly counsel against an injunction in this case.  All of the remedies sought by Plaintiffs are unnecessary and some of them are impossible.  One impossible remedy is to extend the voter registration deadline to Election Day.  As described in Director Arntz's declaration, this remedy would likely be fatal to the Department's ability to conduct the election.  Arntz Dec., ¶ 43.  There are currently about 397,000 San Franciscans who have not registered to vote and millions more people throughout the state who have not registered.  *See id.*  Ordering Election Day registration would be tantamount to requiring the Department to allow every single person who showed up at a polling place on Election Day to cast a ballot.  *See id.*  If this happened, the election would be plunged into chaos, as the Department has not prepared for such vast numbers of people, nor could the Department prepare for such numbers in such a short time.  *See id.*

Planning for and running an election is an incredibly complex process that requires the Department to make a series of projections related to possible voter turnout. *See id.* ¶ 44. These projections inform the number of polling places; the number of ballots, provisional ballots, and ballot envelopes to order; the number of poll workers; the number of field support personnel; and countless other operational requirements. *See id.* The projections also inform the how the Department staffs and organizes the Voting Center at City Hall. *See id.* These projections are based on the registration totals from 15 days before an election. *See id.* The Department could not conduct the election if this Court ordered the Department to open the polls to 397,000 new San Francisco voters plus the millions of non-San Francisco voters who could attempt to vote in San Francisco on Election Day. *See id.*

The other remedies sought by Plaintiffs are unnecessary because the Department is already doing them. The Department will already inform NPP voters who vote at a polling place that they can vote in a presidential primary. The Department's online vote-by-mail application already satisfies the requirements of Elections Code § 3006(c), and in any event, the deadline to apply to vote by mail is the same day as the hearing on Plaintiffs' motion. The Department is already widely distributing information that NPP voters can vote in a presidential primary. The Department has already widely distributed the fact that voters can change their party preference, and in any event, the deadline for re-registering was on May 23. The Department has already ensured that sufficient ballots will be available at every polling place.

"[E]lection cases are different from ordinary injunction cases, and "[i]nterference with impending elections is extraordinary." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003). There is no basis for such extraordinary intervention in this case.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: May 31, 2016

By:    /s/*Joshua S. White*
JOSHUA S. WHITE
Attorney for Defendant JOHN ARNTZ