(4)—establishment of rates, tolls, fares, and charges for the purpose of obtaining funds for capital projects necessary to maintain service within existing service areas.

The Board affirms these exemption determinations of the Planning Department, for the reasons set forth in the analyses in these exemptions contained in Board of Supervisors File No. 151276. The Board finds that based on the whole record before it there are no substantial project changes, no substantial changes in project circumstances, and no new information of substantial importance that would change the conclusions set forth in these exemption determinations by the Planning Department that these proposed projects are exempt from environmental review.

Section 13. The Board finds and declares that the proposed Bond is (a) in conformity with the priority policies of Section 101.1(b) of the Planning Code, (b) in accordance with Section 4.105 of the Charter and Section 2A.53(f) of the Administrative Code, and (c) consistent with the City's General Plan, and adopts the findings of the Planning Department, as set forth in the General Plan Referral Reports dated January 26, 2016, for the Public Health Projects—SFGH Building 5; January 26, 2016, for the Public Health Project—Southeast Health Center; January 26, 2016, for the Safety Project—SFFD Emergency Medical Services Facility; and [Homeless Shelter] copies of which are on file with the Clerk of the Board of Supervisors in File No. 151276.

Section 14. Under Section 53410 of the California Government Code, the bonds shall be for the specific purposes authorized in this ordinance and the proceeds of such bonds will be applied only for such specific purposes. The City will comply with the requirements of Sections 53410(c) and 53410(d) of the California Government Code.

Section 15. The Bonds are subject to, and incorporate by reference, the applicable provisions of Administrative Code Sections 5.30 – 5.36 (the "Citizens' General Obligation Bond Oversight Committee"). Under Section 5.31, to the extent permitted by law, one-tenth of one percent (0.1%) of the gross proceeds of the Bonds shall be deposited in a fund established by the Controller's Office and appropriated by the Board of Supervisors at the direction of the Citizens' General Obligation Bond Oversight Committee to cover the costs of said committee.

Section 16. The time requirements specified in Section 2.34 of the Administrative Code are waived.

Section 17. The appropriate officers, employees, representatives, and agents of the City are hereby authorized and directed to do everything necessary or desirable to accomplish the calling and holding of the Bond Special Election, and to otherwise carry out the provisions of this ordinance.

Section 18. Documents referenced in this ordinance are on file with the Clerk of the Board of Supervisors in File No. 151276.

# Proposition B

**Describing and setting forth a proposal to the voters to amend the Charter of the City and County of San Francisco to require an annual baseline appropriation for the Park, Recreation and Open Space Fund based on City spending for park and recreation purposes in FY2015-2016, extend the annual set-aside and the baseline appropriation for 15 years to FY2045-2046, and modify the Recreation and Park Department's planning obligations to include equity analysis and Board of Supervisors review, at an election to be held on June 7, 2016.**

Section 1. The Board of Supervisors hereby submits to the qualified voters of the City and County, at an election to be held on June 7, 2016, a proposal to amend the Charter of the City and County by revising Section 16.107, to read as follows:

> NOTE: **Unchanged Charter text and uncodified text** are in plain font.
> **Additions** are *single-underline italics Times New Roman font*.
> **Deletions** are *strike-through italics Times New Roman font*.

**SEC. 16.107. PARK, RECREATION AND OPEN SPACE FUND.**

(a) Establishment of Fund. There is hereby established the Park, Recreation and Open Space Fund ("Fund") to be administered by the Recreation and Park Department ("Department") as directed by the Recreation and Park Commission ("Commission"). Monies *in the Fund* ~~therein~~ shall be expended or used solely by the Department, subject to the budgetary and fiscal provisions of the Charter, to provide ~~enhanced~~ park and recreational services and facilities. *The Department embraces socio-economic and geographic equity as a guiding principle and commits to expending the funds across its open space and recreational programs to provide park and recreational access to all of San Francisco's diverse neighborhoods and communities.*

(b) Annual Set-aside. The City will continue to set aside from the annual tax levy, for a period of *forty-five* ~~thirty~~ years starting with the fiscal year 2000-2001 *and through and including fiscal year 2045-2046*, an amount equivalent to an annual tax of two and one-half cents ($0.025) for each ~~one hundred dollars~~ ($100) assessed valuation. *Beginning in fiscal year 2016-2017, revenues from the set-aside, together with interest, shall be deposited into the Park, Recreation and Open Space Fund.* Revenues ~~obtained thereby~~ *from the set-aside* shall be in addition to *the baseline appropriation required by subsection (c),* ~~and not in place of, any sums normally budgeted for the Department and, together with interest, shall be deposited into the Park, Recreation and Open Space Fund.~~

The Controller shall set aside and maintain such an amount, together with any interest earned thereon, in the Fund, and any amount unspent or uncommitted at the end of the fiscal year shall be carried forward to the next fiscal year and, subject to the budgetary and fiscal limitations of this Charter, shall be appropriated then or thereafter for the purposes specified in this Section *16.107*.

*(c) Baseline Maintenance of Effort. The annual set-aside shall be used exclusively to increase the aggregate City appropriations to and expenditures by the Recreation and Park Department for Department purposes. To this end, beginning in fiscal year 2016-2017 and thereafter through fiscal year 2045-2046, the City shall not reduce the baseline general fund support amount appropriated to the Department below the amount appropriated in fiscal year 2015-2016, as calculated by the Controller, except that the baseline amount shall be adjusted as follows:*

*(1) Each year in fiscal years 2016-2017 through 2025-2026, the City shall increase the baseline appropriation by $3 million over the prior year.*

*(2) Each year in fiscal years 2026-2027 through 2045-2046, the City shall adjust the baseline by the percentage increase or decrease in aggregate City discretionary revenues, as determined by the Controller, based on calculations consistent from year to year. In determining aggregate City discretionary revenues, the Controller shall only include revenues received by the City which are unrestricted and may be used at the option of the Mayor and the Board of Supervisors for any lawful City purpose. The Controller is authorized to increase or reduce budgetary appropriations as required by this subsection (c) to align the baseline amount to the amount required by formula based on actual revenues received during the fiscal year.*

*(3) The City may suspend growth in the baseline funding pursuant to subsection (c)(1) in fiscal year 2016-2017 if the City's projected budget deficit for that year at the time of the Joint Report or Update to the Five Year Financial Plan as prepared jointly by the Controller, the Mayor's Budget Director, and the Board of Supervisors' Budget Analyst exceeds $200 million. For fiscal year 2017-2018 through fiscal year 2045-2046, the City may suspend growth in baseline funding pursuant to subsections (c)(1) and (c)(2) when the projected budget deficit for the upcoming fiscal year at the time of the Joint Report or Update to the Five Year Financial Plan as prepared jointly by the Controller, the Mayor's Budget Director, and the Board of Supervisors' Budget Analyst exceeds $200 million adjusted annually by changes in aggregate City discretionary revenues.*

*(4) Monies from the baseline appropriation required by this subsection (c) shall not be appropriated or expended for services provided to the Recreation and Park Department by other City departments and agencies unless: (A) the City department or agency charged the Recreation and Park Department for that service in fiscal year 2015-2016 and the amount the Recreation and Park Department paid the City department or agency for that service was included in the baseline amount for fiscal year 2015-2016, although increases in the cost of such services may be paid out of the baseline appropriation, or (B) the Recreation and Park Department requests or agrees to a new service from a City department or agency.*

*(5) At the end of the fiscal year 2015-2016 and every year thereafter, any excess general fund Departmental revenue, including any Department expenditure savings or revenue surpluses deposited prior to fiscal year 2015-2016, shall be reserved to be used for one-time Departmental expenditures. "General fund Departmental revenue" is defined as all revenues credited to the Department's general fund budget other than the baseline contribution defined in subsection (c).*

~~(c) Enhanced Revenue and Efficiency Incentives for the Department. It is the policy of the City and County of San Francisco to give the Department greater incentives to improve operational efficiencies and to increase revenue. Increases in revenues and savings shall be dedicated as follows:~~

~~1. Actual net increases in Department-generated revenues, compared to the previous fiscal year, shall be dedicated to capital and/or facility maintenance improvements to park and recreational facilities; and,~~

~~2. New revenues from outside sources, such as grant or foundation support, shall be used only for enhancement of park and recreational programs, including, but not limited to, capital and/or facility maintenance improvements ; and~~

~~3. Overall Department expenditure savings shall be retained by the Department to be dedicated to one-time expenditures.~~

(d) The City shall implement its efforts to increase revenues in a manner consistent with the City's policy of charging City residents a lower fee than that charged nonresidents for the use and enjoyment of Department property.

*(e)* ~~(d)~~ Revenue Bond Authority. Notwithstanding the limitations set forth in Sections 9.107, 9.108, and 9.109 of this Charter, the Commission may request, and upon recommendation of the Mayor the Board of Supervisors may authorize, the issuance of revenue bonds or other evidences of indebtedness, or the incurrence of other obligations, secured by the Park, Recreation and Open Space Fund for acquisition, construction, reconstruction, rehabilitation and/or improvement of real property and/or facilities and for the purchase of equipment.

*(f)* ~~(e)~~ Fund Expenditures on Commission Property. Any real property acquired with monies from the Fund, including the proceeds of obligations issued pursuant to subsection *(e)* ~~(d)~~, above, shall be placed under the jurisdiction of the Commission within the meaning of Section 4.113. Fund expenditures to improve, construct, reconstruct or rehabilitate real property shall be limited to property under the jurisdiction of the Commission or property under the jurisdiction of another City department or public agency and subject to an agreement with the Department for its use, management and maintenance.

*(g)* ~~(f)~~ Use and Allocation of the Fund. Each year, the Commission shall adopt a budget for the allocation and expenditure of the Fund in compliance with the budget and fiscal provisions of the Charter~~, which shall be adopted by the Commission only after a written determination by the Planning Department of conformity with the City's General Plan~~.

The annual budget for allocation of the Fund that is adopted by the Commission and submitted by the Mayor to the Board of Supervisors shall include:

*(1)* Allocations for after-school recreation programs, urban forestry, community gardens, volunteer programs, and a significant natural areas management program in the amounts allocated for each of those programs from the Park and Open Space Fund in the Department's fiscal year *2015-2016* ~~1999-2000~~ budget, to the extent that such programs are not so funded in the Department's operating budget or in the budget of another City department.

*(2)* An allocation necessary to ensure that 3% of the monies to be deposited in the Fund during the upcoming fiscal year pursuant to subsection (b), above, be available at the start of the fiscal year as an undesignated contingency reserve. *No later than September 1, 2017, the Commission shall adopt a policy for expenditures from the contingency reserve. Thereafter, the Commission shall submit a report to the Mayor and the Board of Supervisors on any expenditures from the contingency reserve during the previous budget cycle along with its proposed budget for allocation of the Fund.*

*(3)* An allocation of not less than 5% of the monies to be deposited in the Fund during the upcoming fiscal year pursuant to subsection (b), above. These monies shall be dedicated to the acquisition of real property identified in the Capital *Expenditure* Plan discussed in subsection *(h)(3)* ~~(g)~~, below. Any portion of these monies that remains unspent or uncommitted at the end of any fiscal year shall be carried forward, with interest thereon, to the next fiscal year for the purposes set forth herein. ~~The 5% allocation need not be included in the budget submitted to the Board of Supervisors for an upcoming fiscal year to the extent that the total City expenditure for acquisition of property to be placed under the jurisdiction of the Commission for the period commencing with fiscal year 2000-2001 2000-01 and ending with the close of the immediately preceding fiscal year exceeds an amount equal to 5% of the total amount appropriated, or to be appropriated, to the Fund for the period commencing with fiscal year 2000-2001 2000-01 and ending with the close of the upcoming fiscal year.~~

*(4) An allocation, as a separate line item, of funds required for preparation, monitoring, and evaluation of the plans required under subsection (h).*

Prior to the adoption of the annual budget by the Recreation and Park Commission, the Department, in conjunction with the ~~Citizens~~ *Parks, Recreation, and Open Space* Advisory Committee *("Advisory Committee")* discussed in subsection *(i)* ~~(h)~~, below, shall conduct two public hearings in the evenings or on weekends to permit the public to comment on the Department's full budget and programming allocations.

*The Board of Supervisors shall consider and apply the Planning and Reporting Measures, including equity metrics, required in subsection (h) when reviewing and approving the Department's budget.*

*(h)* ~~(g)~~ Planning and Reporting Measures. The Commission shall adopt several long-term plans that include, but are not limited to, the following:

*(1) Equity Metrics. The Department shall develop, and the Commission shall adopt, a set of equity metrics to be used to establish a baseline of existing Recreation and Park services and resources in low-income neighborhoods and disadvantaged communities, compared to services and resources available in the City as a whole. Following Commission approval, the Department shall submit its Equity Metrics to the Mayor and the Board of Supervisors.*

*(2)* ~~1.~~ Strategic Plan. By *February 1, 2017, and every five years thereafter* ~~December 1, 2000~~, the Department shall prepare, for Commission consideration and approval, a five-year Strategic Plan~~, to be updated annually,~~ that establishes or reaffirms the mission, vision, goals and objectives for the Department. *The Strategic Plan shall include an equity analysis of Recreation and Park services and resources, using the equity metrics adopted under subsection (h)(1), and shall include strategies to mitigate any equity deficiencies identified in the Plan.*

*The Department shall submit the proposed Strategic Plan to the Parks, Recreation, and Open Space Advisory Committee for its review and comment before submitting the Plan to the Commission for its approval. Following Commission approval of the Strategic Plan, the Department shall submit the Strategic Plan to the Mayor and the Board of Supervisors. The Board of Supervisors shall consider and by resolution express its approval or disapproval of the Plan, but may not modify the Plan. If the Board expresses its disapproval of the Plan*



or makes recommendations regarding the Plan to the Department, the Department may modify and resubmit the Plan.

The Department will use the approved Strategic Plan to guide its work over each five-year period. Every two years after the approval of a Strategic Plan, the Department shall report to the Commission on the Department's progress under the Plan and, subject to the Commission's approval, may amend the Plan as appropriate. Following Commission approval of any amendments to the Strategic Plan, the Department may submit the amended Strategic Plan to the Mayor and the Board of Supervisors. ~~This Strategic Plan will be used to guide the Department's work over the next five years.~~

(3) ~~2.~~ Capital _Expenditure_ Plan. _By January 15, 2017 and for each annual or biennial budgetary cycle thereafter, as determined under Charter Section 9.101, the Department shall prepare, for Commission consideration and approval, an annual Capital Expenditure Plan that addresses the development, renovation, replacement and maintenance of capital assets, and the acquisition of real property projected during the life of the Department's five-year Strategic Plan. The Capital Expenditure Plan shall include an equity analysis of Recreation and Park capital expenditures, using the equity metrics adopted under subsection (h)(1), and shall include strategies to mitigate any equity deficiencies identified in the Plan. The Capital Expenditure Plan shall further address irrigation, water conservation, and urban forestry on park lands._

_The Department shall submit the proposed Capital Expenditure Plan to the Parks, Recreation, and Open Space Advisory Committee for its review and comment before submitting the Plan to the Commission for its approval. Following Commission approval, the Department shall submit the Capital Expenditure Plan to the Mayor and the Board of Supervisors. The Board of Supervisors shall consider and by resolution express its approval or disapproval of the Plan, but may not modify the Plan. If the Board expresses its disapproval of the Plan or makes recommendations regarding the Plan to the Department, the Department may modify and resubmit the Plan._

_The Department shall further cooperate in the development of the City's Capital Expenditure Plan under Administrative Code Section 3.20, as amended, or any successor legislation._

~~By December 1, 2000, the Department shall prepare, for Commission consideration and approval, a five-year Capital Plan, to be updated annually, for the development, renovation, replacement and maintenance of capital assets, and the acquisition of real property. In its Capital Plan the Department shall propose specific properties to be acquired for open space, recreation facilities, significant natural areas, and other recreational purposes and shall prioritize capital and maintenance improvements and provide budgets associated with such improvements. Capital and acquisition projects will be designated by the Department based upon needs identified by the Department and the community. Capital projects will include the planning, design and construction of projects that rehabilitate, restore or replace existing facilities or that develop new facilities. Acquisition projects will include, but will not be limited to, purchase, lease, exchange, eminent domain, license or any other vehicle giving the City a right, whether revocable or not, to use real property, or any interest therein, or any improvement or development rights thereon, for recreational purposes, including, but not limited to, protection of natural resources, development of community gardens and development of urban trails, provided that, notwithstanding anything herein to the contrary, no acquisition of less than fee simple title may be for a term of less than ten years.~~

(4) ~~3.~~ Operational Plan. _By February 1, 2017, and for each annual or biennial budgetary cycle thereafter, as determined under Charter Section 9.101, the Department shall prepare, for Commission consideration and approval, an Operational Plan. The Department shall base the Operational Plan on the then-current Strategic Plan, and the Operational Plan shall be in addition to the Department's budget. The Department shall include in the Operational Plan a statement of the objectives and initiatives within the Strategic Plan that the Department plans to undertake and/or accomplish during the next budgetary period, including performance indicators and targets. The Operational Plan shall include an equity analysis of Recreation and Park services and resources, using the equity metrics adopted under subsection (h)(1). Each Operational Plan shall further include an assessment of the Department's progress on the previous Operational Plan._

_The Department shall submit the proposed Operational Plan to the Parks, Recreation, and Open Space Advisory Committee for its review and comment before submitting the Plan to the Commission for its approval. Following Commission approval, the Department shall submit the Operational Plan to the Mayor and the Board of Supervisors._

~~By December 1, 2001, the Department shall prepare, for Commission consideration and approval, a five-year Operational Plan, to be updated annually, detailing proposed improvements to the Department's services and responsiveness to customer needs. The annual Operational Plan will serve as a tool for improving the operational efficiency of the Department and will include measurable performance standards for the Department. The Department shall prepare the initial Operational Plan after conducting a performance audit of Departmental operations. Thereafter, the Department will conduct periodic performance audits.~~

The Commission shall establish a community input process, which _shall_ ~~may~~ include the _Parks, Recreation, and Open Space_ ~~Citizens~~ Advisory Committee discussed in section _(i)_ ~~(h)~~, below, through which citizens of the City and County of San Francisco will provide assistance to the Commission as it develops criteria and establishes the plans required by this subsection. Prior to the adoption of _any Strategic Plan_ ~~each five-year plan~~, the Department shall conduct at least five hearings in locations distributed geographically throughout the City to receive and to consider the public's comments upon the plan. The Commission shall ensure that at least two of these hearings are held in the evenings or on weekends for the public's convenience.

~~The Department shall report regularly annually, as a part of the City's budget process, to the Mayor and to the Board of Supervisors, on the status of the plans and on the status of Department goals, objectives and capital project timelines for the current fiscal year, as well as provide reports on performance measures required by this Section.~~

_In the fourth year of each Strategic Plan under subsection (h)(2), the Controller's City Services Auditor shall conduct a performance audit of the Department to assess the Department's progress under the Strategic Plan and to inform the development of the Department's next Strategic Plan. The audit shall include an analysis of the Department's compliance with the planning and reporting measures in this subsection (h). The costs of the audit may be charged to the baseline established in subsection (c)._

_If the audit finds that the Department has not complied with the requirements in this subsection (h), the Board of Supervisors may place up to 5% of the baseline appropriation under subsection (c) for the next fiscal year on reserve, pending subsequent release of the reserve by Board action upon finding progress toward these requirements. The preceding sentence is not intended to modify the Board's authority under the fiscal and budgetary provisions of the Charter._

_The Commission may modify any deadlines contained in this subsection (h) by resolution adopted by a two-thirds vote of its members, and a resolution adopted by the Board of Supervisors and approved by the Mayor._

_(i)_ ~~(h)~~ _Parks, Recreation, and Open Space_ ~~Citizens~~ Advisory Committee. The Board of Supervisors shall establish, by ordinance, a _Parks, Recreation, and Open Space_ ~~Citizens~~ Advisory Committee, _such as the committee established in Park Code Section 13.01, as amended, or any successor legislation_.

_(j) Equity Fund. The City shall establish an Equity Fund to accept and expend private gifts, grants, and donations received by the Department and intended to support initiatives and programs addressing unmet program and capital needs identified in the equity analyses required under subsection (h)._

_(k)_ ~~(i)~~ Environmental and Design Guidelines. The _Department_ ~~Commission~~ shall _maintain_ ~~adopt~~ written environmental and design guidelines for new facilities, parks, and open spaces and the renovation

or rehabilitation of existing facilities, parks, and open spaces. ~~These guidelines shall be consistent with any applicable standards of the Art and Planning Commissions.~~

*(l)* ~~(j)~~ Capital Projects. Notwithstanding the provisions of Section 3.104 of this Charter, the Commission shall have the authority to prepare and approve the plans, specifications and estimates for all contracts and orders, and to award, execute and manage all contracts and orders, for capital projects on real property under its jurisdiction or management. Capital projects supported by the Fund, other than those projects identified by the Department as long-term projects, must be fully constructed within three years of the initial budget allocation for those projects. Long-term projects must be fully constructed within five years of the initial budget allocation. Any exceptions to this provision must be authorized by a two-thirds vote of the Commission.

~~The Recreation and Park Department and the Department of Public Works ("DPW") shall establish a committee to develop a written, capital implementation program, for the consideration of both Departments, that will govern DPW's involvement in capital projects undertaken by the Recreation and Park Department. In developing this program, the committee shall consider the Capital Plan discussed in subsection (g), above, staffing levels in both Departments, and the availability of other resources.~~

~~(k) Unspent Funds. All unspent funds in the Park and Open Space Fund on June 30, 2000 shall continue to be held for the use and benefit of the Department. These monies shall be expended in a manner consistent with the general purposes for which they were originally appropriated.~~

*(m)* In addition to the requirements set forth by this Section *16.107*, all expenditures from the Fund shall be subject to the budget and fiscal provisions of the Charter.

*(n) This Section 16.107 shall expire by operation of law at the end of fiscal year 2045-2046 and the City Attorney shall cause it to be removed from future editions of the Charter unless the Section is extended by the voters.*

## Proposition C

Describing and setting forth a proposal to the voters to amend the Charter of the City and County of San Francisco at an election to be held on June 7, 2016, to authorize the Board of Supervisors to update the inclusionary or affordable housing obligations for housing development projects and setting forth increased interim requirements; and affirming the Planning Department's determination under the California Environmental Quality Act.

Section 1. The Planning Department has determined that the actions contemplated in this proposed Charter Amendment comply with the California Environmental Quality Act (California Public Resources Code Sections 21000 et seq.). Said determination is on file with the Clerk of the Board of Supervisors in File No. 151274 and is incorporated herein by reference. The Board affirms this determination.

Section 2. The Board of Supervisors hereby submits to the qualified voters of the City and County, at an election to be held on June 7, 2016, a proposal to amend the Charter of the City and County as follows:

NOTE:   Unchanged Charter text and uncodified text are in plain font.
Additions are *single-underline italics Times New Roman font*.
Deletions are ~~*strike-through italics Times New Roman font*~~.
Asterisks (*   *   *   *) indicate the omission of unchanged Charter subsections.

(a) The People of the City and County of San Francisco hereby find as follows:

1. San Francisco voters overwhelmingly passed the Affordable Housing Goals Policy Declaration (Proposition K) in 2014 and an Affordable Housing Bond (Proposition A) in 2015 in a proactive response to a worsening housing crisis that requires a broad spectrum of land use and financing tools to both preserve existing and create new affordable housing.

2. San Francisco currently has the largest income gap in the country, rents are three times higher than the national average and evictions have increased by 170% in a lucrative development market that has incentivized widespread speculation.

3. While San Francisco has built 4,300 units of affordable housing over the past ten years, it has simultaneously lost 3,200 units of existing affordable housing stock as a direct result of Ellis Act evictions and short term rental speculation during the same ten year window.

4. With San Francisco's median rent for a 1 bedroom unit continuing to climb past $3,500 a month, most San Franciscans are finding that they cannot afford to pay rental prices.

5. Over the last decade, 5,000 children and youth have left the City due to evictions and economic displacement, while families are the fastest-growing demographic of homeless residents.

6. All new residential development should include a mix of market rate housing and affordable housing. In addition, development of new market rate housing creates additional demand for affordable housing. As one of the many ways to address the need for affordable housing, the inclusionary requirements should be updated to reflect more appropriately the link between creation of new market rate housing and demand for affordable housing.

(b) The Charter is hereby amended by revising Section 16.110, to read as follows:
**SEC. 16.110. HOUSING TRUST FUND.**
*   *   *   *
(b) **Definitions.** For purposes of this Section:
~~(1) "Affordable Housing Fee" shall mean a fee calculated by the Mayor's Office of Housing as the difference between the affordable sales price of a housing unit of a certain bedroom size and the cost of developing a comparable housing unit. The Mayor's Office of Housing shall index the fee annually based on the annual percent change in the Construction Cost Index for San Francisco as published by Engineering News-Record or a similar index selected by the Mayor's Office of Housing.~~

~~(2) "Area Median Income" or "AMI" shall mean the unadjusted area median income levels as calculated by the Mayor's Office of Housing using data from the Department of Housing and Urban Development on an annual basis for the San Francisco area, adjusted solely for Household size, but not high housing cost area.~~

~~(3) "Basic On-Site Inclusionary Requirement" shall mean 12% of the units in the principal project, affordable to a Household whose initial household income does not exceed 90% of Area Median Income for ownership units and 55% for rental units or an on-site requirement with an equivalent Inclusionary Housing Cost Obligation.~~

~~(4)~~ "First Responder" shall mean a City employee who responds first in cases of natural disaster or emergencies, including, but not limited to, all active uniformed, sworn members of the San *f*Francisco Police and Fire Departments.

~~(5)~~ "General Fund Discretionary Revenues" shall mean revenues that the City receives and deposits in its treasury, that are unrestricted, and that the City may appropriate for any lawful City purpose.

~~(6) "Gross floor area" shall have the meaning in Planning Code Section 102.9, or any successor section, as amended from time to time.~~

~~(7)~~ "Household" shall mean any person or persons who reside or intend to reside in the same housing unit.

~~(8)~~ "Mayor's Office of Housing" shall mean the Mayor's Office of Housing *and Community Development* or any successor City agency.

~~(9) "Other Affordable Housing Fees" shall mean any fee imposed on residential development by the City as a condition of a~~

~~development approval related to affordable housing, which fee shall be adjusted annually by the City using an index selected by the City, or any exactions on residential development related to affordable housing imposed by the City, excluding fees imposed under Planning Code Section 415.~~

~~(10) "Planning Code Section 415" shall mean San Francisco Planning Code Section 415 as of July 1, 2012, together with the defined terms in Section 401 as of that same date, and any successor legislation adopted consistent with this Section 16.110. Notwithstanding the foregoing, the calculation of the applicable affordable housing fee for "buildings of over 120 feet in height" shall be as set forth in Planning Code Sections 315(a)(1)(B) & (C) and 315.6(b)(1) in Ordinance No. 101-07, Board of Supervisors File No. 061529.~~

~~(11) "Inclusionary Housing Cost Obligation" shall mean an obligation equal to the applicable percentage of below market rate housing units required under Planning Code Sections 415.5, 415.6 or 415.7 multiplied by the then-current Affordable Housing Fee required per unit. For purposes of calculating the cost burden of any legislative change, the Mayor's Office of Housing shall use the average citywide unit mix for projects subject to Planning Code Section 415 within the past five years as applied to a hypothetical project of 100 units. For purposes of calculating the cost burden imposed by a condition of approval for a particular project, the Mayor's Office of Housing shall use the actual unit mix and unit count proposed in the development project subject to the condition of approval.~~

\* \* \* \*

~~(g) On-Site Inclusionary Affordable Housing Requirements.~~

~~(1) Application. This subsection (g) shall not apply to: any residential projects subject to a development agreement approved by the City under California Government Code Section 65864 et seq.; any project exempt from the provisions of Section 415et seq. under Section 415.3 as it existed on July 1, 2012; the requirements of a redevelopment plan for a redevelopment project area; or any project in which the City has a proprietary interest.~~

~~(2) Reduction of Current On-Site Inclusionary Affordable Housing Requirement. Beginning on January 1, 2013, the City shall reduce by 20% the on-site inclusionary housing obligation for all projects subject to the on-site Inclusionary affordable housing requirements of Planning Code Section 415et seq., including any onsite requirements found in other sections of the Planning Code including, but not limited to, Planning Code Sections 415.6, 419, 424, 249.33, 827(b)(1) and any other Municipal Code sections that refer to Planning Code Section 415et seq. or its predecessor, from the requirements of Section 415 and other related sections as they exist as of July 1, 2012. Notwithstanding the foregoing, in no event shall the on-site inclusionary housing obligation for any project be reduced below the Basic Inclusionary Housing Requirement.~~

~~(3) Application to Previously Approved Projects.~~

~~(A) This subsection (g)(3) does not apply to projects that received a reduction in on-site inclusionary housing requirements through subsection (g)(2) above.~~

~~(B) Sponsors of projects that already have received their first construction document as defined in Section 107A.13.1 of the San Francisco Building Code as of January 1, 2013 may not receive a reduction in any on-site below market rate requirement applicable to the subject property under this subsection (g).~~

~~(C) Sponsors of projects that have not received their first construction document as defined in Section 107A.13.1 of the San Francisco Building Code by January 1, 2013 may apply once to the Planning Commission for a modification of their existing conditions of approval to reduce any on-site below market rate inclusionary requirements by 20% consistent with subsection (g)(2), or change their election so that they will provide on-site rather than off-site below market rate units or Affordable Housing Fee payments. Project sponsors seeking to amend their conditions of approval to benefit from the 20% reduction must demonstrate to the Planning Commission that the proposed reduction will enable the project to obtain financing and commence construction within a one-year time period following Planning Commission's approval of the proposed reduction. The Planning Commission shall include a condition of approval to require that the project sponsor obtain its first construction document within one year of the approval. If the project sponsor does not obtain its first construction document within one year, then the conditions of approval existing before the modification shall apply unless the Zoning Administrator, after a duly noticed hearing, determines that the project sponsor has made good faith efforts to obtain its first construction document but for reasons beyond the project sponsor's control including, but not limited to, the filing of a lawsuit or delay on the part of the City or another public entity, has been unable to obtain its first construction document. In such a case, the Zoning Administrator may extend the time once, and for up to 1 year, for obtaining the first construction document. Any further extensions of time may only be granted by the Planning Commission using the same inquiry as to whether the project sponsor has made good faith efforts to obtain its first construction document. The Planning Commission may not make modifications under this subsection (g)(3)(C) after January 1, 2016.~~

~~(h) Stabilizing the Cost Obligation of Future Inclusionary or Affordable Housing Requirements.~~

~~(1) Application. This subsection (h) shall apply as follows:~~

~~(A) This subsection shall apply only to private residential projects or the private residential portion of a mixed-use project, and not commercial projects; and~~

~~(B) This subsection shall not apply to any of the following:~~

~~(i) A project located in an area subject to a development agreement under California Government Code Sections 65864 et seq., as amended, or any successor legislation;~~

~~(ii) A project located in a redevelopment project area, an infrastructure financing district, or any other area that the City designates under State law in which property tax increment is allocated to fund affordable housing;~~

~~(iii) A project that, through a Special Use District or other local legislation adopted after November 6, 2012, receives (1) a 20% or greater increase in developable residential gross floor area, as measured by a change in height limits, Floor Area Ratio limits, or use, over prior zoning, or (2) a 50% or greater increase in residential densities over prior zoning. Notwithstanding the foregoing, should a project sponsor seek to develop a project in accordance with zoning in place immediately before the establishment of the Special Use District, this subsection (h) shall apply;~~

~~(iv) An area subject to a change in zoning enacted after November 6, 2012 that affects 40 or more acres or greater and results in a significant increase in residential development potential, where the area is not also encompassed by a Special Use District adopted after November 6, 2012. The City shall adopt a standard for determining what constitutes "a significant increase in residential development potential" for these purposes as follows: There shall be a Housing Review Committee comprised of the Directors of the Mayor's Office of Housing, the Planning Department, and the Office of Economic and Workforce Development, or their successor agencies. No later than March 1, 2013, the Housing Review Committee, after at least one public hearing, shall recommend a standard to the Board of Supervisors in the form of a proposed ordinance. Thereafter, the Housing Review Committee, at regular intervals determined by the Committee, shall review the standard and recommend any necessary updates or modifications to the Board. The Board of Supervisors may reject a proposed ordinance submitted by the Housing Review Committee by a majority vote. If the Board fails to reject the proposed ordinance within 60 days of receiving it from the Housing Review Committee, the proposed ordinance shall be deemed adopted. In subsequently applying the standard established in the ordinance and determining whether to increase affordable housing fees or exactions in the area subject to the change in zoning, the Board of Supervisors shall consider any analysis approved by the Controller's Office regarding the financial feasibility of development subject to the proposed fee or exaction.~~

~~(v) A project that receives public financing or financial incentives for affordable housing from the California Debt Limit~~

~~Allocation Committee tax-exempt bond financing or other similar public source; or~~
~~(vi) A project that receives a density bonus for the development of affordable housing through the State Density Bonus Law or other similar State legislation;~~
~~(vii) A project in which the City has a proprietary interest.~~
~~(2) Inclusionary Housing Cost Obligation. As of January 1, 2013, the City may not adopt any new land use legislation or administrative regulation, including a Planning Code amendment, or impose any new condition of approval on the issuance of a discretionary permit, that would require an increase in the project sponsor's Inclusionary Housing Cost Obligation beyond that required as of January 1, 2013, including and incorporating the reductions effected by subsection (g).~~
~~(3) Other Fees Related to Affordable Housing Fee. As of January 1, 2013, the City may not adopt any new land use legislation or administrative regulation, including a Planning Code amendment, or impose any new condition of approval on the issuance of a discretionary permit, that would increase any Other Affordable Housing Fees beyond that required as of July 1, 2012.~~
~~(4) Remedy. Any challenge to the validity of any legislation or final administrative order or decision on the grounds that such legislation, order or decision increases the project sponsor's Inclusionary Housing Cost Obligation or imposes Other Affordable Housing Fees will be subject to the requirements of California Code of Civil Procedure Sections 1085 and 1094.5, respectively. Any such challenge may be brought only after a project sponsor has exhausted all available administrative remedies, and shall be subject to all applicable statutes of limitations, including without limitation those set forth in California Code of Civil Procedure Section 1094.5 and California Government Code Sections 65009 and 66499.37.~~

(~~f~~g) Legislation. ~~The City shall enact any legislation necessary to implement subsections (g) and (h) as soon as practicable after the effective date of this Section, but no later than January 1, 2014. Before the adoption of such legislation, the Mayor's Office of Housing, with consultation as necessary with the Planning Department, shall implement the provisions of subsections (g) and (h) administratively and shall issue any necessary guidance.~~

*(1) The City may enact an ordinance adopting inclusionary or affordable housing obligations, including definitions that differ from those set forth in subsection (b) of this Section 16.110. After any such ordinance becomes effective, the City Attorney shall cause to be removed from the Charter this subsection (g) of Section 16.110, and shall cause the subsequent subsections to be renumbered accordingly. Thereafter, the City may by ordinance set and change the minimum or maximum inclusionary or affordable housing obligations, and may adopt definitions for inclusionary and affordable housing programs. In doing so, the City shall endeavor to meet affordable housing needs across a broad range of household incomes, family sizes and neighborhood conditions and may update the method of fee calculation based on different building types and sizes, and may set policies controlling conversion of rental units to ownership units, among other programmatic changes.*

*(2) Until the City enacts an ordinance amending the Planning Code, including but not limited to Section 415, adopting inclusionary or affordable housing obligations different from those called for in previously existing Charter subsections (g) and (h), the following requirements for inclusionary housing shall apply during such interim period for any housing development project that has not procured a final first discretionary development entitlement approval, which shall include approval following any administrative appeal to the relevant City board, or has not entered into a development agreement or other binding agreement with the City as of January 12, 2016:*

*(A) For housing development projects consisting of ten dwelling units or more, but less than twenty-five dwelling units, the requirements of the Planning Code, including but not limited to Section 415 et seq., in effect on the date this Charter Amendment is adopted by the voters shall apply.*

*(B) For housing development projects consisting of twenty-five dwelling units or more, the requirements of the Planning Code, including but not limited to Section 415 et seq., in effect on the date this Charter Amendment is adopted by the voters shall apply, except that the amounts of the inclusionary housing requirement shall be modified as follows:*

*(i) **Fee**. The development project shall pay an affordable housing fee equivalent to a requirement to provide 33% of the units in the principal project as affordable units, using the method of fee calculation set forth in Planning Code Section 415.5(b). In the event the City's Nexus Analysis in support of the Inclusionary Affordable Housing Program demonstrates that a lower affordable housing fee is lawfully applicable based on an analysis of all relevant impacts, the City may utilize the method of fee calculation supported by the Nexus Analysis in lieu of the 33% requirement set forth herein.*

*(ii) **On-Site Housing**. If the project sponsor elects and is eligible to construct units affordable to qualifying households on-site of the principal project as set forth in Planning Code Section 415.5(g), the project sponsor shall construct 25% of all units constructed on the project site as affordable housing units, with 15% of the units affordable to low- and very low-income households and 10% affordable to middle income households, and shall comply with all otherwise applicable requirements of Section 415.6.*

*(iii) **Off-Site Housing**. If the project sponsor of a housing development project elects and is eligible to provide units affordable to qualifying households off-site of the principal project as set forth in Planning Code Section 415.5(g), the project sponsor shall construct or cause to be constructed affordable housing units equal to 33% of all units constructed on the principal project site as affordable housing, with 20% of the units affordable to low- and very low-income households and 13% of the units affordable to middle-income households, and shall comply with all otherwise applicable requirements of Section 415.7.*

*(C) Interim definitions of "Lower Income" and "Middle Income" households. For purposes of the interim period before the City enacts an ordinance amending the Planning Code, including but not limited to Section 415 et seq., "lower income" households shall be defined as households whose total household income does not exceed 55% of Area Median Income for purposes of renting an affordable unit, or 80% of Area Median Income for purposes of purchasing an affordable unit, and "middle income" households shall mean households whose total household income does not exceed 100% of Area Median Income for purposes of renting an affordable unit, or 120% of Area Median Income for purposes of purchasing an affordable unit.*
\* \* \* \*

# Proposition D

**Ordinance amending the Administrative Code to require the Office of Citizen Complaints to investigate all officer-involved shootings.**

NOTE:   **Unchanged Code text and uncodified text** are in plain font.
**Additions to Codes** are in *single-underline italics Times New Roman font*.
**Deletions to Codes** are in ~~*strikethrough italics Times New Roman font*~~.

Be it ordained by the People of the City and County of San Francisco:

Section 1. The Administrative Code is hereby amended by adding a new Section 96.11 and re-numbering the current Section 96.11 as Section 96.12, to read as follows:
***SEC. 96.11. INVESTIGATIONS OF OFFICER-INVOLVED SHOOTINGS.***

*The OCC shall conduct a timely and complete investigation of any incident occurring within the City and County of San Francisco*

*in which a member of the uniformed ranks of the San Francisco Police Department discharges a firearm resulting in the physical injury or death of a person, even if the discharge is accidental. The Police Department and its officers and employees shall provide the OCC with prompt and full cooperation and assistance in connection with the OCC's investigations under this Section 96.11.*

SEC. *96.12* 96.11. SEVERABILITY.

If any provision, subdivision, section, paragraph, phrase or clause of this Chapter or the application thereof is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remainder of this Chapter. The remainder of this Chapter shall remain effective and enforceable to the fullest extent allowed by law. All clauses and provisions of this Chapter are hereby declared to be severable.

Section 2. Scope of Ordinance. In enacting this ordinance, the People of the City and County of San Francisco intend to amend only those words, phrases, paragraphs, subsections, sections, articles, numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal Code that are explicitly shown in this ordinance as additions or deletions, in accordance with the "Note" that appears under the official title of the ordinance.

Section 3. Undertaking for the General Welfare. In enacting and implementing this ordinance, the City is assuming an undertaking only to promote the general welfare. The City is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

Section 4. No Conflict with Federal or State Law. Nothing in this ordinance shall be interpreted or applied so as to create any requirement, power, or duty in conflict with any federal or state law.

## Proposition E

Ordinance amending the Administrative Code to revise the City's Paid Sick Leave Ordinance (PSLO) to include protections for employees under the PSLO that largely parallel recent State law enactments pertaining to paid sick leave, primarily the Healthy Workplaces, Healthy Families Act of 2014, as amended.

NOTE: Unchanged Code text and uncodified text are in plain font.
Additions to Codes are in *single-underline italics Times New Roman font*.
Deletions to Codes are in ~~strikethrough italics Times New Roman font~~.
Asterisks (*   *   *   *) indicate the omission of unchanged Code subsections or parts of tables.

Be it ordained by the People of the City and County of San Francisco:

Section 1. Background, Findings, and Purpose.

(a) At the election of November 7, 2006, San Francisco voters adopted Proposition F, the Paid Sick Leave Ordinance ("PSLO"), codified at Chapter 12W of the Administrative Code. The PSLO, which requires employers to provide paid sick leave to employees for work performed in San Francisco, was the first such law in the United States. The PSLO contained extensive uncodified findings, including the determination that the "absence or inadequacy of paid sick leave among workers in San Francisco poses serious problems not only for affected workers but also for their families, their employers, the health care system, and the community as a whole." After detailing the problems then associated with the absence or inadequacy of paid sick leave, the findings concluded that "[i]t is in the interest of all San Franciscans to require that employers benefiting from the opportunity to do business here make available to their employees a reasonable amount of paid sick leave."

(b) Eight years after the adoption of the PSLO, the State of California enacted the Healthy Workplaces, Healthy Families Act of 2014 ("Act") (A.B. 1522; Stats. 2014, Ch. 317, section 3). The Act was amended in 2015 to clarify a number of its provisions. (A.B. 304; Stats. 2015, Ch. 67.) The Act, which is codified at California Labor Code Sections 245-249, requires employers throughout California to provide paid sick leave to employees. In adopting the Act, the Legislature made extensive findings that parallel many of the findings made in support of the PSLO when it was adopted by the voters, including that providing paid sick leave to employees ensures a healthier and more productive workforce; improves public health by lessening recovery time for employees and reducing the likelihood of spreading illness to other members of the workforce or, in the case of public contact positions such as service workers and restaurant workers, to customers; and provides greater job security and retention for employees. The findings in the Act recognize the importance of providing parental care for children, which makes a child's speedy recovery from illness more likely and the child's development of more serious illnesses less likely, and improves children's overall mental and physical health. The findings also recognize that many employees have significant elder care responsibilities involving medical care for loved ones. And, going beyond the PSLO and its findings, the Act also expressly recognizes the devastating effects of domestic violence, sexual assault, and stalking, and the need for victims who are employees to take time off from work for reasons related to those dangerous circumstances. In addition, in 2011, the State of California enacted a measure related to paid sick leave, the Michelle Maykin Memorial Donation Protection Act, codified at California Labor Code Sections 1508-1513, which requires many employers to provide paid time off for employees making a bone marrow or organ donation.

(c) In some respects the PSLO and the Act have essentially identical provisions. In some other respects, the PSLO provides greater protections for employees and greater scope of coverage than the Act. These more expansive provisions remain in effect following passage of the Act, which states that the provisions of the Act are in addition to and independent of any other rights, remedies, or procedures available under any other law and do not diminish, alter, or negate any other legal rights, remedies, or procedures available to an aggrieved person. The Act establishes minimum statewide requirements and does not preempt, limit, or otherwise affect the applicability of any other paid sick leave law, including the PSLO.

(d) But in some respects, the Act provides greater protections for employees and greater scope of coverage than the PSLO. As a result, the City now finds itself in the ironic position that its pioneering paid sick leave law is in some ways less expansive than State law. Further, employers now find themselves bound by two legal regimes, enforced respectively by two distinct governmental entities, because the Act does not authorize the City to enforce its provisions; rather, the City may only enforce the PSLO. But if the PSLO is amended to include provisions that parallel those provisions in State law that are currently more protective of employees and provide a greater scope of coverage than the PSLO, there will be a greater degree of congruence between the PSLO and the Act, and a less fragmented enforcement process.

(e) The general purpose of this ordinance is to include within the PSLO provisions that parallel those provisions in the Act that provide greater protections for employees and greater scope of coverage than the PSLO, and thereby to enhance the City's ability to enforce employee rights regarding paid sick leave. This ordinance is not intended and shall not be construed to narrow, restrict, or otherwise limit in any manner the present or future application, interpretation, implementation, or enforcement of the PSLO. Nevertheless, it is hoped that, without weakening any provision of the PSLO, this ordinance will simplify the efforts of employers to comply with their legal obligations under both the PSLO and the Act.

(f) This ordinance also looks to the future, anticipating that at some point there may be enhanced paid sick leave requirements imposed by State or federal law, going beyond what the PSLO, as amended by this ordinance, would provide. This ordinance gives the Board of Supervisors power to amend the PSLO's substantive requirements or scope of coverage for the purpose of adopting provisions parallel to State or federal law if and to the extent State or federal law provides

greater or additional protections or broader coverage than the PSLO. This ordinance also gives the Board of Supervisors power to amend the PSLO as to those amendments contained in this ordinance, if the State amends the provisions of State law on which those amendments are based.

Section 2. The Administrative Code is hereby amended by revising Sections 12W.2, 12W.3, 12W.4, 12W.5, 12W.8, 12W.12, 12W.13, and 12W.16, to read as follows:

### SEC. 12W.2. DEFINITIONS.

For purposes of this Chapter, the following definitions apply.

(a) "Agency" shall mean the Office of Labor Standards Enforcement or any department or office that by ordinance or resolution is designated the successor to the Office of Labor Standards Enforcement.

(b) "City" shall mean the City and County of San Francisco.

(c) "Employee" shall mean any person who is employed within the geographic boundaries of the City by an employer, including part-time and temporary employees. "Employee" includes a participant in a Welfare-to-Work Program when the participant is engaged in work activity that would be considered "employment" under the federal Fair Labor Standards Act, 29 U.S.C. §201 et seq., and any applicable U.S. Department of Labor Guidelines. "Welfare-to-Work Program" shall include any public assistance program administered by the Human Services Agency, including but not limited to CalWORKS and the County Adult Assistance Program (CAAP), and any successor programs that are substantially similar to them, that require a public assistance applicant or recipient to work in exchange for their grant.

(d) "Employer" shall mean any person, as defined in Section 18 of the California Labor Code, including corporate officers or executives, who directly or indirectly or through an agent or any other person, including through the services of a temporary services or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of an employee.

(e) "Paid sick leave" shall mean paid "sick leave" as defined in California Labor Code § 233(b)(4), except that the definition extends beyond the employee's own illness, injury, medical condition, need for medical diagnosis, *care including preventive care*, or treatment, or *other* medical reason, to also encompass time taken off work by an employee for the purpose of providing care or assistance to other persons, as specified further in Section 12W.4(a), with an illness, injury, medical condition, need for medical diagnosis, *care including preventive care*, or treatment, or other medical reason. *"Paid sick leave" shall also include time taken off work for purposes related to domestic violence, sexual assault, or stalking, suffered by an employee, as specified in Section 12W.4(b), and for purposes related to bone marrow donation or organ donation, as specified in Section 12W.4(c).*

(f) "Small business" shall mean an employer for which fewer than ten persons work for compensation during a given week. In determining the number of persons performing work for an employer during a given week, all persons performing work for compensation on a full-time, part-time, or temporary basis shall be counted, including persons made available to work through the services of a temporary services or staffing agency or similar entity.

### SEC. 12W.3. ACCRUAL OF PAID SICK LEAVE.

(a) For employees working for an employer on or before the operative date of this Chapter, paid sick leave shall begin to accrue as of the operative date of this Chapter. For employees hired by an employer after the operative date of this Chapter, *but before January 1, 2017*, paid sick leave shall begin to accrue 90 days after the commencement of employment with the employer, *or on January 1, 2017, whichever date is earlier. For employees hired on or after January 1, 2017, paid sick leave shall begin to accrue on commencement of employment with the employer.*

(b) For every 30 hours worked after paid sick leave begins to accrue for an employee, the employee shall accrue one hour of paid sick leave. Paid sick leave shall accrue only in hour-unit increments; there shall be no accrual of a fraction of an hour of paid sick leave.

*(c) An employer may, in the employer's discretion, make available to an employee a lump sum of paid sick leave at the beginning of each year of employment, calendar year, or other 12-month period (an "upfront allocation"). In such cases, the Agency shall treat the upfront allocation as an advance on paid sick leave to be accrued under this Section 12W.3; that is, accrual of paid sick leave under this Section would temporarily halt and the employee would not continue to accrue paid sick leave until after the employee has worked the number of hours necessary to have accrued the upfront allocation amount, at which point the employee would then resume accruing paid sick leave under this Section. This subsection (c) shall not be construed to prevent an employer, in the employer's discretion, from advancing paid sick leave to an employee at other times, and shall not be construed to limit the amount of paid sick leave that may be advanced to an employee. Any advance of paid sick leave shall affect the employee's accrual of paid sick leave under this Section 12W.3 as described in this subsection (c). Any advance of paid sick leave shall occur pursuant to an employer's written policy or, absent an applicable written policy, shall be documented in writing to the affected employee.*

(*c*d) For employees of small businesses, there shall be a cap of 40 hours of accrued paid sick leave. For employees of other employers, there shall be a cap of 72 hours of accrued paid sick leave. Accrued paid sick leave for employees carries over from year to year (whether calendar year or fiscal year), but is limited to the aforementioned caps.

(*d*e) If an employer has a paid leave policy, such as a paid time off policy, that makes available to employees an amount of paid leave that may be used for the same purposes as paid sick leave under this Chapter and that is sufficient to meet the requirements for accrued paid sick leave as stated in subsections (a)-(c), the employer is not required to provide additional paid sick leave.

*(f) On the same written notice that an employer is required to provide under Section 246(h) of the California Labor Code, an employer shall set forth the amount of paid sick leave that is available to the employee under this Section 12W.3, or paid time off an employer provides in lieu of sick leave. If an employer provides unlimited paid sick leave or unlimited paid time off to an employee, the employer may satisfy this subsection by indicating on the notice or the employee's itemized wage statement "unlimited." This subsection (f) shall apply only to employers that are required by state law to provide such notice to employees regarding paid sick leave available under state law.*

(*e*g) An employer is not required to provide financial or other reimbursement to an employee upon the employee's termination, resignation, retirement, or other separation from employment, for accrued paid sick leave that the employee has not used. *But if an employee separates from an employer for any reason and is rehired by the employer within one year from the date of separation, previously accrued and unused paid sick leave shall be reinstated. The employee shall be entitled to use the previously accrued and unused paid sick leave and to accrue additional paid sick leave upon rehiring. This subsection (g) shall not apply if and to the extent that, upon the employee's separation from employment, the employee received cash compensation for previously accrued and unused paid sick leave.*

*(h) For the purposes of this Chapter, an employer shall calculate paid sick leave using any of the following calculations:*

*(1) Paid sick leave for nonexempt employees shall be calculated in the same manner as the regular rate of pay for the workweek in which the employee uses paid sick leave, whether or not the employee actually works overtime in that workweek.*

*(2) Paid sick leave for nonexempt employees shall be calculated by dividing the employee's total wages, not including overtime premium pay, by the employee's total hours worked in the full pay periods of the prior 90 days of employment.*

*(3) Paid sick leave for exempt employees shall be calculated in the same manner as the employer calculates wages for other forms of paid leave time.*

*(4) In no circumstance may paid sick leave be provided at less than the minimum wage rate required by the Minimum Wage Ordinance, Administrative Code Chapter 12R.*

### SEC. 12W.4. USE OF PAID SICK LEAVE.

(a) An employee may use paid sick leave not only when he or

she is ill or injured or for the purpose of the employee's receiving medical care, treatment, or diagnosis, as specified more fully in California Labor Code §*Section* 233(b)(4) *and Section 12W.2(e) of this Code*, but also to aid or care for the following persons when they are *likewise* ill or injured or receiving medical care, treatment, or diagnosis: Child; parent; legal guardian or ward; sibling; grandparent; grandchild; and spouse, registered domestic partner under any state or local law, or designated person. The employee may use all or any percentage of his or her paid sick leave to aid or care for the aforementioned persons.

*(1)* "Child," "parent," "sibling," "grandparent," "grandchild." The aforementioned child, parent, sibling, grandparent, and grandchild relationships include not only biological relationships but also relationships resulting from adoption; step-relationships; and foster care relationships.

*(2)* "Child" *also* includes a child of a domestic partner and a child of a person standing in loco parentis.

*(3) "Parent" also includes a person who stood in loco parentis when the employee was a minor child, and a person who is a biological, adoptive, or foster parent, stepparent, or guardian of the employee's spouse or registered domestic partner.*

*(4) "Designated person."* If the employee has no spouse or registered domestic partner, the employee may designate one person as to whom the employee may use paid sick leave to aid or care for the person. The opportunity to make such a designation shall be extended to the employee no later than the date on which the employee has worked 30 hours after paid sick leave begins to accrue pursuant to Section 12W.3(a). There shall be a window of 10 work days for the employee to make this designation. Thereafter, the opportunity to make such a designation, including the opportunity to change such a designation previously made, shall be extended to the employee on an annual basis, with a window of 10 work days for the employee to make the designation.

*(b) In addition to the purposes for which an employee may use paid sick leave under subsection (a), an employee who is a victim of domestic violence, sexual assault, or stalking may use paid sick leave for the purposes described in Sections 230(c) and 231.1(a) of the California Labor Code.*

*(c) An employee may use paid sick leave for purposes related to donating the employee's bone marrow or an organ of the employee to another person. Further, an employee may use paid sick leave to care for or assist a person, as specified in Section 12W.4(a), for purposes related to that person's donating bone marrow or an organ to another person.*

*(d) An employee shall be entitled to use accrued paid sick leave beginning on the 90th day of employment, after which day the employee may use paid sick leave as it is accrued.*

(b*e*) An employer may not require, as a condition of an employee's taking paid sick leave, that the employee search for or find a replacement worker to cover the hours during which the employee is on paid sick leave.

*(f) An employer may not require, as a condition of an employee's taking paid sick leave, that the employee take paid sick leave in increments of more than one hour, unless the Agency, by rule or regulation, authorizes a larger increment in particular circumstances provided that the increment is no larger than the employer may require under state law.*

(c*g*) An employer may require employees to give reasonable notification of an absence from work for which paid sick leave is or will be used.

(d*h*) An employer may only take reasonable measures to verify or document that an employee's use of paid sick leave is lawful.

*(i) An employer shall provide payment for sick leave taken by an employee no later than the payday for the next regular payroll period after the sick leave was taken.*

**SEC. 12W.5. NOTICE AND POSTING** *OF RIGHTS*.

(a) The Agency shall, by the operative date of this Chapter, publish and make available to employers, in all languages spoken by more than 5% of the San Francisco workforce, a notice suitable for posting by employers in the workplace informing employees of their rights under this Chapter. The Agency shall update this notice on December 1 of any year in which there is a change in the languages spoken by more than 5% of the San Francisco workforce. In its discretion, the Agency may combine the notice required herein with the notice required by Section 12R.5(a) of the Administrative Code. *In addition, the Agency shall combine into one document the notice required by this subsection (a) with the poster required by California Labor Code Section 247, provided that such a combined notice fulfills all the requirements of this subsection and that the Agency has received written assurance from the appropriate State authority that the combined notice satisfies the requirements of California Labor Code Section 247.*

(b) Every employer shall post in a conspicuous place at any workplace or job site where any employee works the notice required by subsection (a). Every employer shall post this notice in English, Spanish, Chinese, and any language spoken by at least 5% of the employees at the workplace or job site.

**SEC. 12W.8. IMPLEMENTATION AND ENFORCEMENT.**

(a) **Implementation.** The Agency shall be authorized to coordinate implementation and enforcement of this Chapter and may promulgate appropriate guidelines or rules for such purposes. Any guidelines or rules promulgated by the Agency shall have the force and effect of law and may be relied on by employers, employees, and other persons to determine their rights and responsibilities under this Chapter. Any guidelines or rules may establish procedures for ensuring fair, efficient, and cost-effective implementation of this Chapter, including supplementary procedures for helping to inform employees of their rights under this Chapter, for monitoring employer compliance with this Chapter, and for providing administrative hearings to determine whether an employer or other person has violated the requirements of this Chapter. *As of January 1, 2017, in promulgating guidelines and rules pursuant to this subsection (a), the Agency shall consider any relevant guidelines, rules, or interpretations issued by the California Department of Labor Standards Enforcement pertaining to the Healthy Workplaces, Healthy Families Act of 2014, as amended, California Labor Code Sections 245-249, but shall not be bound by such guidelines, rules, or interpretations.*

* * * *

**SEC. 12W.12. OPERATIVE DATE.**

*(a)* This Chapter shall become operative 90 days after its adoption by the voters at the November 7, 2006 election. This Chapter shall have prospective effect only.

*(b) Amendments to this Chapter adopted by the voters at the June 7, 2016 election shall become operative on January 1, 2017. These amendments shall have prospective effect only.*

**SEC. 12W.13. PREEMPTION.**

Nothing in this Chapter shall be interpreted or applied so as to create any power or duty in conflict with federal or state law. *The term "conflict," as used in this Section 12W.13, means a conflict that is preemptive under federal or state law. For purposes of this Section, consistent with California Labor Code Section 249(d), a difference between this Chapter and the provisions of the Healthy Workplaces, Healthy Families Act of 2014, as amended, California Labor Code Sections 245-249, is not a preemptive conflict under state law.*

**SEC. 12W.16. AMENDMENT BY THE BOARD OF SUPERVISORS.**

*(a)* The Board of Supervisors may amend this Chapter with respect to matters relating to its implementation and enforcement (including but not limited to those matters addressed in section 12W.8) and matters relating to employer requirements for verification or documentation of an employee's use of sick leave, but not with respect to this Chapter's substantive requirements or scope of coverage*, except as stated in subsections (b) and (c)*; provided, however, that, in the event any provision in this Chapter is held legally invalid, the Board retains the power to adopt legislation concerning the subject matter that was covered in the invalid provision.

*(b) The Board of Supervisors may amend this Chapter's substantive requirements or scope of coverage for the purpose of adopting provisions parallel to state or federal law, if and to the extent state or federal law provides greater or additional substantive requirements, or broader coverage, than this Chapter.*

*(c) Notwithstanding subsection (b), the Board of Supervisors may amend this Chapter's substantive requirements or scope of coverage as to the amendments adopted by the voters at the June 7, 2016 election, for the purpose of adopting provisions that parallel any changes in State law regarding those provisions of State law on which those amendments are based. This subsection (c) shall not be construed to authorize any other amendment of this Chapter or to reduce the substantive requirements or scope of coverage of this Chapter below that which existed before the amendments adopted at the June 7, 2016 election.*

Section 3. Scope of Ordinance. In enacting this ordinance, the People of the City and County of San Francisco intend to amend only those words, phrases, paragraphs, subsections, sections, articles, numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Administrative Code that are explicitly shown in this ordinance as additions or deletions, in accordance with the "Note" that appears under the official title of the ordinance.

# District Proposition AA

### THE SAN FRANCISCO BAY CLEAN WATER, POLLUTION PREVENTION AND HABITAT RESTORATION MEASURE

The people of the San Francisco Bay Restoration Authority do ordain as follows:

**Section 1. Findings and Purpose.**

Over the last century, landfill and toxic pollution have had a massive impact on San Francisco Bay (sometimes referred to herein as the "Bay"). It is not too late to reverse this impact and restore the Bay for future generations. To meet that objective, in 2008, state law established the San Francisco Bay Restoration Authority (the "Authority"), to raise and allocate resources for the restoration, enhancement, protection, and enjoyment of wetlands and wildlife habitats in the San Francisco Bay and along its shoreline.

The purpose of the San Francisco Bay Clean Water, Pollution Prevention and Habitat Restoration Measure (the "Measure") is to protect and restore San Francisco Bay to benefit future generations by reducing trash, pollution, and harmful toxins, improving water quality, restoring habitat for fish, birds, and wildlife, protecting communities from flood and increasing shoreline public access and recreational areas.

**Section 2. Funding of San Francisco Bay Clean Water, Pollution Prevention and Habitat Restoration Expenditure Plan.**

Subject to voter approval, the Authority hereby establishes a special parcel tax (the "Special Tax") the proceeds of which shall be used solely for the purpose of supporting the programs and priorities and other purposes set forth in this Measure. The Special Tax shall be levied at a rate of twelve dollars ($12) per parcel within the jurisdiction of the Authority, which consists of the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano and Sonoma and the City and County of San Francisco (such nine counties, collectively, the "San Francisco Bay Area"). The Special Tax shall be levied annually for a total of twenty (20) years, commencing July 1, 2017 and ending June 30, 2037.

The Special Tax shall be levied on each parcel of taxable property within the San Francisco Bay Area, and shall be collected by the tax collectors of each county (including the City and County of San Francisco) in the San Francisco Bay Area (the "Tax Collectors") at the same time as, and along with, and will be subject to the same penalties as general, *ad valorem* taxes collected by the Tax Collectors. The Special Tax and any penalty shall bear interest at the same rate as the rate for unpaid *ad valorem* property taxes until paid. Any Special Tax levied shall become a lien upon the properties against which taxes are assessed and collectible as herein provided. The Special Tax shall appear as a separate item on the tax bill.

All property that is otherwise exempt from *ad valorem* property taxes in any year shall also be exempt from the Special Tax in such year. The Authority shall adopt procedures that set forth any clarifications and exemptions to address unique circumstances and any procedure for claimants seeking an exemption, refund, reduction or recomputation of the Special Tax.

**Section 3. San Francisco Bay Clean Water, Pollution Prevention and Habitat Restoration Expenditure Plan.**

The revenues from the Special Tax set forth in Section 2 above shall be used solely for the purpose of supporting programs and priorities and purposes set forth in this Measure, including the following:

A. **Program Descriptions**

Under this Measure, the Authority may fund projects along the Bay shorelines within the Authority's jurisdiction, which consists of the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano and Sonoma and the City and County of San Francisco. The shorelines include the shorelines of San Francisco Bay, San Pablo Bay, Carquinez Strait, Suisun Bay, and most of the Northern Contra Costa County Shoreline to the edge of the Delta Primary Zone. These projects shall advance the following programs:

1. **Safe, Clean Water and Pollution Prevention Program**

The purpose of this program to be funded under the Measure is to remove pollution, trash and harmful toxins from the Bay in order to provide clean water for fish, birds, wildlife, and people.
   a. Improve water quality by reducing pollution and engaging in restoration activities, protecting public health and making fish and wildlife healthier.
   b. Reduce pollution levels through shoreline cleanup and trash removal from the Bay.
   c. Restore wetlands that provide natural filters and remove pollution from the Bay's water.
   d. Clean and enhance creek outlets where they flow into the Bay.

2. **Vital Fish, Bird and Wildlife Habitat Program**

The purpose of this program to be funded under the Measure is to significantly improve wildlife habitat that will support and increase vital populations of fish, birds, and other wildlife in and around the Bay.
   a. Enhance the San Francisco Bay National Wildlife Refuge, shoreline parks and open space preserves, and other protected lands in and around the Bay, providing expanded and improved habitat for fish, birds and mammals.


    b. Protect and restore wetlands and other Bay and shoreline habitats to benefit wildlife, including shorebirds, waterfowl and fish.

    c. Provide for stewardship, maintenance and monitoring of habitat restoration projects in and around the Bay, to ensure their ongoing benefits to wildlife and people.

3. **Integrated Flood Protection Program**

The purpose of this program to be funded under the Measure is to use natural habitats to protect communities along the Bay's shoreline from the risks of severe coastal flooding caused by storms and high water levels.

    a. Provide nature-based flood protection through wetland and habitat restoration along the Bay's edge and at creek outlets that flow to the Bay.

    b. Build and/or improve flood protection levees that are a necessary part of wetland restoration activities, to protect existing shoreline communities, agriculture, and infrastructure.

4. **Shoreline Public Access Program**

The purpose of this program to be funded under the Measure is to enhance the quality of life of Bay Area residents, including those with disabilities, through safer and improved public access, as part of and compatible with wildlife habitat restoration projects in and around the Bay.

    a. Construct new, repair existing and/or replace deteriorating public access trails, signs, and related facilities along the shoreline and manage these public access facilities.

    b. Provide interpretive materials and special outreach events about pollution prevention, wildlife habitat, public access, and flood protection, to protect the Bay's health and encourage community engagement.

B. **Additional Allocation Criteria and Community Benefits**

1. The Authority shall ensure that the Measure's revenue is spent in the most efficient and effective manner, consistent with the public interest and in compliance with existing law. The Authority shall give priority to projects that:

    a. Have the greatest positive impact on the Bay as a whole, in terms of clean water, wildlife habitat and beneficial use to Bay Area residents.

    b. Have the greatest long-term impact on the Bay, to benefit future generations.

    c. Provide for geographic distribution across the region and ensure that there are projects funded in each of the nine counties in the San Francisco Bay Area over the life of the Measure.

    d. Increase impact value by leveraging state and federal resources and public/private partnerships.

    e. Benefit economically disadvantaged communities.

    f. Benefit the region's economy, including local workforce development, employment opportunities for Bay Area residents, and nature-based flood protection for critical infrastructure and existing shoreline communities.

    g. Work with local organizations and businesses to engage youth and young adults and assist them in gaining skills related to natural resource protection.

    h. Incorporate monitoring, maintenance and stewardship to develop the most efficient and effective strategies for restoration and achievement of intended benefits.

    i. Meet the selection criteria of the Coastal Conservancy's San Francisco Bay Area Conservancy Program and are consistent with the San Francisco Bay Conservation and Development Commission's coastal management program and with the San Francisco Bay Joint Venture's implementation strategy.

2. The Authority shall ensure that 50% of the total net revenue generated during the 20-year term of the Special Tax is allocated to the four Bay Area regions, defined as the North Bay (Sonoma, Marin, Napa and Solano Counties), East Bay (Alameda and Contra Costa Counties), West Bay (City and County of San Francisco and San Mateo County) and South Bay (Santa Clara County) in proportion to each region's share of the Bay Area's population, as determined in the 2010 census, and consistent with the priorities set forth in this section. As a result, each region will receive the following minimum percentage of total net revenue generated during the 20-year term of the Special Tax: North Bay: 9%, East Bay: 18%, West Bay: 11%, South Bay: 12%. The remaining revenue shall be allocated consistent with all other provisions of this Measure.

3. The Authority shall conduct one or more public meetings annually to gain public input on selection of projects under this Measure. All actions, including decisions about selecting projects for funding, will be made by the Authority in public meetings with advance notice and with meeting materials made available in advance to the public.

4. The Authority may accumulate revenue over multiple years so that sufficient funding is available for larger and long-term projects. All interest income shall be used solely to support programs and priorities set forth in this Measure.

5. No Special Tax proceeds shall be used for campaign advocacy.

6. No more than 5% of the Special Tax proceeds generated in any given fiscal year may be used by the Authority for general government purposes in such fiscal year, including to administer the projects funded under this Measure. Any unused funds may be carried over for use in subsequent fiscal years.

7. The Authority shall have the right, power and authority to pledge Special Tax proceeds to the payment of bonds of the Authority or another public agency (including, but not limited to, a joint powers authority created pursuant to Article 1 of the Joint Exercise of Powers Act (Government Code Section 6500 et seq.), and use Special Tax proceeds to pay debt service on such bonds and the costs of issuance related thereto.

C. **Accountability and Oversight**

In order to ensure accountability, transparency and public oversight of funds collected and allocated under this Measure and comply with State law, all of the following shall apply:

1. The specific purpose of the Special Tax shall be to support only programs and priorities and other purposes listed in this Measure. The Special Tax proceeds shall be applied only for specific purposes of this Measure and shall be spent only in accordance with the procedures and limitations set forth in this Measure.

2. A separate account shall be created by the Authority into which all Special Tax proceeds must be deposited. The Authority shall commission an independent annual audit of all revenues deposited in, and all expenditures made from, the separate account and publish annual financial statements.

3. All Special Tax revenue, except as set forth in Section 3.B.6 above, shall be spent on projects for the benefit of the San Francisco Bay Area, and shall not be taken by the State.

4. The Authority shall prepare annual written reports showing (i) the amount of funds collected and expended from Special Tax proceeds and (ii) the status of any projects or programs required or authorized to be funded from the proceeds of the Special Tax, as identified above. The report shall comply with Government Code section 50075.3, be posted on the Authority's website, and be submitted to the Bay Restoration Advisory Committee, established pursuant to Government Code section 66703.7 (the "Advisory Committee"), for review and comment.

5. The Advisory Committee shall provide advice to the Authority on all aspects of its activities under this Measure to ensure maximum benefit, value, and transparency. Advisory Committee meetings will be announced in advance and will be open to the public. The responsibilities of the Advisory Committee shall include, but shall not be limited to: (a) advising the Authority about implementation of this Measure; and (b) making recommendations regarding expenditure priorities under this Measure.

6. The Authority shall appoint six members of the public to an Independent Citizens Oversight Committee that shall: (a) annually review the Authority's conformance with the Measure; (b) review the Authority's audits and expenditure and financial reports; and (c) publish an annual report of its findings, which shall be posted on the Authority's website. The six members shall include residents of the North Bay, East Bay, West Bay, and South Bay, as defined in Government Code 66703(a), who are experts in water quality, pollution reduction, habitat restoration, flood protection, improvement of public access to the Bay, or financing of these objectives. No person may serve on the Independent Citizens Oversight Committee who (a) is an elected official or government employee, or (b) has had or could have a financial interest in decisions of the Authority as defined by Government Code section 87103 and the Fair Political Practices Commission.

## Section 4. Establishment of Appropriation Limit.

Pursuant to Article XIII-B of the California Constitution and section 66704.05(b)(2) of the Government Code, the appropriation limit of the Authority shall be set by the total revenues actually received by the Authority from the proceeds of the Special Tax levied in fiscal year 2017-18, as adjusted each fiscal year thereafter for the estimated change in the cost of living, population and number of parcels on which the Special Tax is levied (such estimate to be determined by the Governing Body of the Authority and be conclusive for all purposes after made). The appropriation limit may be further adjusted by any other changes that may be permitted or required by Article XIII-B of the California Constitution.

## Section 5. Amendments and Severability.

A. The Governing Board of the Authority shall be empowered to amend this Measure by majority vote of its members to further the purposes of this Measure, to conform the provisions of this Measure to applicable State law, to modify the methods of levy and collection of the Special Tax, or to assign the duties of public officials under this Measure.

B. If any part of this Measure is held to be invalid for any reason, such decision shall not affect the remaining portions of this Measure and the voters declare that they would have passed the remainder of this Measure as if such invalid portion were not included.

# Frequently Asked Questions (FAQs)
## Answered by the Ballot Simplification Committee

**❓ Who can vote?**
U.S. citizens, 18 years or older, who are registered to vote in San Francisco on or before the registration deadline.

**❓ What is the deadline to register to vote or to update my registration information?**
The registration deadline is May 23, fifteen days prior to Election Day.

**❓ When and where can I vote on Election Day?**
You may vote at your polling place or at the City Hall Voting Center on Election Day from 7 a.m. to 8 p.m. Your polling place address is shown on the back cover of your Voter Information Pamphlet. You can also find it at *sfelections.org/pollsite* or call (415) 554-4375. The City Hall Voting Center is located outside Room 48.

**❓ Is there any way to vote before Election Day?**
Yes. You have the following options:
- **Vote by mail.** Fill out and mail the Vote-by-Mail Application printed on the back cover of this pamphlet, complete one online at *sfelections.org/toolkit*, or call (415) 554-4375 to request to vote by mail. A vote-by-mail ballot will be sent to you. Your request must be *received* by the Department of Elections by May 31, or
- **Vote in person** at the City Hall Voting Center, beginning May 9 (see page 5 for dates and times).

**❓ If I don't use an application or call, can I get a vote-by-mail ballot some other way?**
Yes. You can send a written request to the Department of Elections. This request *must* include: your printed home address, the address where you want the ballot mailed, your birth date, your printed name, and your *signature*. Mail your request to the Department of Elections at the address on the back cover of this pamphlet or fax it to (415) 554-4372. Your request must be *received* by May 31.

**❓ If I was convicted of a crime, can I still vote?**
Yes, you can. You are eligible to register and vote if you:
- Are convicted of a misdemeanor or detained in county jail serving a misdemeanor sentence.
- Are detained in county jail because jail time is a condition of probation.
- Are on probation.
- Are on mandatory supervision.
- Are on post-release community supervision.
- Have completed your parole.

If you are awaiting trial or are currently on trial, but have not been convicted, you may register and vote.

**❓ My 18th birthday is after the registration deadline but on or before Election Day. Can I vote in this election?**
Yes. You can register to vote on or before the registration deadline and vote in this election—even though you are not 18 when you register.

**❓ I have just become a U.S. citizen. Can I vote in this election?**
Yes.
- If you became a U.S. citizen on or before the registration deadline (May 23), you can vote in this election, but you must register by the deadline;
- If you became a U.S. citizen *after* the registration deadline but on or before Election Day, you may register **and** vote at the City Hall Voting Center before 8 p.m. on Election Day with proof of citizenship.

**❓ I have moved within San Francisco but have not updated my registration prior to the registration deadline. Can I vote in this election?**
Yes. You have the following options:
- Come to the City Hall Voting Center, on or before Election Day, complete a new voter registration form **and** vote; or
- Go to your new polling place on Election Day and cast a provisional ballot. You can look up the address of your new polling place by entering your new home address at *sfelections.org/pollsite*, or call (415) 554-4375.

**❓ I am a U.S. citizen living outside the country. How can I vote?**
You can register to vote and be sent a vote-by-mail ballot by completing the Federal Post Card Application. Download the application from *fvap.gov* or obtain it from embassies, consulates or military voting assistance officers.

**❓ If I don't know what to do when I get to my polling place, is there someone there to help me?**
Yes. Poll workers at the polling place will help you, or you may visit *sfelections.org/toolkit* or call the Department of Elections at (415) 554-4375 for assistance on or before Election Day.

**❓ Can I take my Sample Ballot or my own list into the voting booth?**
Yes. Deciding your votes before you get to the polls is helpful. You may use either a Sample Ballot or the Ballot Worksheet in this pamphlet for this purpose.

**❓ Do I have to vote on every contest and measure on the ballot?**
No. The votes you cast will be counted even if you have not voted on every contest and measure.

# Ballot Worksheet

*Fill in your choices – Cut out and take with you to the polls*

Not all voters are eligible to vote on all party contests. Your sample ballot includes the contests for which you are eligible to vote. For more information, see your sample ballot.

## OFFICES

**PARTY-NOMINATED OFFICES:** ▼ *Vote for one*

President of the United States _____

**VOTER-NOMINATED OFFICES:** ▼ *Vote for one*

United States Senator _____

United States Representative _____

State Senator _____

Member, State Assembly _____

**NONPARTISAN OFFICES:** ▼ *Vote for one*

Judge of the Superior Court, Office No.7 _____

Members, County Central Committee ▼
or County Council *(Democratic, Green, and Republican parties only)*

*The spaces below allow for the maximum number of County Central Committee or County Council candidates for whom any voter may vote. See your sample ballot for the number of candidates for whom you may vote.*

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

| TITLE: | PROPOSITIONS | YES | NO |
|---|---|---|---|
| 50 | Suspension of Legislators. Legislative Constitutional Amendment. | | |
| A | Public Health and Safety Bond | | |
| B | Park, Recreation and Open Space Fund | | |
| C | Affordable Housing Requirements | | |
| D | Office of Citizen Complaints Investigations | | |
| E | Paid Sick Leave | | |
| AA | San Francisco Bay Clean Water, Pollution Prevention and Habitat Restoration Program. | | |



# Index

## Voter Information Pamphlet
## Consolidated Presidential Primary Election — June 7, 2016

**A**
Access for voters with disabilities ........................ 10
Address of your polling place................... (back cover)
Application for a vote-by-mail ballot............. (back cover)
Application for permanent vote-by-mail status.... (back cover)

**B**
Ballot Simplification Committee............................ 3
Ballot worksheet..................................... 135

**C**
Candidate information ................................... 16
Candidate statements of qualifications .................... 16
  Candidates for State Senator .......................... 17
  Candidates for Judge of the Superior Court, Office No. 7.... 18
  Candidates for United States Representative ............. 21
  Candidates for State Assembly......................... 23
Chinese-language voter assistance (中文選民服務)........ 8
City Hall Voting Center.................................... 5
Confidentiality and voter records ........................ 20
Contact the Department of Elections ...... (inside back cover)

**D**
Dates, important ....................... (inside front cover)
Debt overview ......................................... 14

**E**
Early voting ............................................. 5

**F**
Filipino-language voter assistance
(tulong para sa botante sa wikang Filipino)................. 9
Frequently asked questions (FAQs)...................... 134

**L**
Legal text of local and district ballot measures ........... 120
Letter from the Director................................... 2
Local ballot measure and argument information ........... 80
  A   Public Health and Safety Bond ..................... 82
  B   Park, Recreation and Open Space Fund ............. 92
  C   Affordable Housing Requirements .................. 98
  D   Office of Citizen Complaints Investigations......... 107
  E   Paid Sick Leave ................................. 112
  AA  San Francisco Bay Clean Water, Pollution
      Prevention and Habitat Restoration Program....... 116

**M**
Mistake while voting, how to get a new ballot............... 7
Multilingual voter services ................................ 8

**P**
Party endorsements..................................... 16
Permanent vote-by-mail information....................... 5
Polling place, confirm location............................ 4
Poll worker recruitment.................................. 91
Primary election information ............................ 12
Purpose of the Voter Information Pamphlet and Voter
Information Guide....................................... 3

**S**
Safe at Home program................................... 20
**Sample Ballot**
  American Independent Party....................... 24, 76
  Democratic Party .................................... 28
  Green Party ......................................... 36
  Libertarian Party................................. 44, 76
  Peace and Freedom Party ......................... 48, 76
  Republican Party .................................... 52
**Options for voters with no party preference:**
  (NPP) American Independent Party ................ 60, 76
  (NPP) Democratic Party .......................... 64, 76
  (NPP) Libertarian Party........................... 68, 76
  Nonpartisan ballot ............................... 72, 76
Spanish-language voter assistance (asistencia en español)... 8

**V**
Voter bill of rights ...................................... 20
Voter Information Pamphlet, stop mail delivery
and read online instead................................ 111
Voting by mail .......................................... 5
Voting instructions ...................................... 6

**W**
Website of the Department of Elections.... (inside back cover)
Words you need to know ............................... 81
Write-in candidates, how to vote for ....................... 7



If the Department of Elections learns of any substantial errors on our part after this pamphlet has been mailed, we will publish a correction in the Public Notices section of the *San Francisco Chronicle* and in *Sing Tao Daily* on May 24, 25, and 26, and in *La Opinión de la Bahía* on May 29.

# Contact the Department of Elections



| PHONE | | MAIL | EMAIL |
|---|---|---|---|
| English: | (415) 554-4375 | Department of Elections | Use the email form at |
| Español: | (415) 554-4366 | 1 Dr. Carlton B. Goodlett Place | sfelections.org/sfvote |
| 中文: | (415) 554-4367 | City Hall, Room 48 | |
| Filipino: | (415) 554-4310 | San Francisco, CA 94102-4634 | |
| TTY: | (415) 554-4386 | | |

*Office hours are Mondays through Fridays (except holidays) from 8 a.m. until 5 p.m.*

## Visit *sfelections.org/toolkit* to:

- → Check your voter registration status, including party preference
- → Register to vote or update your registration
- → Learn more about ranked-choice voting
- → Request a vote-by-mail ballot
- → Check the status of your vote-by-mail ballot
- → Look up your polling place location
- → View your sample ballot

---

Return Address:

_____

_____

Place a first-class stamp here. Post Office will not deliver without one.

**Did you sign the other side of your Vote-by-Mail Application?**



OFFICIAL ELECTION MAIL — Authorized by the U.S. Postal Service ®

DIRECTOR OF ELECTIONS
DEPARTMENT OF ELECTIONS
1 DR CARLTON B GOODLETT PLACE ROOM 48
SAN FRANCISCO  CA 94102-4608

**DEPARTMENT OF ELECTIONS**
City and County of San Francisco
1 Dr. Carlton B. Goodlett Place
City Hall, Room 48
San Francisco, CA 94102-4608
Telephone: (415) 554-4375
TTY: (415) 554-4386
sfelections.org



| NONPROFIT ORG. |
| U.S. POSTAGE |
| PAID |
| TOWNE, INC. |

ELECTRONIC SERVICE REQUESTED

### Your polling place address:
La dirección de su lugar de votación: / 您的投票站地址：/
Address ng inyong lugar ng botohan:

### Mailing Address:

**Are the entryway and the voting area accessible?** ¿Son accesibles la entrada y el área de votación? / 入口和投票區是否方便出入？ / Madali bang makarating at makapasok sa pasukan at sa lugar ng botohan?

**Political Party Preference:** / Preferencia por partido político: / 政黨傾向: / Kinakatigang Partidong Politikal: ▶

## Vote-by-Mail Application for the June 7, 2016, Consolidated Presidential Primary Election
Must be in the Department of Elections office by May 31 at 5 p.m.

**Name:**

If "PERM" is printed above, DO NOT send in this application. You are a Permanent Vote-by-Mail Voter. A ballot will be sent to you automatically.
Si aparece impreso "PERM" arriba, NO envíe esta solicitud. Usted ya es un Elector de Voto por Correo Permanente. Se le enviará una boleta automáticamente.
如果以上印有「PERM」字樣，您不必寄送本申請表。您已是永久郵寄投票選民，我們會主動寄選票給您。/ Kung nakasulat ang "PERM" sa itaas, HUWAG ipadala ang aplikasyong ito. Kayo ay isang Permanenteng Vote-by-Mail na Botante. Awtomatikong ipadadala sa inyo ang isang balota.

☐ Check here if you wish to become a Permanent Vote-by-Mail Voter. / Marque aquí si quiere hacerse un Elector de Voto por Correo Permanente. / 如果您想申請成為永久郵寄投票的選民，請勾選此句前的方格。/ Markahan ng check dito kung nais ninyong maging Permanenteng Vote-by-Mail na Botante.

| Residential Address | Mailing Address (If different from Mailing Address printed above) |
|---|---|
| Street:                                     Apt: | Street:                                     Apt: |
| City, State, ZIP Code: | City, State, ZIP Code: |
| Phone: | Country: |

**I certify under penalty of perjury that this information is true and correct.** / Certifico bajo pena de perjurio que esta información es verídica y correcta. / 本人依照偽證罪處罰法宣誓，所填資料真實無誤。/ Aking sinesertipika, alinsunod sa parusang pagsisinungaling sa sinumpaang salaysay, na totoo at tama ang impormasyong ito.

**Sign here / Firme aquí / 在此簽名 / Pumirma dito** ▶ _____ / ___ /16

Date / Fecha / 日期 / Petsa

We must have your signature – Do not print / Necesitamos recibir su firma – No escriba en letra de molde / 我們一定要有您的簽名 —— 不需正楷 / Kailangan namin ang inyong pirma – Huwag isulat ang pangalan.

According to our records, you did not indicate a preference for a qualified political party when you registered to vote. For this election, the following political parties will allow voters with no party preference to vote in their primary election for President: American Independent, Democratic, Libertarian.

**Note:** If you do not request the ballot of one of these parties, your ballot will not include a contest for President.

I have declined to disclose a preference for a qualified political party. However, for this primary election only, I request a vote-by-mail ballot of the _____ party (choose one):
☐ American Independent   ☐ Democratic   ☐ Libertarian

For more information, call 1-800-345-VOTE, or visit sos.ca.gov.

**NP**