1  William M. Simpich SB #106672
   Attorney at Law
2  1736 Franklin Street, 10th Floor
   Oakland, CA 94612
3  Telephone (415) 542-6809
   E-mail:  bsimpich@gmail.com
4
5  Attorney for Plaintiffs
6
7                    UNITED STATES DISTRICT COURT
8                  NORTHERN DISTRICT OF CALIFORNIA
9
10 VOTING RIGHTS DEFENSE PROJECT, et      Case No.  C-16-02739
   al.,
11                                        PLAINTIFFS' OPPOSITION TO MOTIONS
               Plaintiffs,                TO DISMISSAL BY ALL DEFENDANTS
12                                        AND REQUEST FOR LEAVE TO AMEND
        v.                                COMPLAINT TO CONFORM WITH PROOF
13
14 ALEX PADILLA, et al.,                  Date:  7/12/16
                                          Time: 11:00 am
15             Defendants.                Dept:  8, Hon. William Alsup
16

17        Plaintiffs respectfully ask the court to determine at the July 12 hearing if this case can go

18 any further.  Plaintiffs waive any defect caused by San Francisco's filing on June 20 and ask the

19 court for guidance now.   Plaintiffs will move the court separately to accept this larger-than-15

20 page brief.

21        The 2016 primary election is over – but its legacy continues.  Millions of Californians

22 now feel let down by their voting system.  The battle for the no-party-preference voters

23 continues.

24        The best remedy for their plight is uniform voting standards consistent with 52 USC

25 10101(a)(2)(A).  For this reason, Plaintiffs seek to continue this lawsuit, and to amend the

26 complaint before San Francisco's motion is heard on August 18, 2016.  Otherwise, the

27 discriminatory treatment of the NPPs will be repeated in 2020.

28            PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

                                                                                        1

## I. PLAINTIFF'S REQUEST TO AMEND THE COMPLAINT TO CONFORM WITH PROOF

### A. This lawsuit began with realizing how San Francisco had misled its voters

Plaintiffs seek leave to amend the complaint to conform with the documents submitted prior to the injunction hearing on June 1, 2016. In the week after the complaint was filed, Plaintiffs learned first-hand about a raft of abuses involving the poll workers in the County of Alameda.

This case was filed following the revelations about the City and County of San Francisco, as documented in the previously filed declaration of counsel.

As stated in Exhibit 11A-D of the Roguski Declaration, counsel has provided documents that are a major basis of the contentions regarding San Francisco. Exhibit 11A is a notice informing the voters how "to request a ballot that includes the presidential primary contest of one of these parties, mark the name of the party on the attached postage-paid postcard, and sign and return the postcard no later than April 18. If you do not request the ballot of one of these parties, your ballot will not include a contest for President." The impact to the reasonable voter is clear – if you don't return the postcard by April 18, your ballot will not include a contest for President. Ms. Mena, in her declaration, explains that she changed her registration from NPP to Democrat to heighten the chance she could vote for President after seeing this notice shortly after April 18.

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

Counsel went to the Elections office on Thursday, May 19 and obtained a copy of the postcard that was attached to Exhibit 11-A by showing 11-A to the election worker and asking for a copy of the attached postcard.  That copy is attached as Exhibit 11B to the Roguski Declaration.  It contains a request for a vote-by-mail ballot but provides the wrong date – pursuant to Elections Code 3006, any application for a vote by mail ballot such as Exhibit 11B must be requested by May 31.  This application states that the deadline is June 1.  The consequence of missing this deadline will mean that voters by mail will not receive by mail their ballot to vote for President, even though they are expecting it.  It is a matter of common knowledge that a high percentage of California voters vote by mail.  On information and belief, plaintiffs believe that the number varies between ½ to 2/3 of the populace.  Similarly, it is common knowledge that a substantial number of voters in the state are no party preference; my understanding is that number is somewhere between  23% to 25%.  This indicates that hundreds of thousands of NPP votes are at stake in this primary election; especially in light of a recent May 25 US News & World Report article stating that at that time 50% of the NPP voters are Democrats, but only 14% of them at that time had received vote-by-mail ballots back in the mail.

These statistics are found in this widely circulated US News and World Report article:  http://www.usnews.com/news/articles/2016-05-24/bernies-ballot-burden-in-california.

The next problem manifested when the City and County of San Francisco sent out the Voter Information Pamphlet and Sample Ballot in early May.  Counsel discussed his problem with Mr. White in mid-May in a letter exchange.  Mr. White took the position that the Elections Code 3006(c) to all voter only needed to be given to NPP

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

voters.  It is counsel's belief it needs to be given to all voters pursuant to the statute and the statutory scheme of which 3006 is a part.  Section 3000 states in essence that it is to be construed in a light most helpful to voters.

Counsel believes that all voters need to have access to the 3006 notice in the statute, because some of those voters may have switched to NPP status or may be considering such a switch, and they are entitled to this information in order to make an informed decision.  Mr. White is of the completely opposite opinion, saying that providing such a notice in an application to vote by mail would be more confusing to voters.

A document contrasting the party and NPP sample ballot in San Francisco is attached as Exhibit 11C in the Roguski declaration.  Counsel provided these materials in Exhibit 11 to Mr Roguski for inclusion in his declaration.

A problem with both defendant counties is that they are distributing the applications to vote by mail by electronic mail on their website.  See Exhibit 8-9, Roguski Declaration.  Defense counsel for both counties state that in both counties, if you enter your data into the form, then the NPP data is provided to you and you get that information.  However, it is a "distribution" to post these forms on a public website where citizens perusing the website and trying to make intelligent decisions are not given the NPP information unless they log their data into the site and push"submit".  This violates Election Code 3006(c) and 3007.7, which incorporates 3006(c) in its provisions in the electronic context of "distribution".

Counsel was unable to get San Francisco or Alameda to change this practice, but counsel did convince San Mateo County to do so and Plaintiffs did not sue them as a result of that positive gesture.  The Roguski Declaration, as a general matter,

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

chronicles from Exhibits 1-14 defects in applications pursuant to 3006 as well as faulty instructions throughout the state.

It should be added that San Francisco failed to inform their voters pursuant to 3006(b)(3) that voters applying to vote by mail have the right to deliver their application directly to the elections county office by May 31.  They are not limited to having to do it by mail.  What made it worse is that San Francisco informed the voters that the deadline to return the vote-by-mail application was June 1 – another act of potential disenfranchisement.

### B.   It became clear that voters and poll workers were suffering from mass confusion

Voters suffered from mass confusion.  Besides the aforementioned Ms. Mena's confusion that led to her switch from NPP to Democratic, plaintiff and NPP registrant Ms. Daims was concerned as well about whether she will be able to vote the Democratic ballot.  Also concerned was Gary Remer, a voter in Monterey, whose declaration shows that he made a similar switch and witnessed great confusion in this county board of elections about who gets to vote in this election for President and how.  Also concerned was Richard Troy, a voter in Alameda County:  His detailed declaration shows that despite his deep interest in the process of voting, his experiences with the county board of elections in Alameda left him completely confused.

Mimi Kennedy, a veteran poll worker in Los Angeles County, recounted how many people made mistakes in the past about thinking that the American Independent Party was the same as no party preference; how many voters are forced to vote

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

provisionally due to failure to bring their vote-by-mail ballots with them to the polls to "surrender" for a replacement ballot; and several other issues that illustrate why voters are suffering from great confusion with this primary.

As counsel never heard from Alameda County counsel despite his post and his call to the defendant Tim Dupuis on May 13, 2016, Plaintiffs filed suit against both entities and the Secretary of State on May 20.  Plaintiffs learned that there was an issue in counties about forcing NPP voters to vote provisionally if they wanted to vote for President, as in San Diego (see Declaration of Jennifer Abreu and Exhibits – even the training materials include this admonition to give NPP presidential voters provisional ballots – on information and belief, these votes are not included in the count until two to four weeks after the election, and only 85% of the time according to leading voter analyst Paul Mitchell), so Plaintiffs amended the complaint to include that issue.

However, in the days ahead counsel was provided a number of very serious reports stating that in some counties the poll workers were being trained to not inform NPP voters that they had the right to receive a Presidential primary ballot.  Counsel sifted through these numerous reports and obtained declarations from the aforementioned Ms. Abreu of San Diego, Jeff Lewis of Santa Clara County, and Ashley Beck of Orange County.  All of them said that they were told not to inform the voter of this right, but to provide the Presidential primary ballot only when the voter asked for it.

Conversely, witnesses such as Michelle Jenab of Los Angeles stated that they were trained to ask the NPP voter if they would like a Presidential primary ballot. (Note that despite counsel's best efforts counsel was able to include where she signed

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

the document, but she informed counsel that she signed it in the County of Los Angeles on May 26 – the date is reflected in the electronic signature.) Joshua White, the attorney for the City and County of San Francisco on election matters as counsel understands it from his conversations with him, has told counsel that the City is informing NPP voters that they can request a Presidential primary ballot, and that it is reflected in their training materials, and counsel presently has no evidence to dispute this assertion and does not make this request regarding the San Francisco defendants.

However, the Secretary of State's counsel Ms. Sharon O'Grady informed counsel on May 27 that it is her understanding that the law is that the voter must request the ballot and that there is no duty of the official to offer the ballot – that was counsel's understanding of counsel's conversation with her on that point.  Her own training materials illustrate that her office states that NPP voters should be advised of the right to obtain a Presidential ballot, a copy is attached as Exhibit 1 to this declaration, see page 3.

However, the Secretary's brief at the time of the injunction hearing stated that "The Secretary of State's poll workers instruction guide encourages poll workers to affirmatively ask NPP voters if they wish to request a party presidential ballot. But the fact that the Secretary of State encourages, and elections officials may choose to instruct poll workers to do more than is legally required does not mean that a failure to do so a violation of the Elections Code."  (Docket 36, pp. 14-15)

The Secretary of State has offered a blueprint for gaming the system.

**C.  After the complaint was filed, Alameda's intra-county problems emerged**

The County of Alameda has written counsel and states that their training materials show that poll workers are trained to inform the NPP voter of their right to receive a

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

Presidential ballot.  Plaintiffs' two Alameda County poll worker witnesses are Gabrielle Dolphin (who is a poll worker judge) and pollworker Dawn DelMonte.  Ms. Dolphin came away from her training with the understanding that individual poll workers were free to do as they liked – to inform or not to inform the NPP voter that they had the right to request a Presidential party ballot.  Ms. DelMonte had the experience of her trainer contradicting the training video which said that the poll worker shall inform the NPP voter of the right to request a Presidential party ballot. She says the trainer said do not provide that information, but wait for the voter to request a Presidential party ballot.  The trainer's denial of Ms DelMonte's recollections does not negate Plaintiffs' right to rely on her account in this suit.

Plaintiff's suit, if amended, will allege that poll workers must be uniformly trained to ask NPP voters whether they want to vote for a presidential candidate in any of the three crossover parties. A training manual doesn't provide a remedy for an NPP voter who doesn't know their rights. The manual is not dispositive of what is actually said to voters at the polling places, or how the trainers were actually trained. The words in the manual do not prove what words are said to the voter in the polling place, or what words were said to the trainer in the training.

The content of the pages relating to crossover voting for nonpartisan voters in the Alameda County poll worker clerk manual  (pp 43-44, see exhibit 1 to Gabrielle Dolphin's declaration at docket numbers 14 and 20) is the same as the one for judges/inspectors (pp 67-70), except visually more material is crammed onto one page for the clerks. In two instances, at the bottom of the respective slides, poll workers are told to "advise the Nonpartisan voters they are entitled to vote nonpartisan or in one of the following parties: American Independent, Democratic,

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

Libertarian."  The "Roster-Index Page: Crossover Voting for Nonpartisan Voters"
page of the inspector manual appears to be an empty green field below the title. (Page
70 in the judge/inspector manual, and not in the clerk manual at all).

In both of the Alameda County poll worker training manuals, there is no mention
of Presidential candidates in the nonpartisan crossover voting, unlike in the Los
Angeles poll worker training handbook, which specifically instructs poll workers to
ask NPP voters whether they wish to vote for the Presidential candidate for the
American Independent, Democratic or Libertarian party. This subtle difference points
to an example of how low information voters can be confused. They might not
understand that their No Party Preference / NP/ Nonpartisan ballot is missing a
Presidential candidate, and most importantly, that the only way they get to vote for a
Presidential candidate is by casting one of the crossover ballots. They might not
realize that the crossover ballots simply only add the Presidential candidate to their
choice of down ballot nonpartisan candidates and that they are not betraying their
independent status by choosing a crossover ballot.

It is entirely possible that the County of Alameda is working very hard to make
the voting experience a positive one – and the same for San Francisco, and their
positive efforts should be commended, however, it is in these subtle wording and
visual choices involving both the training materials and the applications to vote for
mail and attendant instructions that have important information has been omitted (or
ambiguously phrased) to the serious detriment of nonpartisan voters. We have
identified these subtle differences, and are concerned that many nonpartisan voters
are not informed in a sufficiently clear manner what their rights and duties are. We
realize it is a daunting task, but we also wish to help those voters get all the

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

information they need, in as clear and accurate way as possible, to successfully vote according to their wishes.

## II.   THEORIES BEHIND PLAINTIFFS' CAUSES OF ACTION

This action is brought pursuant to 42 U.S.C. § 1983 to secure equitable relief from Defendants' unlawful deprivation of Plaintiffs' rights, privileges and immunities guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Section 2 of the Voting Rights Act of 1965, 52 U.S.C. 10101(a)(2)(A) and (B).  Plaintiff is not seeking a writ of mandamus at this time, and seeks to dismiss this cause of action with leave to amend.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws…" *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Plaintiffs bring the instant lawsuit to protect the right to vote by mail, early voting, registration, and informational voting rights of millions of California voters. Nearly 70% of ballots cast in the 2014 California special election were by mail, and over 65% of the ballots cast in the 2012 presidential preference primary were by mail. http://www.sos.ca.gov/elections/historical-absentee/

The impact of failure to inform NPP voters (no party preference voters) of their right to obtain a "crossover ballot" and to vote in the Presidential primary was significant, as is the failure to inform party-affiliated voters of their right to re-register as no party preference voters and still receive the Presidential primary ballots of the Democratic, American Independent, and Libertarian parties. All Californians' voting rights have been and will continue to be denied or unreasonably infringed upon due to the lack of oversight of the California Secretary of State and county Boards of Elections.

This action seeks injunctive relief to redress the widespread and ongoing

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

failure to provide information regarding the protected voting rights of "no party preference" voters to receive a Democratic, American Independent or Libertarian presidential ballot. Inadequate information has also been provided regarding the right of "no party preference voters" to personally deliver their application to vote by mail to the county board of elections office by May 31, 2016 in order to mail their ballot in by the last day of the primary on June 7.

This failure to provide adequate information is in violation of the Voting Rights Act of 1965, 52 U.S.C.A. § 10101 *et seq*, California Elections Code Section 3000 *et seq.*, and the U.S. Constitution's guarantee of Equal Protection, applied to states pursuant to the Fourteenth Amendment. Plaintiffs are eligible California voters (one Democratic and one no party preference); Voting Rights Defense Project (an organization campaigning to heighten voter education and voter turnout for their candidate Bernie Sanders); and the American Independent Party itself.

### III. FIRST CAUSE OF ACTION – 52 USC 10101(a)(2)(A)

Defendants' actions violate 52 USC 10101(a)(2), generally known as "Section 2" of the Voting Rights Act of 1965. 52 U.S.C. § 10301(a) grants rights to voters by providing, in relevant part: (2) No person acting under color of law shall – (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure difference from the standards, practices or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote. . .

Private litigants may enforce their rights under 52 U.S.C. § 10101(a) by bringing a suit under 42 U.S.C. § 1983. Defendants, acting under color of state law, applied different standards, practices, or procedures in determining whether party voters would be given voter

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

informational rights than were applied to no party preference voters.   Jeffers v. Clinton, 730 F.

Supp. 196, 204 (E.D. Ark. 1989) (three-judge court) (Arnold, J.) (finding that section 2 of the

Voting Rights Act "should be construed liberally in favor of its object, which is to open up the

electoral process to full participation").   There is nothing in the statute that limits this cause of

action to "voter registration".   The facts here illustrate a long series of intra-county and inter-

county practices where some counties provide the necessary NPP information to NPP voters and

some do not; some provide the requisite vote by mail information to all voters and some do not;

and some poll workers provide the information needed to NPP voters and some do not.   This is

an elementary violation of the statute.   Compare the declarations of the poll workers in San

Diego, Orange, and Santa Clara (no notice given) with the policies of San Francisco and Los

Angeles (notice given) with the custom of Alameda (Plaintiffs' evidence indicates that poll

workers decide for themselves whether or not notice will be given).

        The Secretary of State Alex Padilla is named as an indispensable party. The Secretary of

State created the regulations that the Elections Code rely on. On information and belief, the Secretary

of State failed to properly advise the other Defendants, despite the enormous autonomy that the

Defendants enjoy in running their own affairs free of interference from the Secretary.   The

Secretary's role in encouraging the counties to "game the system", as described in Docket 36, pp. 14-

15, is illustrative.

        In Wash. Ass'n of Churches v. Reed, 492 F. Supp. 2d 1264, 2006 U.S. Dist. LEXIS

96444 (W.D. Wash. 2006) the court addressed defendant's argument that he is not the proper

defendant to this action. Defendant initially asserted that, while he maintains the voter statewide

registration list, the counties actually register voters, and therefore he has no direct control over

the 39 separately-elected county auditors. Defendant further asserted that these county auditors

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

are not his "agents," such that he could somehow order the counties to register mismatched applicants.

Plaintiffs responded that defendant had undersold his      , and that he indeed is the proper defendant. As in Washington state, the Secretary of State is the chief elections officer of the state, and he has supervisory control over local elections officials, including the power and responsibility to issue instructions and promulgate rules to ensure that elections are conducted in a uniform manner.  The powers are not as strong as in Washington state, but the facts in this case from the poll workers and the applications to vote by mail show that the Secretary of State is not conducting sufficient guidance in a uniform manner.

## IV. **SECOND CAUSE OF ACTION (52 USC 10101(a)(2)(B) and 42 USC 1983)**

52 USC 10101(a)(2)(B) grants rights to voters by providing, in relevant part: "No person acting under color of state law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." See *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005) (finding a Georgia requirement that voting registrants disclose Social Security number before voting violated materiality provision of Voting Rights Act), aff'd, 439 F.3d 1285 (11th Cir. 2006).

Certain Plaintiffs – or the individuals that they represent - are in imminent danger of being denied the right to vote in the Presidential primary election because of the errors and omissions contained in the mandatory notices containing crucial information necessary in order to obtain the ballot. These errors or omissions are not material in determining whether these individuals are qualified under State law to vote in the June 2016 Presidential primary election.

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

*Friedman v. Snipes, 345 F. Supp. 2d 1356, 2004 U.S. Dist. LEXIS 23739, 18 Fla. L. Weekly Fed. D 63 (S.D. Fla. 2004)* offers the best guidance in this situation.  After analysis, the court ruled against the Plaintiffs because the errors or omissions did not happen in a record or paper.  In this instance, the 3006 and 3007.7 violations occurred in precisely this manner.  The fact  that Defendants got it right sometimes does not excuse the statutory violation.   It is a serious error and omission that fundamentally impacts the voter's rights to information.   Voters have informational rights that must be assiduously respected.

Plaintiffs' theory is that defendants have violated Section 10101(a)(2)(B) by omitting the statements regarding no-party- preference voters from materials distributed to voters that had indicated a party preference.  Dkt. 46 at 4.

Section 10101(a)(2)(B) applies when there is some error or omission in any record or paper relating to any application, registration, or other act requisite to voting. 52 USCS § 10101(a)(2)(B). In applying §10101(a)(2)(B), courts consider state voter qualification law and whether the alleged error or omission is material to that law. It should not be material, i.e., section 10101(a)(2)(B) applies in the presence of an immaterial requirement that only serves to disfranchise voters. See, e.g., Churches, 492 F. Supp. 2d 1264; Schwier, 412 F. Supp. 2d 1266.

The other prong of the inquiry is whether said error or omission

causes an individual to be denied the right to vote. 52 USCS § 10101(a)(2)(B).

Case law is somewhat disfavorable based on the facts at hand. In Friedman v. Snipes, the plaintiffs were unable to vote by mail because of delays at the registrar's office. 345 F. Supp. 2D 1356, 1358 (S.D. Fla. 2004). The court held that, "because the error and omission alleged here did not occur on any record or paper and did not occur in relationship to a determination of the

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

Plaintiffs' eligibility to vote, Plaintiffs have not established a substantial likelihood of success on the merits of a claim of violation of 42 U.S.C. § 1971(a)(2)(B). Id. at 1373.

The court reasoned: "Nothing in my review of the case law in this jurisdiction or in other jurisdictions indicates that section 1971(a)(2)(B) was intended to apply to the counting of ballots by individuals already deemed qualified to vote." Id. At 1371. "This is especially true in the context of absentee ballots, because there is no fundamental right to vote by absentee ballot." Id. at 1370. Further, omitting the ballot as a whole from the batch of absentee ballots was not a qualifying error or omission because it was not "on" a record or paper. Id. At 1373.

In every case in which relief was granted based on section 10101(a)(2)(B), the error or omission was related to a registration form with a nonmaterial requirement such as a social security number. Schwier, 412 F. Supp. 2d at 1276–77 (holding defendant violated Voting Right Act in denying plaintiffs right to register to vote because they refused to disclose their SSNs); Churches, 492 F. Supp. 2D at 1271 (holding plaintiffs demonstrated strong likelihood of success on merits of claim that matching requirement is in direct conflict with "materiality" provision); Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1182-83, 1188 (11th Cir. Fla. 2008) (holding Voting Rights Act violated by registration requirement for driver's license, last four digits of social security number, and matching).

However, we argue that the present situation differs from that in Friedman because the errors or omissions at issue here did occur on paper and did occur in relationship to a determination of the Plaintiff's eligibility to vote for president. Additionally, in the 9th circuit case, Churches, the court applied 10101(a)(2)(B) more liberally than the court in Friedman.

**ANALYSIS**

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

First, we argue that Defendants have misconstrued our 10101(a)(2)(B) argument to be about "failing to tell voters who have disclosed a preference for a qualified political party that that they "have declined to disclose a preference for a qualified political party," Arntz MTD, Dkt. 51 at 10 (quoting Compl. ¶ 8) or that they should have "given no-party- preference voter information to party-affiliated voters." Padilla MTD, Dkt. 48 at 11.

The primary error or omission was Defendants' "failure to inform NPP voters (no party preference voters) of their right to obtain a 'crossover ballot' and to vote in the Presidential primary." Amended Compl. ¶ 3. Specifically, Defendants Tim Dupuis and John Arntz . . . distributed to the voters an electronic application to vote for mail on Dupuis' Oakland website and Artnz's San Francisco website that violated Elections Code § 3006(c) and 3007.7(e). Both of these applications failed to provide the mandatory notice to all voters of their right to state no party preference; and, further, that a no party preference voter shall be provided with a Democratic, American Independent Party or a Libertarian Party Presidential primary ballot."

Id. ¶ 8. Registrars around the state failed to inform NPP voters how they could vote for a presidential candidate, as is required by the Elections code. Another huge problem related to registration happened in the interim when thousands of voters went missing from the registration rolls or had their registrations inexplicably changed. At best, this was an "error or omission" on the part of registrars. See Stephanie Dube Dwilson, Election Fraud: Why Are Voter Registrations Changing?, HEAVY, http://heavy.com/news/2016/04/election-fraud- voter-registration-changed- suppression- party-affiliation- sanders-clinton- ca-ny- az-md- pa-what- to-do/ (April 13, 2016);

California Primary - A Case of Highway Robbery, http://www.caucus99percent.com/content/california-primary-case- highway-robbery (June 8, 2016).

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

Many people were in fact denied the right to vote for a presidential candidate because of this

omission.  Exit polls point to massive numbers of NPP voters who were unable to vote for

president because they were not properly instructed how to do so: Exit polling of independent,

vote-by- mail voters is showing that 40 percent wanted to vote for a Democratic presidential

candidate, but only 15 percent requested a Democratic ballot, Political Data, Inc. Vice President

Paul Mitchell said. "They just didn't have the Democratic candidates on their ballot and didn't

know how to get them, get the right ballot or get their ballot replaced, Mitchell said.

Sharokina Shams, Many CA independent voters left out of presidential primary, KCRA NEWS,

http://www.kcra.com/news/many-ca- independent-voters- left-out- of-presidential-

primary/39854480 (June 1, 2016).

An early exit poll conducted by Capitol Weekly found that 60 percent of nonpartisan voters

either thought they would automatically receive a Democratic ballot or didn't understand the

process. Indeed, an analysis of the 322,000 nonpartisan mail ballots turned in by last Thursday

show that only 40 percent of them even cast a vote for president.

John Fund, California's Crazy Election Quirks Limit Voter Choices and Create Chaos,

NATIONAL REVIEW, http://www.nationalreview.com/article/436220/californias-presidential-

primary-rules- are-crazy (June 5, 2016). Thus, millions of NPP voters were in fact deprived of

their right to vote because of the omission of information on how to obtain a crossover ballot.

The need for a crossover ballot is just the sort of unnecessary, immaterial hurdle that section

10101(a)(2)(B) was enacted to avoid. Being able to use a crossover ballot instead of the one

distributed to NPP voters in no way reads on "whether such individual is qualified under State

law to vote in such election." 52 USC § 10101(a)(2)(B). To the contrary, we are witnessing

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

"state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise" certain voters. NAACP, 522 F.3d at 1173. This "trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." Id. In sum, the wrongs being committed are exactly the sort 52 USC § 10101(a)(2)(B) is intended to remedy.

## V.  THIRD CAUSE OF ACTION (First and Fourteenth Amendments, and 42 USC 1983)

Defendants' actions violated the 1st Amendment to the United States Constitution and the equal protection clause of the 14th Amendment to the United States Constitution, as the acts of the defendants towards the no party preference voters constituted arbitrary discrimination of these plaintiffs as well as the associational classes that Voting Rights Defense Project and American Independent Party represent.

The First and Fourteenth Amendments of the Constitution require that courts closely scrutinize challenged election regulations, weighing "the character and magnitude of the asserted injury . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

The facts here illustrate arbitrary discrimination.  Some CA counties send complete information to NPP voters while others fail to do so.  Similarly, there is a failure to treat similarly situated parties equally under the Elections Code.  California has a very high incidence of by-mail voters compared to other states.   Nearly 70% of ballots cast in the 2014 California special election were by-mail, and over 65% of the ballots cast in the 2012 presidential preference primary were by-mail.   http://www.sos.ca.gov/elections/historical-absentee/  Therefore, the

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

impact of failure to inform NPP voters of their right to vote a Presidential party ballot is significant.

Even after the enactment of the federal Voting Rights Act (VRA) eligible citizens have had to navigate "a complicated maze of local laws and procedures" creating obstacles to voting sometimes "as restrictive as the outlawed practices."  H.R. REP. NO. 103-9, at 3. "Voting is of the most fundamental significance under our constitutional structure.'" Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (quoting Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979)).

*Griffin v. Burns*, (D.R.I. 1977) 431 F.Supp. 1361,  1366  (D.R.I. 1977) is an illustrative case, even when Plaintiffs must hurdle the more difficult argument of equal protection as contrasted to the Voting Rights Act.  The facts concern failure to properly notify and issue absentee ballots in a Rhode Island primary election.   "The Court rejects any contention that no relief is justified. Plaintiffs have been deprived of a valuable, and fundamental, right. The Court ought to remedy this loss if it can do so equitably. The defendants did not present, and the Court cannot find, any compelling equitable reasons to deny relief" at 1368.

"[T]here is an undoubted right, guaranteed by the constitution, to vote in primary elections on an evenhanded basis together with other qualified voters." Citing *Smith v. Allwright,* 321 U.S. 649, 660-662, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *United States v. Classic,* 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941))

The right to vote on an equal basis with other citizens is a fundamental right in a free society; indeed, in any viable form of representative government. It is preservative of all governmental rights. *Yick Wo. v. Hopkins,* 1886, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220, 226. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Citing

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

*Harman v. Forssenius,* 1965, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50, 57 (poll tax).


**CONCLUSION**


There is no reason for the voter to have to drink from a firehose by absorbing 100 pages of information from the Voters Information Pamphlet circulated in May 2016 to learn how to vote.    Conversely, if the court is convinced that the Plaintiffs cannot make their case, the court is asked to dismiss the entire case at the July 12 hearing.




_____/s/_____
WILLIAM SIMPICH
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND OPPOSING DISMISSAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' DEMURRER