Pages 1 – 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

VOTING RIGHTS DEFENSE PROJECT,      )
et al.,                             )
                                    )
            Plaintiffs,             )
                                    )
   VS.                              ) NO. C 16–2739 WHA
                                    )
ALEX PADILLA, et al.,               )
                                    )  San Francisco, California
            Defendants.            )  Wednesday
_____)  June 1, 2016
                                    )  11:01 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          THE JAFFE LAW FIRM
                         101 California Street
                         Suite 2710
                         San Francisco, California
                         94111
                    BY:  STEPHEN R. JAFFE, ESQ.
                         and
                         LAW OFFICE OF WILLIAM MORRIS SIMPICH
                         1736 Franklin Street
                         10th Floor
                         Oakland, California  94612
                    BY:  WILLIAM M. SIMPICH, ESQ.


 Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                         Official Reporter, U.S. District Court


 (Appearances continued, next page)

APPEARANCES, CONTINUED:


For Defendant Padilla:   CALIFORNIA DEPARTMENT OF JUSTICE
                         Attorney General's Office
                         455 Golden Gate Avenue
                         Suite 11000
                         San Francisco, California  94102
                    BY:  SHARON L. O'GRADY, ESQ.



For Defendant Arntz:     SAN FRANCISCO CITY ATTORNEY'S OFFICE
                         1390 Market Street
                         6th Floor
                         San Francisco, California  94102
                    BY:  JOSHUA S. WHITE, ESQ.
                         RON FLYNN, ESQ.


For Defendant Tim Dupuis:
                         OFFICE OF THE COUNTY COUNSEL
                         County of Alameda
                         1221 Oak Street
                         Suite 450
                         Oakland, California  94612
                    BY:  RAYMOND S. LARA, ESQ.

```
1   WEDNESDAY, JUNE 1, 2016                    11:01 A.M.

2                     P R O C E E D I N G S

3        THE CLERK:  Calling Civil 16-2739, WHA, it's the

4   Voting Rights Defense Project versus Padilla, et al.  On for

5   motion for preliminary injunction.

6      Counsel, please state your appearances for the record.

7        MR. SIMPICH:  William Simpich and Stephen Jaffe here

8   for the Plaintiffs, Your Honor.

9        THE COURT:  Okay.  Thank you.  Welcome.

10        MS. O'GRADY:  Sharon O'Grady, Deputy Attorney General

11   for Alex Padilla, Secretary of State.

12        MR. LARA:  Ray Lara appearing on behalf of Tim

13   Dupuis, Registrar of Voters for Alameda County.

14        MR. WHITE:  Joshua White and Ron Flynn from the

15   San Francisco City Attorney's office here for --

16        THE COURT:  Welcome.  Welcome.  All right.

17      So you get to go first.  We don't have unlimited time.  So

18   please make your best points.

19        MR. SIMPICH:  Thank you, Your Honor.

20      Your Honor, I wanted to start by mentioning a letter I got

21   just last night from a poll worker.  And the gist of the

22   letter was he was afraid that if he informed voters of their

23   right to request a presidential ballot he might go to jail,

24   get in legal trouble.  He wanted to know what to do.

25      It kind of illustrates the nature of the problem with the
```

1   poll workers in particular.  And it also illustrates the

2   confusion among the poll workers and the voters regarding the

3   right path to have a smooth and easy and uniform and fair

4   election.

5       The Secretary of State I thought put it in bold relief on

6   Page 14 of her brief, meaning Ms. O'Grady's brief, but

7   Mr. Padilla's brief if you will, states that under 13102, the

8   Elections Code, the duty is only for the poll worker to wait

9   for the voter to request the presidential ballot.

10      But the Secretary of State's training material focuses on

11  the fact that the poll workers are expected to inform the

12  voter of their right to request a presidential ballot.

13      And so, the question is pretty clear (Indicating).  Who

14  has the burden?  Does the voter have the burden to request the

15  ballot?  Or does the poll worker have the burden to request

16  the ballot?  And I think this is a case that shouts out for

17  uniformity.

18      It's a big question, I think.  I understand the Secretary

19  of State -- we called that office primarily as an

20  indispensable party, but at the same time, because of these

21  training materials, it brings it into bold relief the question

22  of duty to train in a uniform manner the elections boards

23  around the state.

24          **THE COURT:**  Why is that a federal issue?

25          **MR. SIMPICH:**  Well, the federal issue, Your Honor, I

1   would offer, obviously the equal protection argument is one

2   that leaps out in terms of the county-by-county disparity.  We

3   have pointed out that other counties do things different ways.

4       San Francisco, for example, in terms of the poll worker

5   issue, we don't have a complaint with.  I have made that very

6   clear with Mr. White.

7       Alameda County, we do have a problem with the poll worker

8   issue.  And we have a couple poll workers ready to rebut, if

9   need be, today about what happened and happens at their

10  trainings over the last couple weeks at these Alameda County

11  trainings.  They say they're trained to not inform the voters

12  of their right to request a presidential ballots.

13          **THE COURT:**  Okay, but let's assume you are right on

14  the facts, and just for the sake of argument, that in one

15  county the poll workers inform -- what do you call, these

16  NPPs?

17          **MR. SIMPICH:**  "No-party preference" is the term of

18  art, Your Honor, yes.

19          **THE COURT:**  Okay, they get informed of their right to

20  request a crossover ballot.  And another county, they're just

21  silent.

22      Where does it say in the Constitution that there's any --

23  that even comes close to a constitutional issue?

24          **MR. SIMPICH:**  Well, we offer, Your Honor --

25          **THE COURT:**  Maybe a state-law issue, but you should

1    have brought that issue in state court.

2         **MR. SIMPICH:**  Well, believe me, Your Honor, we

3    thought about it, Your Honor.  We felt this was an issue where

4    strict scrutiny should be applied, because you have got a

5    class of individuals and no party preference voters in

6    particular, who are treated in a different way than the rest

7    of the voting populace.  These voters are not informed of what

8    a crossover ballot means, nor are they informed of their right

9    to vote for President.

10        **THE COURT:**  But that is what your group does, is get

11   the word out.  That is what -- people are presumed to know

12   what the law is.  They don't have to have somebody inform them

13   of the law.

14        **MR. SIMPICH:**  Well, in this case, they're simply

15   trying to find out what is inside their ballot packet.  They

16   don't even know -- in many counties, for example, you have ten

17   piles, Your Honor, of different packets.  Six parties, and

18   then four different piles of no-party preference.  One for

19   no-party preference that are just without a presidential

20   ballot, and the other three have the presidential ballots of

21   three parties.

22       So you have ten parties -- ten different groups, totally.

23   And if the voter is not informed of what they are asking for

24   when they say they are no-party preference, in many cases they

25   simply receive what I would call a vanilla no-party preference

1   that has no presidential party ballot within it.  And only if

2   they know that, to say they are not only no-party preference,

3   but also the party preference that they want to choose for

4   President, only then can they vote, because the presidential

5   ballot is on a separate document than the senatorial ballot

6   and the other federal ones.

7          **THE COURT:**  So let's take that -- say, somebody, NPP

8   goes and they get a ballot from the poll worker that doesn't

9   have the right President, and they say, "I wanted to vote for

10  Bernie Sanders," so they get back to the cardboard desk and

11  say "Give me the right ballot."

12      They say, "What are you talking about?"

13      Say, "I want to vote for Bernie Sanders."

14      "Oh, you need a crossover ballot here."  Then they gave

15  them the right one then.

16      Isn't that the way it's going the work?

17          **MR. SIMPICH:**  Well, Your Honor --

18          **THE COURT:**  It's the way it would work where I vote.

19  I vote in Alameda County.  I think that's what would happen if

20  that scenario occurred.

21          **MR. SIMPICH:**  Well, the problem is twofold,

22  Your Honor.  One is that many people don't know what

23  "crossover ballot" means, or that the NPP doesn't necessarily

24  mean they will get a presidential ballot.

25      But then the problem is redoubled because sometimes people

1   simply get the ballot, and they write in their candidate.  Or

2   they leave, or they're confused and they leave it blank.

3       And I think there is a high level of intimidation and

4   confusion when you have federal offices on that ballot that

5   they have been handed for senator, for example.

6       So what I'm saying, Your Honor, is this is what I call a

7   case of mass confusion.  The poll workers aren't acting in

8   uniformity; the voters don't know what is in the packet; the

9   election workers send out inconsistent information to the NPP

10  voters throughout the state.

11      And it kind of culminated for me when I spoke to Mr. White

12  from the City when we were trying to resolve this about a week

13  and a half ago, two weeks ago, and he hands to me these

14  ballot, well, I actually pointed out to him (Indicating) these

15  200-page voting pamphlets that had just arrived on May 9th at

16  my doorstep (Indicating).  I wasn't involved in any litigation

17  until I started hearing about these problems after this went

18  out.

19      But in particular, he pointed out to me that these two

20  documents are different.  One has no-party preference

21  information on it for the no-party-preference voters, and the

22  other does not.  And I pointed out to him:  What if somebody

23  wants to become a no-party preference voter.  Shouldn't they

24  have the right to understand what it would mean to be a

25  no-party preference voter so that they can make a

1   discriminating choice?  And he thought that was confusing, and

2   I said, "Well, you could, you know, have an orange box here

3   and green box here" (Indicating).

4       But it's information that is mandated by law, Your Honor,

5   to be given to all the voters of the State of California.  And

6   this went out to hundreds of thousands of people without them

7   being notified that they could be no-party preference.

8           THE COURT:  I don't know if he -- it's certainly not

9   federal law.  That mandates anything.

10          MR. SIMPICH:  Correct.  It is a state law,

11   Your Honor.  And our principle that we are standing on is,

12   one, equal protection because we do believe that no-party

13   preference voters are not being treated in the same manner.

14       They are being treated arbitrarily and with a much higher

15   level of confusion, because a reasonable person, I would

16   offer, Your Honor, has a very difficult time finding out what

17   their rights are and is easily misled and can fall into error.

18          THE COURT:  So on your pamphlets here --

19          MR. SIMPICH:  These pamphlets here --

20          THE COURT:  Does the NPP one explain about crossover?

21          MR. SIMPICH:  The NPP one does explain about

22   crossover, Your Honor.  My complaint here is a little bit

23   different. What I'm saying is the people who are in parties

24   like Democrat or Republican aren't informed that they have the

25   right to become a no-party-preference voter, and still have

1    three different candidates that they could choose for

2    President.  And to me that's a fundamental right, Your Honor.

3        I think that these people who are not --

4            THE COURT:  But why would -- if somebody was a

5    Democrat and wanted to vote for Bernie Sanders, they could

6    already do that.

7            MR. SIMPICH:  That's correct.

8            THE COURT:  Well, why would they need to switch to

9    NPP to do that?

10           MR. SIMPICH:  When they might not want to be a

11   Democrat anymore.  They may be not in the line with the

12   Democratic party anymore, and feel now they could take that

13   step.

14       Or they might want to vote for a Libertarian.  Maybe they

15   have a strong feeling about the Libertarian, and now they can

16   vote for a Libertarian instead of having to vote for the

17   Democrat or the American Independent party.

18       What I'm saying, Your Honor, is these options are open to

19   voters.  And they are terrific options to have.  They are not

20   empty choices.

21           THE COURT:  All right, let me hear from the other

22   side.

23           MS. O'GRADY:  Your Honor, I'll speak to some of the

24   overarching issues.

25       (Reporter interruption)

1          **MS. O'GRADY:**  There are many people that have been

2   working very hard to make this election successful, and, and

3   that it would go smoothly and be a positive experience for the

4   voter.

5          The secretary has worked very hard, including extensive

6   outreach, specifically targeted to NPP voters and people who

7   wants to change their voting registration, it's in the record

8   attached to Mr. Reyes' declaration, intended as an exhibit in

9   the attachments.  Websites, press releases, outreach events.

10  A hotline.

11         They have done -- they've gone the extra mile to try to

12  make sure everyone in this important election knows their

13  rights.  The office staff speaks directly to voters.  And the

14  secretary actually spearheaded legislation to give more

15  funding for counties to make sure that they had enough

16  balance.

17         So this is not a case where the people in charge are

18  asleep at the switch.  People are working very hard.  The

19  statute has a requirement that if a party -- if a non-NPP

20  voter does not request a party ballot they are to be given by

21  statute, the non-party ballot.  And the fact that voter

22  outreach and polling people, maybe not entirely uniformly,

23  maybe there's some that don't, but tell people about that

24  affirmatively is great.

25         But that's not what the statute requires.  And it's

1    certainly not a constitutional violation.

2          **THE COURT:**  Well, but Counsel said if Alameda County

3    does tell them, and San Francisco does not, or vice-versa,

4    that they're being -- that is a denial of equal protection of

5    the law.

6          **MS. O'GRADY:**  Your Honor, you could say that almost

7    every time someone opens their mouth.  I mean, if you really

8    wanted to make sure that no one had any additional information

9    that everyone else didn't have, people would go into polling

10    places and just be given written documents, and said:  Figure

11    it out for yourself.

12      Interaction with voters is -- is common and a practice,

13    and there's nothing wrong with that.  There's nothing wrong

14    with assisting voters.  And the information is widely

15    available for anyone who wants it.  I can't speak to the

16    individual counties; I would let them do that.

17          **THE COURT:**  Let me ask you this.  If the -- take the

18    scenario that I gave.  Let's say an NPP goes to a voting place

19    and gets the NPP ballot.  Right?  Let's say that's right.

20    They go into the little booth and say, "Oh, wait I wanted to

21    vote for Bernie Sanders."  And then they go back to the table

22    and say "You gave me the wrong one.  Where's Bernie on here?"

23      And then they say, "Oh, you didn't ask for it, but do you

24    want a Democrat..."  Can that happen?  Or --

25          **MS. O'GRADY:**  Yes, absolutely.  Election Code Section

1    13102(b) provides that if you, if -- and I believe all the

2    posting -- polling places, it's posted that says:  You have

3    the right to receive a new ballot if prior to casting your

4    ballot you believe you've made a mistake.

5         And every voter can get up to three ballots.  So, yes.  If

6    someone comes and says:  Oh, my God, I thought I was going to

7    be able to vote for President, I can't, of course they can go

8    back to the poll worker, and exchange that for the ballot that

9    they want.

10        They would have to actually vote, not vote for President,

11   cast their ballot, and leave before they would be in a

12   position where they couldn't change their vote.  Or at least,

13   they'd have to cast their ballot.  They'd have to put their

14   ballot in the ballot box.

15        So this is not a situation where people are going to be

16   blindsided or trapped.  If someone wants to vote for Bernie

17   Sanders and goes into a voting place and finds out he can't,

18   he or she, all they have to do is raise that with the poll

19   worker.

20             **THE COURT:**  Is this correct, that -- I think it is

21   correct, under our system here in California, a registered

22   Democrat or registered Republican cannot cross over.

23             **MS. O'GRADY:**  That's right.  They have to reregister

24   to vote because every political party can decide who votes in

25   their party.  The Democrats have decided that Democrats and

1  NPP voters can vote.  The Republicans, for example, have

2  decided that only Republicans can vote.  So if you are a

3  party-affiliated voter and you want to vote in another

4  political party, you do need to reregister in that party.

5          **THE COURT:**  What are the timelines on that?

6          **MS. O'GRADY:**  I believe the deadline for

7  reregistering is May 23rd.

8          **MR. WHITE:**  (Inaudible)

9          **THE COURT:**  What is today?  June 1?

10          **MR. LARA:**  Yeah.

11          **THE COURT:**  So that's already come and gone.

12          **MS. O'GRADY:**  It's already come and gone.  The last

13  day to vote by mail was yesterday.  The election is six days

14  away.

15          **THE COURT:**  Okay, let's hear from one of the other

16  Defendants.

17          **MR. LARA:**  Thank you, Your Honor.  Ray Lara appearing

18  on behalf of Tim Dupuis.  And I'm going to be brief.  I just

19  want to point out of a couple of things.

20     In the scenario that you presented, at the polls, where

21  you mentioned if there's an NPP voter who gets a ballot and

22  they want to get their Democratic ballot, they can do that.

23     But even before any of that happens, what Alameda County

24  has at each precinct is the flowchart that is in Tim Dupuis'

25  declaration.  And that flowchart outlines who can vote for

1  what, and it outlines what the NPP voters can vote for.  And

2  there's more to the flowchart.

3     At the bottom of the flowchart, it expressly, explicitly

4  advises the poll worker to advise the NPP voter of his or her

5  crossover options.  And it goes even further.  In bold red

6  lettering, it gives a verbatim statement of what they should

7  say.

8     So I think it's kind of hard to imagine somebody getting

9  to that point and not knowing that they have the right to

10  crossover vote if they are an NPP voter.

11     And one other thing is that sheet is placed before the

12  poll worker who is in charge of the roster index.  And that's

13  right before you get the ballot.

14     So you have to go in, check in, and then you go to the

15  roster index, you find your name, and it shows what party you

16  are registered with or if you're NPP.  And then you sign your

17  name.  And right there, that roster index poll worker then

18  gives the advice.

19        **THE COURT:**  What happens -- I'm just curious.  Let's

20  say that an NPP voter gets the NPP ballot, goes in there and

21  doesn't say anything, but gets confused, and writes in "Bernie

22  Sanders."

23     What happens to that write-in vote?  Does that get counted

24  or is it ignored?

25        **MR. LARA:**  I don't believe write-in votes are

1    counted.

2            THE COURT:  So that vote would be lost.  Right?

3            MR. LARA:  You know, I don't know if write-ins are

4    counted.  If they're not counted, it would be lost; if they

5    are counted, it would not be lost, is the short answer to

6    that.

7            THE COURT:  That's a non-answer.

8            MR. LARA:  Okay.

9            THE COURT:  All right.

10           MR. LARA:  Also, as far as the relief that they

11   request on poll worker training, I'm not sure exactly what the

12   Court could order at this point.

13       We have over 4,000 poll workers.  There have been 300

14   training sessions.  With six days left to the election, it

15   would be impossible to really retrain all of those poll

16   workers at this point.

17       If they're asking for some type of notice, as I pointed

18   out there is that notice.  We already have that in place.

19   That's where -- the roster index poll worker.

20       And the Secretary of State has sent out a sign that

21   advises all NPP voters of their right to vote in the AIP,

22   Democratic or Libertarian presidential primary.  And that has

23   to be posted at every precinct.

24       And also, one other thing I wanted to touch on was in

25   Alameda County all of our voter pamphlets or sample ballots

1   are the same, whether you're AIP, Libertarian, Democrat or

2   NPP.  And they all contain the page that's in Mr. Dupuis'

3   declaration that advises all NPP voters of their right to

4   crossover vote.

5       If you go home tonight and look at your voter pamphlet,

6   you will see it.  I think it is Page 3 of the sample or voter

7   information pamphlet.

8               **THE COURT:**  Okay, let's hear --

9               **MR. LARA:**  One final thing?  It came to my attention

10  that there was a declaration filed today by Plaintiffs.  I

11  haven't had a chance to really review it.

12      I would move to strike, or at least ask the Court not to

13  consider it for this motion.

14              **THE COURT:**  All right, thank you.

15              **MR. LARA:**  Thank you.

16              **THE COURT:**  Let's hear from San Francisco.

17              **MR. WHITE:**  Thank you, Your Honor.

18      First of all, on the poll worker issue --

19              **THE COURT:**  Your name is?

20              **MR. WHITE:**  Oh, I'm sorry.  Joshua White on behalf of

21  Defendant John Arntz.

22      On the poll worker issue, the evidence is undisputed even

23  by Plaintiffs' counsel, that all poll workers are trained to

24  actively inform NPP voters that they may vote in one of the

25  presidential primaries.  That's stated in John Arntz's

1   declaration.  It's also stated in the poll worker training

2   manual on Pages 37 to 50, which is a declaration exhibit to

3   John Arntz.  There's also a sign in every polling place

4   informing NPP voters that they can obtain a crossover ballot.

5       On this question of whether the voter information

6   pamphlet -- the back page, the back cover of the voter

7   information pamphlet violates the equal protection clause, it

8   simply doesn't.  As we explained in our brief, the analysis

9   under *Burdick* is:  Is there a substantial burden on voting

10  rights?  And if the answer to that question is no, then

11  essentially it's a rational-basis analysis.

12      Here, there's no evidence of any kind of burden on voting

13  rights.  To the contrary, the Department, as we described, has

14  gone to great lengths to inform NPP voters which presidential

15  primary they can vote in, which voters could select a party,

16  which -- how to change.  And there's just simply no evidence

17  that any voters' rights have been burdened.

18      In fact, the declarations submitted by Plaintiff actually

19  speak to the effectiveness of the department's efforts.  Ms.

20  -- Ms. Daims is an NPP voter who will be voting in a polling

21  place.  She will be informed, as I just mentioned, that she

22  can obtain a crossover ballot.  Ms. Mena received the

23  department's mailer, submitted it to the Department, and

24  obtained a cross-over ballot.  So I think there's just simply

25  no evidence that any voter's rights have been burdened.

1       You know, sort of the final point, this question about

2   whether the disclosure on the back of the voter information

3   pamphlet had to be provided to both NPP and non-NPP voters.

4   First of all, that is not a constitutional question.  It's a

5   question under state law.

6       And even if the Court had jurisdiction under 1361, which

7   it doesn't, the argument the Plaintiffs' counsel is making

8   which is that that statement which says "I have declined to

9   disclose a party preference," it would make no sense for the

10   legislature to have instructed registrars to inform people who

11   have disclosed a party preference to receive a statement that

12   they have not disclosed a party preference.

13       If the goal --

14       **THE COURT:**  Say that again.  I followed you until the

15   last sentence.

16       **MR. WHITE:**  Sure.  So 3006(c) of the Elections Code

17   indicates that on a vote-by-mail application, NPP voters have

18   to receive a statement that says "I have declined to disclose

19   a party preference, but for this election, I will vote in one

20   of the three parties that's opened up their primary."

21       It makes no sense to interpret that provision to read that

22   people who have disclosed a party preference -- so Democrats,

23   Republicans, et cetera -- to receive a statement that says "I

24   have not disclosed a party preference."  That would, I think,

25   create chaos.

1    What the Department has --

2         **THE COURT:**  Well, I mean, let's say, take Democrat,

3    or let's say Republican.  That's really the only one that

4    would matter here.

5    So a Republican is sitting there, they open their mail,

6    and it says what?

7         **MR. WHITE:**  It doesn't say -- so on the back --

8         **THE COURT:**  I know, but what the Plaintiffs would

9    want it to say.

10        **MR. WHITE:**  "I have declined to disclose a party

11   preference.  However, for the purposes of this primary, I

12   would like to vote Democrat, AIP or Libertarian."  That is the

13   interpretation.

14        **THE COURT:**  But why would a Republican get that?

15        **MR. WHITE:**  They would not.  That is exactly the

16   point.

17   The interpretation that Plaintiffs' counsel is advocating

18   for is that a Republican would receive a statement saying "I

19   have declined to disclose a party preference."  It's a

20   nonsensical interpretation of the statute, in our view.

21        **THE COURT:**  Okay.  Thank you.

22   Let me ask the Plaintiffs a question.  Here we are, on

23   June 1.  You didn't even file this lawsuit until May 20.  You

24   didn't ask for any kind of relief on an emergency basis until

25   May 27th, seven days later.  So we set it up for as fast as we

 1   could possibly set up a hearing.

 2        **MR. SIMPICH:**  (Nods head)

 3        **THE COURT:**  Now, give me one example of some relief

 4   that would be practical that a judge could issue between now

 5   and the election day that could actually be done.  I frankly

 6   don't see anything, but maybe you have a better idea.

 7        **MR. SIMPICH:**  What we're suggesting, Your Honor, is

 8   something on one piece of paper (Indicating).  Something very

 9   small, with four or five bullet points on it.  And we offered

10   an example in the order we were suggesting at the beginning of

11   our motion.

12      The bullet points would be letting voters know that they

13   -- on the NPP side they have a right to a presidential ballot.

14   They have a right to obtain it at the polls.

15      There's several other points --

16        **THE COURT:**  This would be mailed out?

17        **MR. SIMPICH:**  This would be e-mail, internet, social

18   media, radio, TV.  Very simple bullet points, with one

19   sentence, a few words, in each.

20      The problem with these hundred-page documents is the

21   fire-hose problem I mentioned in my brief, Your Honor.  It's

22   too much for most people to wade through.  They simply put it

23   aside and don't read it at all.

24      If it was simple and uniform, voters, for example, if they

25   were voting by mail and then changed their mind and decided to

1   go to the polls, they would know the surrender rule, which

2   means that you have got to bring your ballot, your

3   vote-by-mail ballot to the polls and exchange it, surrender it

4   for a new one.  Otherwise, you will be forced to vote

5   provisionally.  And a lot of people are upset about voting

6   provisionally, and it raises a big stink at the lines.  It's a

7   big problem.

8        Another big issue for many people is simply knowing if

9   their vote-by-mail -- the polls are open now.  Many people

10  don't know the polls are open.  There is no way of knowing

11  that.

12        **THE COURT:**  What do you mean, the polls are open

13  right now?

14        **MR. SIMPICH:**  Yes, Your Honor.

15        **THE COURT:**  You mean I could go vote now in Alameda?

16  I thought it was only on election day.

17        **MR. SIMPICH:**  No, they've been open since May 9th.

18        **THE COURT:**  Okay.

19        **MR. SIMPICH:**  At least in San Francisco.  I can't

20  speak for Alameda, but there's a long period of time they are

21  open.  And they are empty.  I went down on May 18th, and it is

22  a very sad sight.

23        **THE COURT:**  Why doesn't your group get on the radio

24  and do all that yourself?

25        **MR. SIMPICH:**  Well, we have.  But the point is a

1  little different, Your Honor.  The early voting things is

2  maybe not the best example, because that's not a violation

3  they've committed.  But it is a remedy that could be obtained

4  by simply letting people know the polls are open.

5       I'm trying to think of a very discrete remedy.  And the

6  important things for us is that NPP voters know that they have

7  the ability and right to vote for President.  And they have to

8  ask for the ballot.  Because otherwise, they may not be told,

9  as the Secretary of State has said (Indicating), they have a

10 procedure where they claim the law is that they don't hand out

11 the presidential ballot unless -- to an NPP voter unless they

12 ask for it.

13      So these are very fundamental rights that could be said in

14 one sentence.  And this is the kind of relief that we think is

15 central.  And the one sentence the poll workers need at their

16 site, we would say, is "All poll workers shall inform the

17 voter they have the right to request a presidential ballot if

18 they're NPP."

19      Because if they're not NPP, they get a presidential

20 ballot.  There is no need to ask.  But if it's an NPP voter,

21 they will not get a presidential ballot unless they ask for it

22 in many of the counties of this state.

23      San Francisco's an exception.  San Francisco informs

24 everyone that they have the right to request a presidential

25 ballot.  We have no disagreement with San Francisco here.

1     **THE COURT:**  But every NPP would have the right to ask

2  for it, even in a county where they don't inform them.  Right?

3     **MR. SIMPICH:**  Right.  If they know that right.  And

4  this is an informational right that we contend can't -- if --

5  if it's one way, it's got to be the same way throughout the

6  state.  It's a violation of equal protection and, we contend,

7  the Voting Rights Act.

8     **THE COURT:**  You don't have a single decision in the

9  history of the entire universe that says that.  That is just

10  you talking.

11     That is just hot air.  There's not a single decision that

12  says that violates equal protection.

13     **MR. SIMPICH:**  Your Honor, there's *Yick versus Wo*

14  (sic) and various other cases about arbitrary discrimination.

15  Arbitrary discrimination is a fine area of law that's got long

16  standing.  All facts are different.  I would agree with the

17  Court.

18     **THE COURT:**  That case doesn't come anywhere close to

19  this.

20     **MR. SIMPICH:**  All I'm saying, Your Honor, is simply

21  that it's not just the issue of equal protection we're

22  arguing.  We're also arguing that they are looking at the

23  eligibility of these individuals.  They're asking for their

24  name and address.  They're asking if they're vote-by-mail or

25  not vote-by-mail.  They're finding out if they're NPP.  So

1    eligibility is at issue.

2        And under Section A of the Voting Rights Act we've cited

3    within Section 2, we think that the standard and procedure and

4    practice needs to be uniform.  And we think it's a basic

5    right.  We think it's even more closely on point than equal

6    protection.

7        All facts are different; I would agree with the Court on

8    that.  But this is a unique situation brought about by this

9    no-party-preference status, where the ballot is separated from

10   the other ballot, and it's not automatically given to the

11   voter.

12           **THE COURT:**  All right.  Everyone done?

13           **MS. O'GRADY:**  Your Honor, if I could have a minute?

14       Uh, among -- there are very voluminous voting materials,

15   but there are also very clear one-page directives to voters

16   (Indicating) that make very clear their options.

17       Mandatory injunction is an extreme remedy, especially

18   against state officials, that would require a very high

19   showing.  And I don't believe there's been a showing of any

20   violation of federal or state law.

21           **THE COURT:**  All right.  Anyone else?

22           **MR. LARA:**  Your Honor, just briefly, I would concur

23   with that.  And I do want to emphasize that Alameda County

24   does inform poll workers to inform NPP voters of their right

25   to cross-vote.  And more importantly, we already provide that

```
 1    flowchart to the poll workers at the polls.  Which is exactly
 2    what they want.
 3            MR. SIMPICH:  Your Honor, I have one last exhibit
 4    (Indicating) I just wanted to bring to the Court's attention.
 5            THE COURT:  Okay.
 6            MR. SIMPICH:  This (Indicating) is not an application
 7    to vote by mail, but it led to an application to vote by mail.
 8            MR. LARA:  Can we see that?
 9            MR. SIMPICH:  Yes.  This is Exhibit 11A.  City and
10    County of San Francisco.
11        (Exhibit is tendered to opposing counsel and others)
12            MR. SIMPICH:  And this is --
13            THE COURT:  You've got to show it to me.  It won't do
14    any good to talk about it.  Who's got it?
15            MR. SIMPICH:  Thank you.
16            THE COURT:  All right.  My law clerk is giving it to
17    me, I've got it.  Okay.
18        (Document handed up to the Court)
19            MR. SIMPICH:  Thank you.
20            THE COURT:  What is the point?
21            MR. SIMPICH:  The point, Your Honor, is on the
22    paragraph below the three parties that are named -- because
23    they do name the parties in this particular document.  This is
24    a very short document (Indicating).  This is not a
25    hundred-page fire-hose type document.
```

1      This simply states that (As read):

2              "To request a ballot that includes the presidential

3              primary contest of one of these parties, mark the

4              name of the party on the attached postage-paid

5              postcard and sign and return the postcard no later

6              than April 18th.  If you do not request the ballot of

7              one of these parties, your ballot will not include a

8              contest for President."

9      And this, Your Honor, I know why they did it.  They did it

10  so they could get the ballot to the voter a month before the

11  election.  But to the reasonable reader, it sounds like after

12  April 18th, they will no longer be able to vote for President

13  of the United States, if they are a no-party preference voter.

14          **THE COURT:**  But doesn't this relate to doing it by

15  mail?

16          **MR. SIMPICH:**  Well, it does, in one sense,

17  Your Honor.  But my immediate point here -- I had two points.

18  My first point was that here (Indicating), what it means is

19  that the voter doesn't -- believes he's missed his deadline or

20  her deadline, and can no longer vote for President of the

21  United States.

22      My second point is that there was a postcard attached to

23  this -- again, very short document, half a page, like this

24  other one (Indicating).  And this one says: If you want a

25  replacement ballot, get to us by June 1st.

1    But it also adds that (As read):

2        "I request a vote-by-mail ballot of one of these

3        three parties."

4    So, now, another situation was created where an

5    application to vote by mail, which is what this is

6    (Indicating) -- Mr. White doesn't agree with me on that, but

7    this other document, 11B, is an application to vote by mail,

8    by anyone's standards.  And it gives the wrong date of June

9    1st.

10    These are two fundamental mistakes on half-pages of paper

11    that went to hundreds of thousands of people within the last

12    two months before the election.  These are fundamental errors.

13    We don't need to parade a lot of witnesses in here.  It shouts

14    out for very straightforward and simple relief.

15        **THE COURT:**  Can't these people still go to the polls

16    and vote?

17        **MR. SIMPICH:**  If they know enough; if they haven't

18    been disheartened.  My friend Ms. Mena, who is trying to get

19    inside, she was so frightened by getting this (Indicating)

20    that she went and tried to change her registration to

21    Democrat.  And if she had brought her photo ID, she'd be up

22    here right now saying "Please let me testify because I'm still

23    thinking that I -- no-party preference, I'm thinking I'm

24    Democrat," and they're telling her she's no-party preference.

25    She doesn't even know what party she's in.  To this day.

1      And I think that the intake worker was confused when she

2  tried to change to Democrat and put her down as a NPP

3  Democrat, because that means that she will get the Democratic

4  ballot but remain no-party preference.  She was trying to go

5  all the way Democrat so she wouldn't have any problems of any

6  kind.

7      Thank you.

8           **THE COURT:**  Go ahead.

9           **MR. WHITE:**  Very brief, Your Honor, just to respond.

10      So first, to the extent these are state-law claims,

11  there's no jurisdiction under 1361.  Again, it sounds like if

12  Mr. Simpich is making an equal protection argument, we've come

13  back to the standard of:  Has there been a substantial burden

14  on any voter?

15      The answer is:  There's been no burden, whatsoever.

16      What's the -- and then the next question is:  Is it

17  rational?  Was this a rational basis to, you know to, send

18  this form to vote-by-mail voters?  The answer is yes, for the

19  reason we explained in our brief.

20      There's an operational reason why voters have to be

21  encouraged to get their -- to get their requests for an NPP

22  ballot in early.  The reason is if they don't get them in

23  early, then there is a risk that the vendor will not have

24  enough time to actually create the ballot at all.

25      Regarding this June 1st issue, I would just direct the

1   Court to actually read the document that Mr. Simpich is

2   referring to.  June 1st is the date by which people who want

3   to request a replacement ballot may do so.

4       The reason for that request is that if the Department

5   received a request for a replacement ballot on June 3rd or

6   June 4th, there wouldn't be time to get the voter his or her

7   ballot in time for the voter to cast --

8           **THE COURT:**  Is that from voting by mail?

9           **MR. WHITE:**  Yes.  So a voter who has already

10  registered to vote by mail, and let's say, for example, a

11  voter, you have an NPP voter who is registered to vote by

12  mail, that voter, let's say, got their -- didn't send in their

13  form by April 18th.  The ballot they would receive would not

14  include a presidential primary because they hadn't requested a

15  crossover ballot.

16      In the ballot envelope would be the voting instruction

17  guide which is attached as Exhibit B to the dec of Director

18  Arntz.  And they would be told:  If you are an NPP voter and

19  you want to obtain a replacement ballot, here is the form you

20  have to fill out, and you must fill it out by June 1st so we

21  can get you a replacement ballot.

22      And that process worked, even for Ms. Mena.  She sent in

23  her form; she received a crossover ballot.  So there's no

24  evidence that this has imposed any burden.

25      And finally, on the question of issuing some sort of

1   public service announcement, not only have all of the -- have

2   Plaintiffs failed to meet any of the standards, but it's

3   entirely unnecessary.  The Department has already been

4   notifying the public in multiple ways about the option of

5   obtaining an NPP ballot.

6      When they show up at the polls, they'll get an NPP ballot.

7   And if they vote by mail, the deadline has already passed

8   yesterday.  So it would be entirely unnecessary.

9      Thank you, Your Honor.

10        **MR. SIMPICH:**  Could I have a final word, Your Honor?

11        **THE COURT:**  All right.

12        **MR. SIMPICH:**  Thank you.

13      I just wanted to point out a citation that was provided by

14   Alameda County.  And their citation was that (As read):

15        "Burdens that require strict scrutiny are laws and

16        regulations that unreasonably deprive some residents

17        from voting in an election or dilute the voting power

18        of some voters."

19      And that is *Lemons versus Bradbury*, 538 F.3d 1098, 1104,

20   Ninth Circuit, 2008.

21      And again, Your Honor, the NPP voters' voting power is

22   being diluted.  They are 23 percent of the populace.  And it's

23   very clear, Your Honor, I would offer that these laws and regs

24   that we're pointing out to the Court are depriving them from

25   voting in a meaningful fashion; are going to create

1   extraordinarily long lines to voters who have done their

2   homework.  And the poll workers are in a state of fear,

3   because they don't know what information they can give.  It

4   varies within counties and from county to county.

5       We think the eligibility issue is relevant regarding the

6   Voting Rights Act.  And the equal-protection argument I think

7   for NPP voters is unique, but fits here.

8       Thank you.

9       **THE COURT:**  Thank you.  All right.  Normally I would

10  take this under submission and in a couple of weeks I would

11  get an order out.  But since the election is coming up soon, I

12  don't have that luxury, and I'm just going to give you the

13  answer right now.

14      All relief is denied on preliminary injunction.  Here are

15  the basic reasons:  Plaintiffs waited way too long before

16  bringing this lawsuit, and waited way too long before asking

17  for a preliminary injunction.  So that, alone, is

18  show-stopper, period.

19      But there is more to it than that.  Almost all of these

20  claims are state-law claims.  This is a Federal Court.  We

21  also have state courts.  Most of this case should have been

22  brought in state court, because that's the set of judges that

23  know the state election code.  And federal judges are not up

24  to speed on it, but we don't have jurisdiction over that

25  anyway.

1        Now, it is said by Plaintiffs, do have jurisdiction under

2   Section 1361 of Title 28 U.S. Code.  That's totally wrong.  I

3   reject that, reject that basis for saying that I have

4   jurisdiction to enforce state law.

5        With respect to the federal claims, the Court would have

6   jurisdiction, but there's absolutely no showing of any federal

7   violation, either under the equal protection clause or under

8   the Voting Rights Act.

9        And the mere fact that more information might be available

10  in one county versus the other, you could get down to who's

11  got enough money in the budget to put radio ads on.  That's

12  not -- does not rise to the level of an equal protection

13  violation.

14       The citizens of California are smart enough to know what

15  their rights are.  And they are smart enough to be able to go

16  into a polling place and say "I'm an NPP, and I want to do a

17  crossover ballot."  They should know their own rights.  They

18  should know what their rights are.  And if they do, they are

19  going to be properly served.  And we don't need to

20  over-educate them with public service announcements, are going

21  on anyway.

22       So I'm giving you this answer so that you will be able to

23  take your emergency writs to the Court of Appeals for the

24  Ninth Circuit, and then to the U.S. Supreme Court.  And

25  perhaps after that, to the International Court of the Hague.

1    And -- but we are done at the District Court for now.

2        If time permits, I'll get out a memorandum opinion.  But

3    this order on the record of the Court will constitute the

4    denial of the motion for preliminary injunction.

5        Thanks to everyone.  Have a good day.

6        (Proceedings concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

**CERTIFICATE OF REPORTER**

        I, BELLE BALL, Official Reporter for the United

States Court, Northern District of California, hereby certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

        /s/   Belle Ball_____

                Tuesday, August 2, 2016

            Belle Ball, CSR 8785, CRR, RDR